CHURCH OF SCIENTOLOGY OF CALIFORNIA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3352–78.    Filed September 24, 1984.

---

*Robert H. Harris, Christopher Cobb, Michael Wells,* and *Peter Young,* specially recognized, for the petitioner.
*Martin D. Cohen,* for the respondent.

STERRETT, *Judge*: Petitioner, the Church of Scientology of California (California Church or Church), was incorporated as a nonprofit corporation in the State of California in 1954. In 1957, respondent recognized petitioner as an organization described in section 501(c)(3)[1] exempt from Federal income taxes under section 501(a). In 1967, respondent revoked petitioner's tax-exempt status. Following an extensive audit of petitioner's records for the year 1971–74, respondent, by notice of deficiency dated December 28, 1977, determined deficiencies in petitioner's Federal income taxes and additions to tax as follows:

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

| Taxable year | Deficiency | Addition to tax under sec. 6651(a) |
|---|---|---|
| 1970 | $581,245.29 | $145,311.32 |
| 1971 | 70,881.48 | 17,720.37 |
| 1972 | 498,332.10 | 124,583.02 |

The controversy in this case is simply stated: Petitioner claims it is exempt from taxation, and respondent claims it is not. Subsumed within this simple controversy, however, are numerous and complex subsidiary issues including several challenges to the constitutionality of section 501(c)(3). The questions presented for resolution in this case are:

(1) Is the notice of deficiency null and void because respondent never issued a final letter of revocation of exempt status?

(2) Is the notice of deficiency or the letter revoking petitioner's tax-exempt status based upon political animus or hostility to the religion of Scientology in violation of the First and Fifth Amendments?

(3) Do the express conditions in section 501(c)(3) for exempting religious organizations from taxation violate the First Amendment because they tax religious income?

(4) Do the express conditions in section 501(c)(3) for exempting religious organizations from taxation violate the First Amendment because the Government has no compelling interest in taxing religious income?

(5) Are the express conditions in section 501(c)(3) for exempting religious organizations overbroad provisions because they restrict commercial activity in aid of religion which is affirmatively protected by the free exercise clause?

(6) Are the express and implied statutory conditions for exempting religious organizations from taxation unduly vague in violation of the First and Fifth Amendments?

(7) Does section 501(c)(3) violate the establishment clause of the First Amendment because its enforcement advances some religions and inhibits others?

(8) Does section 501(c)(3) violate the establishment clause because its enforcement results in excessive Government entanglement in church affairs?

(9) Does the First Amendment's protection for religious organizations relieve petitioner of the burden of proof in this case and require respondent to assume it?

(10) Is the statutory scheme prohibiting some tax-exempt organizations but not others from using their net earnings to benefit private interests arbitrary and capricious?

(11) Does the application of common law charitable trust doctrine to churches, requiring their conformity to fundamental public policy standards evidenced by criminal or civil statutes, violate the free exercise clause of the First Amendment because there are less restrictive ways of regulating church-sponsored misconduct?

(12) Does the retroactive application of public policy standards derived from the common law of charitable trusts to petitioner's operations deprive petitioner of due process of law in violation of the Fifth Amendment?

(13) May respondent, consistent with fairness, be heard to argue after the start of trial the new position that the United Kingdom Church of Scientology (United Kingdom Church) is a branch of petitioner?

(14) During the years 1970, 1971, and 1972 did petitioner's activities include a substantial commercial purpose?

(15) During the taxable years in issue, did any part of petitioner's net earnings inure to the benefit of any private shareholder or individual?

(16) During the taxable years in issue, did petitioner's activities violate common law standards of public policy applicable to charities and incorporated in section 501(c)(3)?

(17) If petitioner is not exempt from taxation, can the determinations in respondent's notice of deficiency be upheld?

(18) Is petitioner liable for additions to tax under section 6651(a) for willfully failing without reasonable cause to file corporate income tax returns (Forms 1120) in 1970, 1971, and 1972?

### FINDINGS OF FACT

Some of the facts have been stipulated. They represent a miniscule part of the record. In some instances, the stipulated facts were contradicted by the remainder of the record. We, therefore, decline to incorporate in toto the stipulations of fact in our findings. Instead, we have made our own findings, giving weight to the stipulations only where their trustworthiness was not discredited by the remainder of the record.

Petitioner, the Church of Scientology of California, was incorporated on February 18, 1954, as a nonprofit corporation in the State of California. When the petition herein was filed, petitioner's principal place of business was located at 5930 Franklin Avenue, Los Angeles, CA. Petitioner was one of many churches of Scientology organized worldwide. During the tax years at issue, 1970–72, it was considered the "Mother Church" of all churches of Scientology in the United States.

The parties have stipulated that petitioner was organized exclusively for religious purposes and that petitioner has satisfied the organizational requirements found in section 1.501(c)(3)–1(b), Income Tax Regs. The Court adopts this stipulation and finds that petitioner was organized to propogate the faith of Scientology, a religion founded by L. Ron Hubbard, through such means as the indoctrination of the laity, the training and ordination of ministers, the creation of congregations, and the provision of support to affiliates and similar organizations.

## The Religion

Scientology teaches that the individual is a spiritual being having a mind and a body. Part of the mind, called the "reactive mind" is unconscious. It is filled with mental images that are frequently the source of irrational behavior. Through the administration of a Scientology process known as "auditing," an individual, called a "preclear," is helped to erase his reactive mind and gain spiritual competence. A trained Scientologist known as an "auditor" administers the auditing. He is aided by an electronic device called an "E-meter" which helps the auditor identify areas of spiritual difficulty for the preclear by measuring skin responses during a question and answer session.

Scientology teaches that spiritual awareness is achieved in stages. The religion defines different levels of awareness and prescribes the requisite auditing to achieve each level. L. Ron Hubbard researched and developed the spiritual awareness levels and the courses to train auditors. During the docketed years, L. Ron Hubbard continued this research. A chart entitled "Classification Gradation and Awareness Chart of Levels and Certificates" depicts levels of spiritual awareness

and corresponding auditor training requirements in effect in 1970.

One of the tenets of Scientology is that anytime a person receives something, he must pay something back. This is called the doctrine of exchange. Petitioners branch churches applied this doctrine by exacting a "fixed donation" for training and auditing.

Scientology is an international religion, and, during the docketed years, there were numerous churches of Scientology around the world. These churches were organized along hierarchical lines according to the level of services (training and auditing) they were authorized to provide. Churches which delivered Scientology services at the lowest levels were called "franchises" and later "missions." Churches which delivered auditing (also referred to as "processing") through Grade IV and training through Level IV as depicted on the Classification Gradation and Awareness Chart were known as "Class IV Orgs." Saint Hill Organizations and Advanced Organizations offered intermediate and higher level services. A branch of petitioner known as "Flag" offered the highest level training and auditing.

Petitioner's branch churches were opened daily and nightly to provide auditing and training. Petitioner's ministers also officiated at weekly Sunday services and performed services such as marriages, baptisms, and funerals.

*Corporate Structure*

The parties stipulated to seven divisions. They are:

(1) San Francisco Organization (SFO)
(2) Los Angeles Organization (LAO)
(3) American Saint Hill Organization (ASHO)
(4) Advanced Organization of Los Angeles (AOLA)
(5) Flag Operations Liaison Office (FOLO or FOLO WUS) (prior to June 6, 1972, known as United States Liaison Office (USLO))
(6) Flag
(7) United States Guardian Office (USGO)

In addition to these seven stipulated divisions, we find that Scientology churches and organizations in the United King- dom (hereinafter collectively referred to as the United King-

dom Church) were part of the California Church. Furthermore, the Operation Transport Corporation, Ltd. (also known as Operation Transport Services, OTC or OTS), a noncharitable Panamanian corporation, had no true, independent existence apart from petitioner's Flag division.

## A. The Stipulated Divisions

The San Francisco Organization (SFO) and the Los Angeles Organization (LAO) were both "Class IV organizations." As such, they were authorized to conduct training through Class IV and auditing through Grade IV as depicted on the Classification Gradation and Awareness Chart. They were open 7 days a week for training and auditing and related activities. The American Saint Hill Organization (ASHO) located in Los Angeles, like SFO and LAO, provided auditing and training, but at higher levels. ASHO also published and distributed Scientology books, prerecorded tapes, and E-meters throughout the United States. The staff at ASHO were mostly members of the Sea Organization, an elite order of Scientologists. The Advanced Organization of Los Angeles (AOLA) provided high levels of auditing and training to persons who had completed services at a Class IV organization. The staff at AOLA were mostly Sea Organization members, and the parishioners came from all over the United States and Canada.

The Flag Operations Liaison Office (FOLO), located in Los Angeles, was an administrative unit of the California Church.[2] It did not provide religious services except to the staff. FOLO relayed administrative advice emanating from Flag, the headquarters of the California Church, to other branches of the California Church and to other Scientology churches. The staff at FOLO played a significant role in promoting the growth and development of Scientology by providing training to staff from other organizations, by supervising the implementation of new programs developed at Flag, and by providing administrative assistance to new organizations. FOLO also relayed funds from other branches of the California Church and from other churches to Flag. The staff at FOLO were members of the Sea

---

[2] As FOLO evolved and developed, it went through several name changes. At its inception it was called Operation Transport Liaison Office (OTL). It then became variously referred to as the Continental Liaison Office (CLO) and the United States Liaison Office (USLO). Finally, it was designated Flag Operation Liaison Office, Western United States (FOLO WUS or FOLO).

Organization. Other Scientology Churches in the United States and abroad had counterpart FOLO units.

Flag was the highest division of the California Church. It provided spiritual leadership. It also acted as petitioner's administrative center. During the taxable years, the Flag division was headquartered aboard a ship, the *Apollo*, which cruised the Mediterranean Sea and docked in various countries along its shores. L. Ron Hubbard, his wife, Mary Sue, and their family lived on the *Apollo* with other members of the ship's crew and staff. All staff and crew were Sea Organization members. Flag also had two outposts: The Tangier Reception Center (TRC) and the Mission European Agency (MEA). MEA served as a relay point for personnel, deliveries, and communications going to Flag, and TRC, among other things, housed the overload of students who came to Flag for training.

Flag activities fell into three general areas, each conducted by a separate organization within Flag. The Flagship Organization was responsible for all nautical functions—sailing, maintenance, and port relations. The Flag Administrative Organization provided religious and administrative training and auditing at the highest levels. The majority of the students who came to Flag for training were staff members sent from petitioner's other divisions or from other churches of Scientology. Students lived aboard the ship or stayed at TRC. After completing their course work they generally returned to their local organizations.

The Flagship Bureau was petitioner's management body. This management function was fulfilled in a variety of ways which are only briefly recounted here. First, petitioner's other divisions and other churches sent reports on a regular basis to Flag. These reports supplied information, often in statistical form, about the organizations' operations. Flag staff, on the basis of their review of these reports, issued policy letters, directives, and other kinds of administrative advice geared to improving local church operations. Second, Flag personnel researched and developed programs and techniques for improving the administration of local organizations. Finally, Flag sent teams of individuals specially trained in management techniques "on mission" to help other units or churches which were experiencing difficulties.

L. Ron Hubbard officially resigned his position as executive head of the California and other churches of Scientology in 1966. Despite his official resignation, various charts of petitioner depicting management functions during the docketed years continued to place him in the top position. He also held the rank of Commodore, the highest rank in the Sea Organization, which was an elite fraternity of Scientologists. He kept control over the California Church policy by authoring numerous policy letters and by allowing others to go out in his behalf. He also wrote other types of policy directives including Flag Orders, L. Ron Hubbard Executive Directives, and Orders of the Day. He made important decisions affecting Church administration, transferring "U.S. Pubs" from the Denmark Church to ASHO and disbanding the Executive Council Worldwide which had overseen the day-to-day operations of the Church. He supervised the activities of the Franchise Office. Staff consulted with him before inaugurating major plans and whenever an operation of the Church was foundering.

L. Ron Hubbard's control over petitioner's financial affairs was particularly notable and was long standing. In the years immediately preceding the taxable years, L. Ron Hubbard was a signatory on all churches of Scientology bank accounts including petitioner's. His approval was required for all financial planning. He was the sole "trustee" of a major Scientology fund into which petitioner made substantial payments. He decided to open Swiss bank accounts for petitioner and to put them in the name of OTC. He sent a Flag executive to AOLA to revamp its financial operations. He authorized the purchase of a ranch in Ensenada, Mexico, and wrote a check for $80,000 on one of petitioner's Zurich accounts for its purchase. His control continued during the docketed years. He remained a signatory on petitioner's bank accounts including the OTC accounts. His approval was required for financial planning. He authorized the removal of huge sums of money from petitioner's Swiss bank accounts maintained in the name of OTC.

Apart from his executive duties, L. Ron Hubbard also engaged in research and writing and supervised auditing.

During the docketed years, L. Ron Hubbard was served by an executive group variously known as the Commodore's Staff

Aids, the Aides Council, and the International Board of Scientology Organizations. Mary Sue Hubbard was the senior person on the Aides Council. The Aides Council had seven other members, one to oversee the planning for each division on the Scientology Org. Board. The Org. Board is a theoretical model or blueprint of the organization of a Scientology Church. All Scientology churches around the world were organized along similar lines. The Org. Board shows that each Scientology church was organized to have seven divisions and that each division carried on a specific function. Division 1, called the HCO Division, was responsible for communications. Division 2, called the Dissemination Division, was responsible for the dissemination of Scientology literature, materials, and services. Division 3, called the Treasury Division, was responsible for finances. Division 4, called the Technical Division, was responsible for training and auditing. Division 5, called the Qualifications Division, was responsible for quality control in the delivery of services. Division 6, called the Distribution Division, was responsible for public relations, and Division 7, the Executive Division, was responsible for managing the organization and coordinating the programs and policies of the other divisions on the Scientology Org. Board. A member of the Aides Council called a CS–1, CS–2, etc., depending on the area of divisional responsibility, was in charge of the overall planning for each division. In sum, the Aides Council helped L. Ron Hubbard manage petitioner's operations and plan for churches of Scientology around the world.

The CS–3 on the Aides Council was in charge of a Flag Banking Officer network. Each Scientology Organization offering advanced services had a Flag Banking Officer (FBO) who banked the organizations funds, reviewed and approved its weekly financial plan, and generally monitored its financial affairs. The FBO's primary responsibility was to insure his church's solvency. The FBO was also responsible for collecting and sending to Flag weekly sums for support and training. The FBO network was international. During the taxable years in issue, the following branches of petitioner's stipulated divisions had an FBO: AOLA, ASHO, USLO, and Flag. A precise description of the FBO chain of command does not emerge from the record. However, it is clear that the top officials of the FBO network were the Flag FBO, the Staff Banking

Officer (SBO), and the CS–3, all posted at Flag. The continental FBOs operated over the local FBOs, under the authority of the top officials of the network. At least during 1969, and perhaps during the docketed years, the FBO International, posted at AOLA, also exercised mid-level leadership.

The United States Guardian Office (USGO) located in Los Angeles was in charge of petitioner's external affairs. Its chief responsibility was to safeguard petitioner's institutional well-being. Towards this end, it performed a number of functions. It handled petitioner's relations with other organizations including governmental bodies and agencies. It also handled legal matters for petitioner and other churches of Scientology in the United States. It performed accounting services for petitioner and prepared petitioner's tax returns. It informed the public on a national level about the works and doctrines of Scientology and documented unfavorable or inaccurate public comment on Scientology. During the docketed years, the United States Guardian Office had five divisions: Legal, Public Relations, Finance, Intelligence, and Technology.

The United States Guardian Office was part of an international network of Guardian offices and Guardian personnel. The highest ranking Guardian was Mary Sue Hubbard, L. Ron Hubbard's wife. She held the position of Commodore Staff Guardian (CSG). Although Mary Sue Hubbard lived on the *Apollo* and was the senior Guardian, the senior Guardian office, called The Guardian Office Worldwide, was part of petitioner's United Kingdom operations. Jane Kember, the Guardian Worldwide, headed the office. In addition to USGO and the Guardian Office Worldwide, the Guardian network consisted of Guardian personnel attached to other branches of the California Church and other churches of Scientology.

## B. United Kingdom Church

The notice of deficiency issued on December 28, 1977, did not treat the United Kingdom Church as a branch of petitioner. It did not include the accounts of the United Kingdom Church, and specific transactions between the two Churches were treated as transactions between separate entities. Thus, payments made by the United Kingdom Church to petitioner's Flag branch were shown as income to petitioner and not as internal transfers of funds. Respondent's pretrial pleadings and memoranda, reflecting the notice of deficiency, also

treated the United Kingdom Church as a separate entity from petitioner.

The trial of this case began on November 10, 1980, and lasted 10 weeks, spread out over the course of a year.[3] The relationship between petitioner and the United Kingdom Church was first raised during the third week of trial, on December 11, 1980, immediately after petitioner rested its case-in-chief. Respondent raised the issue when he sought to introduce into evidence certain checks representing franchise payments drawn by the Calgary Scientology Mission and variously made payable to the Church of Scientology of California or the Church of Scientology of California, WW. Since Worldwide, or its abbreviation "WW," was a name used by the United Kingdom Church, respondent sought to show by these checks and other evidence that the United Kingdom Church was a branch of petitioner. On December 12, 1980, the second day of respondent's case, respondent again pressed the Court to hear evidence relating to the United Kingdom Church. Respondent disavowed any intention of seeking an increase in the notice of deficiency by reason of the United Kingdom Church's income. However, respondent urged the Court to entertain the matter on the limited issue of petitioner's entitlement to tax-exempt status. Respondent proffered three theories of relevance. First, the franchises managed by the United Kingdom Church were a commercial operation. Second, petitioner's attempt to conceal the corporate status of the United Kingdom Church was one more link in the chain of activities making up petitioner's conspiracy to obstruct the Internal Revenue Service (IRS or Service). Third, L. Ron Hubbard possibly benefited from the money deposited in the Worldwide franchise accounts.

As the trial progressed, respondent, on February 9, 1981, and again on April 9, 1981, stated his intention to reduce the scope of his reliance on matters relating to the United Kingdom Church, so that on April 9, 1981, respondent said he planned to use the matter solely as it was relevant to proving petitioner conspired to obstruct the IRS. However, respondent quickly retracted this decision the following day. On July 20,

---

[3]The petition in this case was filed Mar. 28, 1978. Final supplemental briefs on the public policy issue in this case were filed on Aug. 4, 1983 (petitioner), and Aug. 22, 1983 (respondent), after the decision in *Bob Jones University v. United States*, 461 U.S. 574, was handed down on May 24, 1983.

1981, the first day of the seventh week of trial, this Court ruled that respondent could present evidence relating to the United Kingdom Church's activities and corporate status under three theories of relevance: commercialism, inurement, and conspiracy. Petitioner began its rebuttal case on August 17, 1981. With continuances, petitioner completed rebuttal on November 12, 1981. During rebuttal, petitioner presented documentary and testimonial evidence directed toward refuting loss of tax-exempt status as a result of the United Kingdom Church's operations.

Respondent knew that his claim, that the United Kingdom Church was a branch of petitioner, made the determination in the notice of deficiency, treating payments from the British Church to OTC as Flag income, erroneous. He was aware that his new position would therefore necessitate a hearing under Rule 155 to recompute the notice of deficiency. Respondent consistently disavowed any intention to use the income from the United Kingdom Church to increase the notice of deficiency.

By the end of 1974, respondent's files contained documents from various sources identifying the United Kingdom Church as a branch of petitioner. One such document was a report entitled "Enquiry Into the Practice and Effects of Scientology" (Foster Report) prepared for the House of Commons in the United Kingdom on December 21, 1971, by Sir John G. Foster, K.B.E., Q.C., M.P. The report quoted part of a letter from British Scientologists which stated:

The main activities of Scientology in the United Kingdom are carried on by the Church of Scientology of California (non-profit Corporation in California registered under Part X of the Companies Act) with its branches at St. Hill Manor, London, Brighton, and Swansea. [Foster Report at 26.]

The report also reprinted in full a policy letter written by L. Ron Hubbard explaining the financial considerations which led the California Church to take over the United Kingdom Scientology organization and detailing the history of the transfer. The files of the IRS also contained balance sheets for the fiscal years ended April 5, 1967, and April 5, 1968, which the California Church had filed with the Registrar of Companies in the United Kingdom in order to conduct its operations there. The balance sheets were headed:

## CHURCH OF SCIENTOLOGY OF CALIFORNIA

A company incorporated in the State of California, U.S.A. and registered under Part X of the Companies Act 1948 on 29th March 1966 and not having a share capital.

In March 1975, respondent audited the Church of Scientology of Hawaii (Hawaii Church). This audit was immediately followed by a year-long audit of the California Church's 1971–74 tax years. During these audits, respondent reviewed letters, checks, receipts, and disbursement vouchers, some bearing such names as Church of Scientology of California UK, Church of Scientology of California WW, Church of Scientology Worldwide, Publications Org. WW, or HCO WW as a name on the letterhead or as the endorsement or payee. A few letters and receipts bore petitioner's name in bold print on the letterhead and the words "a non-profit corporation in U.S.A. Registered in England" in fine print across the bottom.

A few documents prepared by the IRS show that some of respondent's employees knew that the United Kingdom Church was a branch of petitioner. The chief of respondent's Foreign Operations Division in a memorandum to the Chief of the Audit Division, Honolulu District Office, dated November 18, 1966, stated:

The Hubbards attempted to organize a British corporation as a religious non-profit organization, but the British tax authorities refused to grant the corporation tax free status. They then organized the Los Angeles corporation and they now carry on their British operations as a part of that corporation.

Respondent's representative in London reviewed the documents petitioner filed with the Registrar of Companies in Great Britain. In a memorandum dated November 18, 1974, transmitting these documents to respondent's Refund Litigation Division, he concluded that the accounts of the United Kingdom Church could be incorporated with petitioner's for tax purposes. At least two other reports prepared by respondent's representatives show knowledge that the California Church was registered to conduct operations in Great Britain. One of these reports was distributed to a Scientology Task Force in December 1974. A report prepared by Service personnel after auditing the Hawaii Church in March 1975 tentatively concluded that the Publication Org. WW, a Scientology

organization operating in the United Kingdom, was a division of the California Church.

Lewis J. Hubbard, Jr., served as respondent's adviser on Scientology matters from middle or late 1974 until July 1977. During this period, Lewis Hubbard held the position of Staff Assistant to the Associate Chief Counsel (Litigation). Lewis Hubbard directly oversaw the exempt function audit of the Hawaii Church which took place in March 1975 (Hawaii audit) and served as the National Office adviser during the year-long audit of petitioner's 1971–74 tax years (1971–74 audit). Before overseeing the Hawaii audit, Lewis Hubbard read a few documents which either explained that the United Kingdom Church was a branch of petitioner or perhaps made passing reference to this fact. He read the Foster Report. He saw petitioner's certificate of incorporation, which it filed with the Registrar of Companies in the United Kingdom in order to operate there. He also skimmed one transmittal memorandum dated November 18, 1974, from respondent's London representative which opined that the United Kingdom Church's accounts could be incorporated with petitioner's for tax purposes. However, Lewis Hubbard did not recall reading that portion of the memorandum. During the Hawaii audit, Lewis Hubbard questioned Joel Kreiner, a Church lawyer and high-ranking Guardian official, about the status of the United Kingdom Church. Kreiner told Lewis Hubbard that petitioner incorporated the United Kingdom Church but that it operated separately and independently. After overseeing the Hawaii audit, Lewis Hubbard authored a report in which he tentatively concluded that the Publication Org. WW was a division of the California Church. Following the 1971–74 audit, Revenue Agent Eugene Endo, on the advice of Lewis Hubbard, changed some wording in a draft of his report of the audit. The original version said that the audit disclosed that petitioner had seven branches and then listed them. The final version again stated that petitioner had seven branches but inserted the phrase "California's submission outlined the seven branches as follows:" before listing them.

On most occasions when the subject arose, petitioner misled respondent about the legal status of the United Kingdom Church. In 1967, respondent asked petitioner to list its subordinate churches. Petitioner's reply letter did not mention

the United Kingdom Church.[4] Again, during the 1971–74 audit, respondent twice asked petitioner to list its divisions. Petitioner did not mention the United Kingdom Church. Petitioner was dissatisfied with respondent's report of the audit and so wrote its own report correcting what it viewed to be respondent's errors. Petitioner's version did not list the United Kingdom Church as a branch church. On the first day of trial, petitioner and respondent filed Stipulation of Facts (Set Number 3) listing the divisions of the Church. The United Kingdom Church was not listed.[5] During the 1971–74 audit, respondent asked for an explanation of several FOLOs including the FOLO in the United States (FOLO WUS) and the FOLO in the United Kingdom (FOLO UK) and was told that FOLO WUS was part of petitioner, but FOLO UK was part of an overseas Church. Also, when respondent asked for a list of petitioner's bank accounts, none of the United Kingdom accounts were listed in petitioner's response. The Church's report of the 1971–74 audit, in discussing the United Kingdom Church's alleged debt repayment to OTC, named several British Scientology organizations and stated they were "part of the corporate entity of the UK Church." Prior to trial, respondent subpoenaed the records of the United Kingdom Church bank accounts used to deposit franchise payments. Objecting to the subpoena, petitioner in open court said:

The accounts referred to there are not accounts of the Church of Scientology of California and they are not in its custody and control. It is true that the accounts bear the name Church of Scientology of California Worldwide but they are actually accounts of the United Kingdom Church of Scientology which until two years ago, as I understand it, was incorporated as the Church of Scientology of California but never, ever was a part of the Church of Scientology of California that's involved in this case.

Those accounts have had nothing to do with the Church of Scientology of California involved in this case.

The United Kingdom Church was formally organized as a branch of petitioner in 1966 when the assets of the Scientology organizations in the United Kingdom were conveyed to peti-

---

[4]The text of the letter listed several branch churches but omitted mention of the United Kingdom Church. In fine print, the stationery referred to petitioner as "a non-profit corporation in U.S.A. registered in England."

[5]The stipulation is carefully worded and does not explicitly state that the list is a list of petitioner's divisions, but the impression created is that it is a list of the Church's divisions.

tioner which then registered to do business in the United Kingdom as a foreign corporation under the Companies Act of 1948, 11 Geo. 6, ch. 38. Tax considerations partly motivated the transfer. British authorities would not grant tax-exempt status to local Scientology organizations. Petitioner therefore took over the assets of those organizations so that they could carry on under petitioner's tax-exempt mantle.

The United Kingdom Church purported to have its own board of directors. Anthony Dunleavy, a high-ranking church official who served as a Commodore Staff Aide during the docketed years, testified about his tenure on the board preceding the docketed years. He gave three different versions of his term on the board, changing dates as he was confronted with conflicting documentary evidence. By the end of his testimony he had completely changed his initial statement regarding the dates of his tenure. He was also evasive about who were the prior members of the board. At first he claimed not to know who they were. Then confronted by one of respondent's exhibits, he claimed his memory was refreshed and listed the prior members. Testimony about board membership during the docketed years was also conflicting, one Church witness naming one set of members and another Church witness naming a different set except for one common member. A few board minutes were placed in evidence. Two of these are captioned "Church of Scientology of California" and refer in their text to officers of the United Kingdom Church as "Directors of the Church of Scientology of California." The Franchise Office was a major division of the United Kingdom Church. The board of the United Kingdom Church did not have final authority for its management. Diana Hubbard, L. Ron Hubbard's daughter and a Commodore Staff Aide, had the final authority.

The California Church and the United Kingdom Church shared responsibility for the franchises. The California Church issued the franchise charters,[6] gave them some legal advice,

---

[6]Petitioner claimed that missions were actually chartered by the United Kingdom Church and not the California Church. For several reasons we find that the California Church chartered the missions. First, the Charter Agreement form recites that the California Church is the chartering authority, and Clive Whittaker, the Franchise Communicator for the United States, testified that this form was faithfully adhered to during the docketed years. Second, the Calgary Scientology Mission was chartered by the California Church. Third, the Church's report of the 1971–74 audit states that the California Church had the authority to charter missions. The only evidence to the contrary is the unsupported statements of Church witnesses.

served occasionally as an intermediate collection point for franchise payments, and ultimately established franchise policy. For its part, the United Kingdom Church collected weekly tithes and operating reports, distributed policy letters, and gave day-to-day operating advice.

United Kingdom Church officials were signatories on the California Church's accounts, and vice versa. Mary Sue Hubbard was authorized to sign checks on virtually all the United Kingdom Church accounts, including Church of Scientology of California Rubric Worldwide Account Number 292236, at the Swiss Bank Corp. in Zurich, Switzerland, where franchise tithes were deposited. Denzil Gogerly, who by all accounts was a member of the board of directors of the United Kingdom Church during the docketed years, was a sole signatory on petitioner's accounts. He signed checks on SFO's and USGO's accounts. Jane Kember, the highest ranking official in the United Kingdom Church's Guardian Office, was also a sole signatory on petitioner's accounts. Herbie Parkhouse, the Deputy Guardian of Finance in the United Kingdom Guardian Office, issued checks on the United States Guardian Office account.

The Guardian Offices of both churches were also interconnected. Mary Sue Hubbard, at Flag, was the chief executive for both offices. Furthermore, sometimes both offices collaborated and jointly issued policy directives on behalf of L. Ron Hubbard or the California board of directors.

For part of the docketed years, the United Kingdom Church tithed to the United States Churches of Scientology Trust. The trustors of this purported trust were all Scientology Churches in the United States. Petitioner was a trustor.

The United Kingdom Church had several divisions. These were: Worldwide; the Hubbard College of Scientology, St. Hill; the Hubbard College of Scientology St. Hill Foundation; Advanced Organization United Kingdom; London Day; London Foundation; Plymouth; Brighton; and Swansea. Worldwide in turn had several departments: the Executive Council Worldwide; the Franchise Office Worldwide; the Guardian Office Worldwide; and the Flag Operation Liaison Office, United Kingdom (FOLO UK). In 1971 the United Kingdom Church underwent some reorganization. The Executive Council Worldwide was officially disbanded. The Hubbard College

of Scientology, St. Hill, merged with the Hubbard College of Scientology St. Hill Foundation. The FOLO UK split off from Worldwide.

## C. Operation Transport Corp., Ltd.

The Operation Transport Corp., Ltd., was a Panamanian corporation incorporated by L. Ron Hubbard, Mary Sue Hubbard, and Leon Steinberg on February 17, 1968. It was not organized as a nonprofit corporation. No shares of stock were issued.

OTC was a sham corporation controlled by L. Ron Hubbard and petitioner. Its board of directors lacked bona fides. L. Ron Hubbard, Mary Sue Hubbard, and Leon Steinberg were the original directors of OTC. They resigned immediately after the corporation's formation and were replaced by Brian Livingston, Joyce Popham, and Barry Watson. All three of these individuals were Flag employees. Joyce Popham was the secretary to L. Ron Hubbard's personal aide. Barry Watson and Brian Livingston were Class-10 auditors and served on the Aides Council. During the docketed years, these three individuals performed only one board function. Sometime in the summer of 1972, they approved L. Ron Hubbard's decision to transfer approximately $2 million from OTC bank accounts in Switzerland to the *Apollo*. That they even performed this function is questionable since there are no minutes of the board meeting adopting a resolution authorizing the transfer. A signature card for petitioner's account number 6919 at the Crocker-Citizens National Bank in Los Angeles, CA, underscores the lack of substance of the OTC board of directors. It certifies that on November 18, 1968, the board of directors of the "O.T.S., Advanced Organization Church of Scientology of California" authorized the signatories listed on the card to sign checks on behalf of the corporation.

OTC purportedly performed banking services for Flag. However, the record shows that OTC had no offices, officers, or employees and that Flag employees were actually the ones who handled all of petitioner's financial activities. During the docketed years, petitioner deposited Flag division funds in accounts maintained in the name of OTC. The signatories on the OTC accounts were all Flag employees. Except for Joyce Popham, who apparently never wrote a check, they had no connection with OTC. Besides keeping the checkbooks, Flag

officials, not OTC personnel, directed the flow of funds into and out of OTC accounts, receipted money for the support of Flag operations, and controlled and managed Flag expenditures. Furthermore, Flag officials did not differentiate between Flag and OTC invoices and disbursement vouchers when they recorded Flag receipts and expenses.

L. Ron Hubbard and Mary Sue Hubbard controlled OTC funds. L. Ron Hubbard initiated the practice of depositing Flag funds in OTC bank accounts. Sometime before the *Apollo* went to Corfu, Greece, in August 1968, he directed a Flag official to travel to Zurich, Switzerland, to open bank accounts in the name of OTC. At that time, two numbered accounts were opened. They were account number 295,728 and account number 295,728.1. During the taxable years in issue, the major share of OTC funds were banked in those accounts. There are other OTC accounts. L. Ron Hubbard was a signatory on all the major OTC accounts. In the summer of 1972, L. Ron Hubbard authorized the transfer of approximately $2 million in cash from OTC accounts in Switzerland to the *Apollo*. The money was stored in a locked file cabinet to which Mary Sue Hubbard had the only set of keys.

To avoid harassment, Flag officials on board the *Apollo* were instructed to tell strangers they were employed by OTC and that OTC was a management company. This cover story was first used in March 1969 when the *Apollo* was suddenly asked to leave Corfu. It was formalized in a Flag Order dated December 24, 1970.

## D. The Sea Organization

The Sea Organization was a fraternal organization of elite Scientologists. Its membership consisted of persons who dedicated their lives to work fulltime for Scientology. Sea Organization members signed a "contract of employment" pledging to work for the Sea Organization for a billion years. Sea Organization members were frequently sent on missions to Scientology organizations throughout the world to handle problems interfering with the effective administration of the organization and the delivery of Scientology services. Organizations mostly or entirely staffed by Sea Organization members were called "Sea Org. Orgs." The following divisions of petitioner were Sea Org. Orgs.: Flag, ASHO, AOLA, and

FOLO. The leadership of the Sea Organization came from petitioner's Flag Division.

### *Church Policy*

California Church officials administered the Church in accordance with written policy directives called "issues." There were several different kinds of issues classified by a combination of factors including author, period of effectiveness, and designated audience. The most important issue was called a Hubbard Communications Office Policy Letter (HCO PL or policy letter). These issues were usually written by L. Ron Hubbard. Sometimes, however, they were written by a high-ranking Scientologist with L. Ron Hubbard's approval or the approval of the Aides Council (also known as the International Board). Policy letters set basic administrative policy. They took precedence over all other types of issues. Each policy letter was dated and had a legend showing its designated area of distribution on the upper-left-hand corner of the first page. Policy letters were intended to remain in full force and effect until officially canceled or modified by another policy letter.

Initially, policy letters were distributed individually in looseleaf form or in packets called "hatpacks." Beginning in 1970, a Scientology organization in Denmark began to compile the policy letters and publish them by subject matter in a comprehensive set of volumes called the Organization Executive Course or OEC. The project took years to complete. Individual volumes were published as they were completed. By 1974, petitioner published the complete nine-volume work. Most of the policy letters in the OEC series contain information about Church administrative practices but some contain instructions on religious practice. As previously found, a typical Scientology church has seven operating divisions. The OEC volumes are organized so that volumes 1 through 7 of the series each contain policy letters relating to the management, operation, and activities of a corresponding division of a Scientology church. Volume 0 of the OEC series is an introductory volume. It contains policy letters describing basic staff duties and responsibilities and the rudiments of Church structure and organization. The Management Series volume contains policy letters relating to data collection, public

relations, personnel practices, operational control, finances, executive duties, and the establishment of churches. The OEC series does not contain every policy letter. The OEC volumes indicate in brackets when a policy letter has been formally canceled or amended. Some HCO PLs fell into desuetude without being officially canceled.[7]

There were other types of policy issues besides policy letters governing petitioner's administrative practices. In addition to writing policy letters, L. Ron Hubbard also wrote executive directives called L. Ron Hubbard Executive Directives (LRH EDs). These communicated short-range orders and directions and described current projects and programs. They were generally written for a limited audience such as a specific organization, region, or staff position. LRH EDs were only valid for a year, and then they automatically expired. Guardian Orders were another type of issue. They set policy for the Guardian Offices and Guardian staff of the Churches of Scientology, including petitioner. Guardian Orders were issued by the authority of Mary Sue Hubbard or Jane Kember, the Guardian Worldwide. Guardian Orders did not expire automatically. Flag Orders set policy for Scientology Sea Organizations including the following divisions of petitioner: Flag, FOLO, ASHO, and AOLA. Most Flag Orders were written by L. Ron Hubbard or with his approval. Flag Orders did not automatically expire at the end of a fixed period.

Another type of issue was the Order of the Day (OOD). The commanding officer of every church unit was supposed to write an OOD, daily. This form of issue was used to communicate newsworthy events, to promulgate daily schedules, and to publicize plans and directions for current programs and projects. The first section of the Flag Order of the Day was reserved for communications from L. Ron Hubbard.

The front piece of each volume in the OEC contains a partial disclaimer stating that the policy letters "should be construed only as a written report of * * * [L. Ron Hubbard's] research and not as a statement of claims made by the Church or the author." Despite this disclaimer, the California Church clearly adopted and utilized the policy letters. Each California Church

---

[7]Throughout this opinion, we have cited specific policy letters by the abbreviation "HCO PL," followed by the letter's date, and where applicable, the volume and page number in the OEC series so that a typical cite reads as follows: HCO PL June 15, 1984, 3 OEC 164.

staff member had a folder of materials called a hatpack describing the duties of his position and the place his position occupied in the organization's structure. The hatpack contained policy letters. Staff members were expected to read the hatpack materials and were quizzed on their contents. Sometimes the failure to follow a policy letter inspired a quiz on the hatpack materials. California Church members also studied policy letters in work-training courses they were encouraged to take. One course, the OEC course offered by most of petitioner's branch churches, was entirely devoted to the study of the OEC volumes. It required 2½ weeks of study for each volume. The Franchise Office Worldwide distributed policy letters to franchise holders for use in running the missions, and Flag distributed them to the local churches for guidance. In the Flag Division, every crew member received and was required to read the Flag OOD and Flag Orders.

One of the guiding principles of Scientology is that most organization problems arise from the failure to follow policy. True policy was strictly limited to the written policy found in the official issues such as HCO PLs, Flag Orders, and Executive Directives. California Church members were taught that if a directive was not in writing based on official policy, it was not to be believed. California Church officials were expected to know the contents of HCO PLs and to follow them. One high-ranking church official referred to policy letters on an average of once a day for guidance. The failure to follow policy was an offense for which a California Church member could be disciplined particularly if the failure resulted in monetary loss or bad publicity. There is no evidence in the record that this happened. California Church officials did not always robotically implement policy. If a particular policy was questionable, staff consulted higher officials, usually in writing, to determine a more favorable course of action. Franchise holders providing services to the public had more freedom to disregard policy directives than did petitioner's officials.

### Discriminatory Selection

On January 2, 1957, respondent recognized petitioner as an organization described in section 501(c)(3) exempt from income tax under section 501(a). Petitioner's tax-exempt status was reconfirmed on November 16, 1964. In August 1965, respon-

dent examined petitioner's records for the taxable year 1963 and concluded that petitioner was a church; that petitioner received income by selling books and E-meters and by providing spiritual counseling and training; and that petitioner paid royalties to the L. Ron Hubbard Trustee Account for the use of Scientology books and materials. After the examination, respondent again confirmed the tax-exempt status of the California Church.

In 1966, respondent again reviewed petitioner's tax status by examining petitioner's Annual Information Returns (Forms 990–A) for 1964 and 1965. The record does not disclose what concerns prompted the examination. Following the examination, respondent sent petitioner a letter on July 29, 1966, recommending revocation of petitioner's tax-exempt status. The letter stated three bases for the recommendation: (1) The California Church's income was inuring to the benefit of Scientology practitioners; (2) the Church's activities were commercial; and (3) the Church was serving the private interests of L. Ron Hubbard and Scientology practitioners. The California Church was accorded the right to protest the recommendation and to submit documents in support of its protest. An informal conference was held in the Los Angeles District Office and the proposed revocation was affirmed. A conference was then held in the National Office on June 15, 1967, and again the proposed revocation of exemption was sustained. One month later, on July 18, 1967, respondent issued a formal letter of revocation which repeated the same three grounds of revocation as had been stated in the original recommendation. Respondent published the revocation in the Internal Revenue Bulletin and removed petitioner from its cummulative list of organizations qualifying under section 170 for deductible charitable contributions. Petitioner was advised that it was required to file Federal income tax returns.

Sometime in the fall of 1966, the Department of Justice asked respondent to review the tax status of several Scientology churches including petitioner. The request was made as the Department of Justice prepared to defend a case against the Founding Church of Scientology (Founding Church) in the United States Court of Claims. In that case, the Founding Church sued for refund of its Federal income taxes which it had paid after its tax-exempt status had been denied. The

exemption was denied on the grounds that the Founding Church was organized and operated as a commercial venture benefiting private interests and that Scientology did not serve a religious purpose.[8] Believing that respondent's recognition of the tax-exempt status of other Churches of Scientology was inconsistent with the defense of the *Founding Church* case, the Department of Justice asked respondent to investigate the matter and rescind recognition of all similar Churches of Scientology prior to the trial of the *Founding Church* case.

In response to this request respondent reviewed the tax status of several Scientology churches, in addition to petitioner, whose tax status was already under review. In the spring of 1967, as the trial of the *Founding Church* case approached, pressure to expedite proceedings relating to these churches increased. In some cases, denial or revocation of exemption was proposed. However, the record is silent with respect to what, if any, final adverse action was taken against these churches, besides petitioner, prior to the trial of the *Founding Church* case. Years later the tax status of some of these Scientology churches was still under administrative review.

During 1966 and 1967, a few of respondent's agents spoke critically of Scientology or circulated reports calling it a medical quackery; evil; a threat to the community, medically, morally, and socially; a pseudo-religious organization; a grab-bag of philosophical voodooism; and a prey on the public pocketbook. These comments were not made by agents in respondent's Exempt Organizations Division—the division charged with reviewing petitioner's tax status. However, agents in respondent's Exempt Organizations Division were privy to memoranda containing these comments and to materials critical of Scientology.

Although petitioner was advised that it was required to file Federal income tax returns (Forms 1120), it refused to do so and continued to file Annual Information Returns (Forms 990). During 1969 and 1970, Revenue Agent Woodrow (Woody) Wilson examined petitioner's records for the taxable years 1964–67 to determine petitioner's tax liability and review its

---

[8]Whether Scientology served a religious purpose was an issue that was never reached in the *Founding Church* case. *Founding Church of Scientology v. United States*, Ct. Cl. Com. Rept. (Aug. 7, 1968), 7 Stand. Fed. Tax Rep. (CCH) par. 7927 (1968), modified 188 Ct. Cl. 490, 412 F.2d 1197 (1969), cert. denied 397 U.S. 1009 (1970).

tax status. A second agent, Robert Cluberton, tried to audit petitioner's records for the taxable years 1968 and 1969. Petitioner resisted this second audit, claiming a right to be free from successive audits until its protest of the 1964–67 audit, including the denial of its tax-exempt status, was finally resolved.

On June 7, 1974, respondent mailed a notice of deficiency to petitioner for the taxable years 1965 through 1967. The deficiencies were:

| TYE Dec. 31— | Deficiency |
|---|---|
| 1965 | $2,614.19 |
| 1966 | 5,041.03 |
| 1967 | 13,946.30 |

Petitioner filed a timely petition in the Tax Court for the 1965 deficiency. In late 1976, respondent settled the case by conceding petitioner's tax-exempt status for that year but without prejudice to any other year. Respondent also decided not to litigate any cases against petitioner prior to the 1968 taxable year and closed the 1966 and 1967 tax years on the basis of "no change."

Returning to 1974, respondent, by the end of the year, was occupied with a number of Scientology matters.[9] Representatives of the California Church, respondent, and the Department of Justice met at a conference in Washington, D.C., on February 14, 1975, to try to settle some of these matters without resorting to litigation. No agreement about substantive issues was reached, but the representatives did establish a procedure for handling some of the ever mounting tax matters. First, the parties would temporarily suspend litigation. Second, respondent would examine the Hawaii Church to determine whether it qualified as a tax-exempt organization. Third, the ruling with respect to the Hawaii Church would govern all churches of Scientology organized and operated in a similar fashion. Fourth, respondent would examine the California

---

[9]These included a summons enforcement action against petitioner for the taxable years 1968 and 1969 on appeal to the Ninth Circuit; reconsideration of the revocation of exemption of the Florida Church issued on Nov. 7, 1969; negotiations to settle a refund case involving the Hawaii Church; consideration of the eligibility of Scientology ministers for exemption from the self-employment tax; and review of pending applications of numerous Churches of Scientology for recognition as tax-exempt organizations. Between 1967 and 1974, respondent had delayed action or changed positions on some of these issues.

Church and any other church that differed from the normal pattern and determine what effect, if any, these differences in operation or organization had on the organization's qualification for tax-exempt status.[10]

The audit of the Hawaii Church was an exempt function audit covering the tax year 1965 or the years 1966 through 1974. The audit lasted approximately 2 weeks. Following the audit of the Hawaii Church, the IRS asked the Church and several similarly situated churches to submit determination applications, Forms 1023. This was done and the IRS set up a special group to process the applications. The Hawaii Church received a favorable ruling and so did several other Churches of Scientology.

The audit of the California Church (1971–74 audit) followed the Hawaii audit. The examination began in June 1975 and continued through July 1976 covering the taxable years 1971 through 1974. Three experienced agents[11] worked full time on the audit. Under IRS policy, cases involving a church are classified as sensitive cases and automatically referred to the National Office. Thus, from time to time, the agents received advice and guidance from Lewis Hubbard, an attorney in the National Office of respondent's Chief Counsel.

The agents examined between 200 and 300 cartons of records, containing approximately 2 million documents. The audit covered the following topics: (1) Petitioner's sources of income; (2) petitioner's corporate structure; (3) the purposes of the California Church as stated in corporate documents; (4) the administration of the Scientology trust fund; (5) compensation and benefits paid or bestowed upon L. Ron Hubbard and his family; (6) the purposes and amounts of petitioner's expenditures; (7) certain aspects of Church administration including banking practices, recordkeeping, and the implementation of policy; and (8) Scientology religious beliefs and practices.

At the outset of the 1971–74 audit, no thought was given to what procedure would be used to obtain a ruling on the audit. As the audit drew to a close, the National Office and the

---

[10]The procedural understandings that were reached at the conference on Feb. 14, 1975, were not reduced to writing. Petitioner's lawyer wrote a letter dated Feb. 26, 1976, purportedly memorializing the agreements reached at the conference. This letter is a one-sided reflection of the understandings that were reached.

[11]The record mentions a fourth agent, Melvin Young, but does not disclose if he worked full time.

District Office jointly decided that the technical advice procedure was best since it afforded the California Church an opportunity to comment on the facts and issues raised by the audit.[12]

In accordance with the technical advice procedure, Agent Eugene Endo prepared a draft report of the audit. The draft report covered the following topics: (1) A description of Scientology religious beliefs; (2) a description of petitioner's corporate charter, bylaws, and amendments thereto; (3) a description of petitioner's pricing and sales policies; (4) an explanation of the different memberships in petitioner; (5) an account of petitioner's charitable and community activities; (6) a description of petitioner's promotion methods; (7) a discussion of the role of policy letters in the administration of petitioner's affairs; (8) a description of petitioner's banking practices and management activities; (9) an analysis of petitioner's income and certain expenses by Church branch; (10) an explanation of the royalties paid to L. Ron Hubbard; (11) a description of OTC's relationship to petitioner; (12) documentation of petitioner's failure to substantiate OTC expenditures on behalf of petitioner; (13) an analysis of financial gains accruing to OTC from currency conversions; and (14) a history and description of the United States Churches of Scientology Trust.

The technical advice procedure was never fully implemented. The California Church took matters into its own hands and sent the National Office Agent Endo's draft report (Service audit report) which it had been given for comment as a matter of courtesy before Agent Endo had a chance to complete it. The Church also sent the National Office a copy of its own report (Church audit report). The Church audit report

---

[12]The technical advice procedure is described in Rev. Proc. 73–8, 1973–1 C.B. 754, modified by Rev. Proc. 78–14, 1978–2 C.B. 486. "Technical advice" is a term of art meaning "guidance as to the interpretation and proper application of internal revenue laws * * * furnished by the National Office upon request of a district office in connection with the examination of a taxpayer's return * * * as a means of assisting Service personnel in closing cases." Rev. Proc. 73–8, *supra*. The District Office writes a statement of facts and issues for submission to the National Office. However, before it is sent to the National Office, it is given to the taxpayer for his concurrence. If the taxpayer does not agree with the statement of facts and issues, he drafts his own, and both statements are submitted to the National Office. If after review of the statements, the National Office proposes advice adverse to the taxpayer, the taxpayer is entitled to a conference. Following the conference, the National Office issues a technical advice memorandum addressed to the District Office giving the conclusions of the National Office and instructing the District Office on how to process the case.

was written in the style of the Service audit report, in goodly measure adopting verbatim the text of the Service audit report. However, there were textual differences, some noted and explained in footnotes. According to Church officials, the purpose of the Church audit report was to present a fair and accurate version of the California Church's tax position. The National Office refused to accept this "end-run" and referred the matter back to the Los Angeles District Office.

In accordance with the technical advice procedure, the examining agent and Church officials met in the District Office in October 1976, and tried to reach agreement on a statement of facts and issues to present to the National Office. Agent Endo reviewed the Church audit report, signified his agreement with the factual content of certain footnotes in the Church audit report, but complete agreement was never reached.[13] There remained significant differences in the texts and the footnotes of both reports. The matter was then referred to the National Office.[14] In January 1977, Church and Service representatives met in the National Office to discuss the reports. Respondent never issued a technical advice memorandum.

During 1977, petitioner and respondent engaged in settlement negotiations. These negotiations were discussed in detail by counsel at a pretrial hearing held on petitioner's Motion to Render the Notice of Deficiency Nugatory and for Other Relief. At the conclusion of the hearing, the Court made findings about the conduct of the settlement talks. The Court found (1) that there was a bona fide dispute between the parties which was the subject of negotiations; (2) that the notice of deficiency incorporates these legitimate grounds of dispute; (3) that respondent was forced to issue the notice of deficiency to protect the Government's interest in the revenue since petitioner would not consent to extending the statute of limitations which was about to expire before a settlement could be reached; and (4) that good-faith settlement negotiations continued after the notice of deficiency was issued. The

---

[13]When Agent Endo accepted the factual content of the footnotes at face value, he had no independent knowledge to judge the Church's representations.

[14]The transmittal memorandum presented four issues for consideration by the National Office: (1) Whether petitioner was a religious organization; (2) whether petitioner was organized and operated for religious purposes; (3) whether petitioner had a substantial commercial purpose; and (4) whether petitioner's net earnings inured to the benefit of private individuals.

Court ultimately found that the determinations were at least sufficiently reasonable to render the notice of deficiency valid and therefore denied petitioner's motion.

During negotiations, the parties came close to reaching a settlement of their disputes over income inuring to OTC's benefit from currency conversions and over alleged debt repayments from the Danish Kingdom and United Kingdom Churches. Significant differences remained on at least three other issues: (1) Petitioner's recordkeeping system; (2) petitioner's reporting obligations; and (3) petitioner's failure to satisfy respondent that it was not implicated in criminal activity to impede the IRS from performing its lawful functions. Respondent's last offer was made on December 20, 1977. The scope of the offer was limited to settlement of petitioner's 1970–72 taxable years.

The notice of deficiency was drafted by Agent Endo. It was drafted sometime in November 1977, as the statute of limitations for the taxable years in issue was about to expire. The notice was issued on December 28, 1977.

On March 5, 1980, this Court ruled that compliance with public policy is a requirement for exemption from tax under section 501(c)(3). In a Memorandum Sur Order dated April 1, 1980, this Court defined the scope of the public policy requirement by stating "this requirement is limited to compliance with well defined public policy—such as may be reflected in a criminal or civil statute." Respondent's trial memorandum, filed October 3, 1980, catalogued a series of petitioner's acts, policies, and procedures which respondent intended to prove to show petitioner's failure to comply with public policy. These acts, policies, and procedures included: (1) Conspiracy to impede and obstruct the Internal Revenue Service under 18 U.S.C. section 371; (2) abuse of the role of religious confidant by auditors; (3) the infliction of psychic harm including the loss of moral judgment through brainwashing accomplished by auditing and other practices and procedures; (4) the use of blackmail and intimidation to implement petitioner's "fair game" policy; (5) the involuntary dissolution of marriages and family ties through the enforcement of petitioner's "disconnect" policy; (6) involuntary detention and false imprisonment; (7) the making of false statements to immigration authorities in violation of 18 U.S.C. section 1544; (8) the

removal of large amounts of currency from the United States without disclosure; (9) the false registration of petitioner's fleet as private yachts used for pleasure when in fact they were used for paramilitary training and commercial activities; and (10) the drastic punishment of staff and members. By letter ruling dated October 30, 1980, the Court precluded respondent from offering proof on many of these issues and narrowed the evidence it would entertain on the remaining issues to "*acts* against others that violated civil or criminal law or were contrary to well-defined public policy." Respondent's trial memorandum also stated two other major issues to be tried in addition to the public policy issue: (1) Whether part of the California Church's net earnings inured to the benefit of L. Ron Hubbard and his family; and (2) whether petitioner engaged in commercial activities, such that it was not operated exclusively for religious purposes.

Respondent also contended, in a letter to petitioner in connection with peititioner's Motion To Render the Notice of Deficiency Nugatory and for Other Relief, that (1) the Church's methods are akin to brainwashing; (2) the Church employs tactics which are harmful to society; (3) petitioner is a cult; (4) Scientology operations are partially a profit-making scheme; and (5) Church policies and practices endanger the moral and physical health of citizens and create trouble in families.[15]

During the years 1969 through 1975, respondent formed and maintained special intelligence units to collect information about certain taxpayers, apparently selected by essentially political criteria, to monitor their compliance with the tax laws. Two of these units, the Special Service Staff (at first called the Activist Organization Committee) and the Intelligence Gathering and Retrieval Unit, were part of respondent's National Office. The third unit, the Case Development Unit, was part of the Los Angeles District Office. All three collected information about petitioner.

In July 1969, the IRS established the Special Service Staff (SSS) to insure that dissident groups were not violating the tax laws. The SSS gathered and centralized information about

---

[15]These admissions form an attachment to a letter dated Oct. 3, 1980, from respondent to petitioner, a copy of which was sent to the Court. The letter and the attachments have been marked as Court's "Exhibit 6."

taxpayers, frequently selected because of their political activism, and disseminated this information to the District Office having jurisdiction over the particular taxpayer. As a result of SSS operations, dissident groups were subject to more rigorous scrutiny for their compliance with the tax laws. Also, all exempt organizations which were scrutinized by the SSS were subject to special procedures for obtaining approval of their applications for exemption from taxation.

Initially, the SSS selected 77 organizations to monitor. On October 8, 1969, an additional 22 organizations were targeted. These included the Founding Church of Scientology. After the Founding Church was selected, the SSS received some information about Scientology churches including petitioner.[16] When the SSS ceased functioning in 1973, it had amassed close to 3,000 files on organizations and approximately 8,500 files on individuals.

In 1973, respondent established a national intelligence program called the Intelligence Gathering and Retrieval Unit (IGRU). This program differed from other intelligence operations in that the IGRU gathered general intelligence unrelated to a specific investigation of a specific allegation. Agents were free to determine whom and what to investigate, provided their investigations in some way related to IRS investigative jurisdiction. In a number of districts, IGRU agents collected intelligence having little relationship to enforcement of the tax laws.

The Los Angeles District Unit of IGRU classified petitioner as a "tax resister." In 1975, certain IGRU files in St. Louis were destroyed. One file labeled "subversives" contained materials only about Scientology.[17] The IGRU was disbanded in mid-1975.

Between 1968 and 1974, the Case Development Unit staffed by two special agents in respondent's Los Angeles Office gathered information about petitioner and Scientology. Practically all of the information they collected concerned petitioner's religious operations and financial activities. Their files,

---

[16]Almost all of the materials that the SSS collected on Scientology, which have been made a part of this record, are tax related. Only two sentences in one report on the Hawaii Church arguably refer to non-tax matters, making reference to complaints from neighbors about the use of "pot" and LSD at the Church.

[17]Some other files on militants were also destroyed, but there is no evidence they contained material about Scientology or petitioner.

however, contained a few reports linking petitioner or Scientology with criminal activity including homicide, blackmail, guerrilla training, break-ins, drug trafficking, and the transportation of illegal firearms.

## Entanglement

Over slightly more than a decade, respondent examined petitioner's records four times. In 1965, respondent audited petitioner's 1963 tax year and, in 1969, petitioner's 1964–67 tax years. Between 1971 and 1973, Agent Cluberton unsuccessfully tried to examine Church records for 1968 and 1969. The most comprehensive audit began in June 1975. It lasted approximately 1 year and covered petitioner's 1971–74 tax years. Three or four agents worked full time and others worked as needed. The auditors received and reviewed between 1 and 3 million records. Most of these were original financial records such as invoices, disbursement vouchers, and canceled checks, since the California Church did not keep business journals or books of account. The examiners also reviewed policy issues, membership fees and descriptions, contracts for services and employment, organizational charts, Scientology newsletters and dissemination pieces, and similar records illustrating petitioner's organization, activities, and financial practices. The agents also inspected petitioner's premises at three or four locations.

Respondent collected information about Scientology and petitioner. An index prepared by the IRS in 1974 shows that respondent had over 6,000 documents relating to Scientology in its files. Many of these documents were prepared by the IRS and related to specific audits, investigations, or lawsuits. Approximately 2,000 of these documents were policy letters similar in kind, if not identical, to the ones contained in the OEC volumes. Other documents transmitted information from confidential sources on such diverse topics as their personal experiences in the Church of Scientology, Scientology financial activities, the administration of Scientology churches, and the names of Scientology members. Respondent's files also contained newspaper articles about Scientology and pamphlets, magazines, and newsletters published by Scientology organizations, and a few books and brochures describing Scientology doctrine and practices.

The trial of this case lasted 51 days, spread over 12 months. Many matters were covered: petitioner's corporate and management structure, petitioner's fee structure, petitioner's banking practices, petitioner's dissemination practices, petitioner's relationship to OTC, the administration of the Scientology trust fund, IRS antipathy toward Scientology, petitioner's efforts to obstruct the IRS, and Scientology beliefs and practices. Petitioner called three witnesses—Joyce Isaacson, Herbert Richardson, and Renee Norton—to provide background information about Scientology beliefs and practices. On cross-examination, respondent inquired of these witnesses whether Dianetics formed part of the religious doctrine of Scientology and whether the E-meter was used apart from auditing to conduct security checks as a condition of employment.[18]

During the trial, respondent tried to prove that some of petitioner's activities served a commercial purpose. Respondent tried to prove that petitioner sent staff on missions to branch churches to increase profits, that petitioner developed new courses and awareness levels for commercial reasons, and that petitioner used commercial techniques to promote Scientology in order to make money.

During the trial, respondent used policy issues to examine witnesses on such subjects as petitioner's corporate and management structure, petitioner's financial activities, and petitioner's efforts to obstruct the IRS. Respondent's reliance on policy issues generated collateral examination on the extent to which policy issues had to be obeyed. While following this line of inquiry, respondent questioned witnesses, past and present members of Scientology, with respect to whether they were disciplined for failing to follow policy. Respondent also inquired into petitioner's system of discipline and ethics in pursuing his inquiry into petitioner's treatment of IRS personnel.

---

[18]Before the trial of this case began, as we have noted, respondent pressed several different grounds in support of his contention that petitioner should be denied tax-exempt status for public policy violations. One such ground was that petitioner used the E-meter to conduct security checks on employees in violation of California State law. This Court ruled that it would not accept evidence on this ground if petitioner established that the E-meter was a religious artifact. Petitioner's witnesses testified that the E-meter was a religious aid, and respondent afterwards abandoned this claim.

## Church Finances

Petitioner mainly derived income from four sources: (1) Auditing and training; (2) sales of Scientology literature, recordings, and E-meters; (3) franchise operations; and (4) management services. Of these four areas, the largest percentage of petitioner's income came from auditing and training. By petitioner's own admission, auditing and training sales accounted for the following percentages of total income:

|      | AOLA | ASHO | LAO | SFO | UK |
|------|------|------|-----|-----|-----|
| 1971 | 91   | 68   | 85  | 81  | 70 |
| 1972 | 94   | 50   | 91  | 86  | 70 |

Petitioner exacted what it called a "fixed donation" for its auditing and training courses. With few exceptions, these services were never given for free.[19] Auditing sessions were offered in fixed blocks of time called "Intensives." By petitioner's own admission the general rate of the fixed donation for auditing was as follows:

| | |
|---|---|
| 12½-Hour intensive ................................................. | $625 |
| 25-Hour intensive.................................................... | 1,250 |
| 50-Hour intensive.................................................... | 2,350 |
| 75-Hour intensive.................................................... | 3,350 |
| 100-Hour intensive ................................................. | [20]4,250 |

At Flag, the fixed donations were 3 to 4 times higher. Additionally, petitioner offered two specialized types of auditing for a higher fixed donation:

Integrity Processing — $750 per 12½-Hour intensive
Expanded Dianetics — $950 per 12½-Hour intensive

---

[19]HCO PL Sept. 27, 1970 (Issue I), 3 OEC 89, describes petitioner's policy against free services and price cutting. It states:

Price cuts are forbidden under any guise.
1. PROCESSING MAY NEVER BE GIVEN AWAY BY AN ORG.
Processing is too expensive to deliver.

\* \* \* \* \* \* \*

9. ONLY FULLY CONTRACTED STAFF IS AWARDED FREE SERVICE, AND THIS IS DONE BY INVOICE AND LEGAL NOTE WHICH BECOMES DUE AND PAYABLE IF THE CONTRACT IS BROKEN. \* \* \*

[20]Historically, the price of a 25-hour intensive was fixed at an amount equal to 3 months of pay for the average middle class worker in the district of the Scientology church providing the service.

Petitioner offered its parishioners a 5-percent discount on the rate of fixed donation if the donation was well in advance of the service. Petitioner also offered 1-year members and lifetime members a 10-percent and 20-percent discount, respectively, on services. Apart from these discounts, branch churches were not allowed to deviate from standard prices.[21]

There was a special fee arrangement for most staff members. In order to become a staff member, a prospective employee had to sign an employment contract. The terms of most employment contracts varied from week-to-week employment to periods of 2½ years or 5 years. Sea Organization staff members pledged to work for a billion years. Contracted staff members, except the week-to-week employees, were given free or discounted training and auditing. If, however, a staff member breached his employment contract by leaving petitioner's employ prior to the contract's expiration, the former staff member, termed a "freeloader," was contractually obligated to pay petitioner a sum equal to the full cost of all services received, or liquidated damages of $5,000. In order to enforce this policy, an organization that sent a staff member for training to a higher organization was required to have the staff member sign a note in the amount of $5,000 before commencing training. The signing of the $5,000 note was intended to prevent a staff member from leaving after receiving higher training. HCO PL December 14, 1969, 3 OEC 241, entitled "ORG Protection," required that "Such a Note * * * must be legally binding in that, if he breaks his Contract, he is automatically in debt to the org for $5,000." In order to insure collection of such amounts, petitioner paid its agents a 10-percent commission for each freeloader debt collected in full.

---

[21]Petitioner's policy against reducing established prices is set forth in HCO PL Apr. 27, 1965, 3 OEC 91, 92, which states:

Therefore we can draw up some policies on prices.

1. The advertised and reported price of anything sold by an org must be the actual price received by the org for that item.

2. There may be no hidden discounts, trick reductions, whims or favours given in pricing.

3. Merchandising by advertising that prices are going up soon is forbidden.

4. Anyone covertly reducing prices is guilty of suppressing an org which is a high crime.

5. Any price passed upon at Saint Hill by myself may not be changed for anything by anyone else in an org.

And finally:

6. Efforts to reduce prices below a set scale will be considered suppressive acts.

This policy was reaffirmed in HCO PL Sept. 27, 1970 (Issue I), 3 OEC 89.

No effort was made by petitioner to collect freeloader debts in court.

Individual applicants for training and auditing were required to execute two documents. Under the first document, entitled the "Pledge of Offering," the applicant pledged a specified amount as an offering to petitioner in exchange for a limited amount of training or auditing directed toward the attainment of a specified state of spiritual awareness.

Additionally, the applicant was required to execute a second document, entitled a "Legal Contract for Auditing and Training." Under this document, the applicant declared that he or she was a proper applicant for training, which entailed among other things that the applicant was of legal age, that he or she did not have any medical illness, that he or she did not have a record of institutionalization, that he or she did not have a criminal record, and that he or she was not addicted to drugs or alcohol. Furthermore, pursuant to this contract, the applicant waived all rights of action against petitioner or L. Ron Hubbard arising from the receipt of the designated services, except the right to request a refund within 3 months of the last day of the services rendered.

Petitioner promoted Scientology services through free lectures, congresses, free personality testing, handouts, and advertisements placed in newspapers and magazines and on the radio. Petitioner geared promotional activities to be responsive to community concerns after taking surveys to ascertain community needs and desires.

Two categories of staff—registrars and Field Staff Members—had the job of establishing contact with the public to stimulate interest in Scientology services. Registrars in the public division of petitioner's branch churches kept track of new people who showed an interest in Scientology. The registrars were trained in salesmanship. They encouraged new people to purchase introductory Scientology courses. Once a new person showed a commitment to Scientology through the purchase of a major Scientology service, responsibility for his progress was turned over to registrars in the dissemination division of petitioner's branch churches who monitored each parishioner's training and auditing progress through a central file system. This second group of registrars had the duty of

contacting people listed in the central files by mail or in person and urging them to take higher Scientology services.

In addition to the actions of the registrars, petitioner used another group of people known as Field Staff Members (FSMs), who also contacted individuals in an effort to interest them in Scientology. These FSMs operated on a commission basis. They were paid an amount equal to 10 percent of the fixed donation for each person they successfully enrolled in a Scientology service. Additionally, the FSMs received awards in the form of scholarship money for Scientology courses based on their ability to make commissions.

Petitioner earned money from the sale of books, E-meters, and recordings. According to petitioner, during the taxable years 1971 and 1972, AOLA, ASHO, SFO, and LAO alone generated in excess of $400,000 and $500,000, respectively, from the sale of these items. By petitioner's admission, sales of these items accounted for the following percentages of total income:

|      | AOLA | ASHO | LAO | SFO | UK |
|------|------|------|-----|-----|-----|
| 1971 | 1    | 24   | 10  | 16  | 3  |
| 1972 | 5    | 49   | 7   | 14  | 3  |

ASHO PUBS, a division of ASHO, from 1971 onwards published and distributed these items. As a distributor, it sold these items to other churches and missions of Scientology as well as commercial bookstores for resale.

The major portion of the books distributed by ASHO PUBS were copyrighted by L. Ron Hubbard. Through the year 1972, L. Ron Hubbard's collected works on Dianetics, Scientology, and closely related topics included 2 multivolume encyclopedic series and more than 50 other books and publications.[22] L. Ron Hubbard also recorded more than 3,000 lectures dealing with Scientology technology, administration, and policies between the years 1950 and 1972. Tapes for 509 of such lectures were regularly available to the public. Additionally, petitioner sold E-meters which L. Ron Hubbard invented and on which he held a patent.

Petitioner had an elaborate system of prices and discounts for books. In 1959, petitioner used the following formula to

---

[22]"Dianetics" and "Scientology" are the registered trademarks of L. Ron Hubbard.

price its books: It took the printing cost and multiplied by 5. In 1965, this formula underwent a slight change. The basic formula, 5 times the printing cost, stayed the same, but to this figure petitioner added 2 times the cost of postage to the furthest church. This formula established a minimum price. During the docketed years, the list price of books sold by petitioner through its bookstore ranged from a low of $2 to a high of $225 or $300 for the OEC series.[23] Books could not be given away. They had to be sold. Books sold to Scientology members were discounted by 10 percent. Books sold to other Scientology churches, including branches of petitioner, were discounted by 40 percent. Books sold to commercial bookstores were also discounted in accordance with the following schedule:

| 1 Book | 25% |
|---|---|
| 2 – 9 Books | 33/13 [sic] |
| 10 – 49 Books | 40 |
| 50 – 99 Books | 41 |
| 100 – 249 Books | 42 |
| 250 – 499 Books | 43 |
| 500 Books | 45 |

The retail price of an E-meter during the tax years at issue was around $200; however, discounts were available in accordance with the following schedule:

1. On individual purchases without any membership, full price, no discount.
2. International Membership holders — 20% discount.
3. Bulk sales (10 – 40 meters) — 35% discount.
4. Bulk sales (50 or more meters) — 40% discount.
5. All contracted staff — 40% discount.

Petitioner's third source of income came from its franchise operations. Petitioner's Franchise Programme was first introduced in the early part of 1959. Under the Franchise Programme, interested auditors were granted franchises which authorized them to use the names "Applied Philosophy," "Scientology," and "Dianetics," along with the copyrights associated therewith, in a certain district or territory. Addi-

---

[23]Book prices fluctuated during the course of the docketed years, so that these amounts may have varied.

tionally, franchise holders were granted 40-percent discounts on their purchases of books that they could later resell to the public. In exchange, the franchise holder agreed (1) to remit 10 percent of his or her gross income to HCO WW, and (2) to abide by the policies governing franchises. The rates franchise holders could charge for processing and courses were set by L. Ron Hubbard and made known to the franchise holders in the form of policy letters. Franchises were strictly forbidden from providing any free services.

In order to obtain a franchise, an interested person had to first file an application for an interim franchise. Initially, these franchises were granted directly by L. Ron Hubbard; however, during the tax years at issue, the franchises were issued to the applicant by petitioner as agent for L. Ron Hubbard.

A principal objective of the Franchise Programme was to involve members of the public and push them up to upper level orgs, such as St. Hill, AOLA, ASHO, and Flag.[24] To this end, franchise holders were only permitted to offer lower level courses and were encouraged to send their students to the higher level orgs for more advanced training. For each student whom the franchise holder successfully referred to petitioner, he received a Field Staff Commission equal to 10 percent of the amount the student spent at the higher level organizations.

In conducting the Franchise Programme, petitioner placed a heavy emphasis on statistics and the regular payment of the required 10 percent of gross income to HCO WW. In this regard, the franchise holders were required to keep a set of books and records and to submit weekly reports of the franchise holder's activities, along with their weekly remittance of the required 10 percent of gross income. Franchise holders who failed to submit the required 10 percent of gross income on a regular basis ran the risk of losing their franchise.

During the tax years at issue, the franchises were administered by the Franchise Office Worldwide, which was directed by the Franchise Officer. As part of his responsibilities, the Franchise Officer sent the franchise holders policy letters pertinent to running their franchises and collected the 10-

---

[24]This objective was expressed by L. Ron Hubbard in HCO PL May 1, 1971, 6 OEC 294, as follows: "MOTIF: THE ROLE OF A MISSION: RAW PUBLIC, GET THEM IN AND UP THE LINE TO ORGS."

percent payments from each franchise. These payments were then reported on the books of petitioner's United Kingdom Church under the designation "Tithes." The record is not clear how much income the Franchise Programme generated. By petitioner's own records, the income from its franchising operations during the tax years in question was as follows:

| | |
|---|---|
| 1970 | $288,672 |
| 1971 | 307,809 |
| 1972 | [25]435,960 |

Petitioner's Flag Bureau generated a fourth source of income through the provision of management services to Scientology organizations around the world, including branches of petitioner. Flag collected a variety of statistics from each local church and organization and used this data to develop programs for improving local church administration. When a local church experienced difficulty, Flag sent staff on assignments, called missions, to help manage the situation. The purposes of such missions were varied and included straightening out financial mismanagement, increasing gross income, clarifying job responsibilities, attracting new parishioners, and insuring excellence in the delivery of services. Flag concentrated its attention on the organizations that made the greatest contribution to Flag's financial support. The fee for these management services was 10 percent of the corrected gross income of the organizations and franchises that were not obligated to pay 10 percent to Worldwide.

Flag collected statistics to track Scientology's worldwide growth and expansion, as well as individual and local church productivity. These statistics were reviewed by Flag and used as a basis for the development of programs, policies, and procedures to increase the organization's growth and expansion. As a basis for these statistics, each local church was required to follow a standard method for reporting statistics to petitioner's Flag Bureau. Required statistics included measures of output for each division within a church. This statistic was called the Gross Divisional Statistic, or GDS, and was specific to each division; for example, the GDS of the Dissemination Division was gross income, while the GDS of the

---

[25]For purposes of this case, a conversion ratio of $2.4 per pound has been used.

Treasury Division was the amount of credit collected and the amount of bills paid. Each church had an Organizational Information Center (OIC) which graphed and posted divisional statistics. The OIC also transmitted certain statistics to World-wide on a weekly basis. Worldwide then transmitted (via Telex) accumulated statistics to Flag, where they were graphed and posted in the Control Information Center (CIC) and on the wall outside the Flag Treasury Division. These graphs reflected overall Scientology Income, Flag Income, and LRH Comm. Statistic Revised Income,[26] as well as other income figures. In addition, each Flag staff member had a graph of his job statistic posted next to his desk.

One of petitioner's articulated goals was to make money. This was expressed in HCO PL March 9, 1972, MS OEC 384, which enumerated the Governing Policy of Finance as follows:

### GOVERNING POLICY

A. MAKE MONEY.

B. Buy more money made with allocations for expense (bean theory).

C. Do not commit expense beyond future ability to pay.

D. Don't ever borrow.

E. Know different types of orgs and what they do.

F. Understand money flow lines not only in an org but org to org as customers flow upward.

G. Understand EXCHANGE of valuables or service for money (P/L Exec Series 3 and 4).

H. Know the correct money pools for any given activity.

I. Police all lines constantly.

J. MAKE MONEY.

K. MAKE MORE MONEY.

L. MAKE OTHER PEOPLE PRODUCE SO AS TO MAKE MONEY.

A small sack of beans will produce a whole field of beans. Allocate only with that in mind and demand money be made.

Petitioner often used business terminology to describe its operations. Churches were referred to as "orgs." Church missions were called "franchises" until 1971 when their designation in the United States was officially changed to "mission." However, even after the name change, petitioner continued to refer to the administrator of the missions as the Franchise Officer. Fees for auditing were called "prices"

---

[26]The LRH Comm. Statistic Revised income was money that went to L. Ron Hubbard personally as debt repayment.

rather than "fixed donations," and petitioner frequently said its services were "purchased," "bought," or "sold" rather than "donated," "offered," or "contributed." HCO PL May 23, 1969 (Issue III), 0 OEC 91–93, describing 134 measures to take to insure Church solvency, exemplifies these patterns of speech. It states in part:

90. DEPARTMENT 17 (DEPT OF PUBLIC REHABILITATION): *Sells Scientology to Governments and broad social stratas* [sic].
92. Makes Scientology popular and the thing to do.

\* \* \* \* \* \* \*

107. DEPARTMENT 20 (DEPT OF ACTIVITIES): Guides in new body traffic.

\* \* \* \* \* \* \*

109. Sees that the Introductory Lecture and non-classed courses use no words that will be misunderstood and *makes people want to buy training and processing* and offers it.

\* \* \* \* \* \* \*

124. DEPARTMENT 22 (DEPT OF FIELD RECRUITMENT, ESTABLISH-MENT AND RECORDS): Recruits, appoints and establishes FSMs, Groups and Franchises.

\* \* \* \* \* \* \*

128. Gets all commissions owed promptly paid to *encourage earning more commissions.*
129. DEPARTMENT 23 (DEPT OF FIELD TRAINING): Trains the FSMs and Franchise holders and *makes them financially successful.*
130. *Treats the whole department activity as salesmen are handled by any other business org.*
[Emphasis added.]

This policy letter is not an isolated phenomenon. Even during the trial of this case, the testimony of petitioner's church witnesses was heavily punctuated with business terminology.

Petitioner performed charitable works. It provided assistance to prisoners, ex-offenders, the elderly, the mentally ill, and drug addicts. It helped form Narcanon, a drug-rehabilitation program. It organized a job referral service for ex-offenders, and it developed an educational program called Applied Scholastics. On occasion, it also assisted the poor and the sick.

Petitioner performed christenings, funerals, and wedding ceremonies free of charge. Petitioner's chaplains provided free marriage and family counseling. Petitioner also provided a specialized form of auditing free of charge called "ARC break" auditing. This service was geared to help people in crisis.

In his notice of deficiency, respondent determined that petitioner's seven stipulated divisions (SFO, LAO, FOLO, ASHO, AOLA, USGO, and Flag) had the following consolidated net incomes during the docketed years:

| Income | 1970 | 1971 | 1972 |
|---|---|---|---|
| Gross receipts | $2,249,013.08 | $3,301,143.73 | $3,134,391.00 |
| Advance payments | 373,222.37 | 788,704.96 | 1,198,763.86 |
| Flag income | | 263,557.47 | 240,932.55 |
| Payment Danish Kingdom Church | | 77.92 | 53,609.76 |
| Payment United Kingdom Church | | 76,497.24 | 161,018.38 |
| Total income | 2,622,235.45 | 4,429,981.32 | 4,788,715.55 |
| | | | |
| *Expenses* | | | |
| Per Form 990 | 2,438,646.65 | 4,242,124.02 | 4,178,876.05 |
| Trust | (28,930.34) | (67,892.40) | (77,986.62) |
| Charter Mission (disallowed) | (982,415.39) | (1,143,928.02) | (1,400,015.99) |
| Flag expenses | | 1,238,466.30 | 1,036,108.56 |
| Total allowable expenses | 1,427,300.92 | 4,268,769.90 | 3,736,982.00 |
| Net income | 1,194,934.53 | 161,211.42 | 1,051,733.55 |

Petitioner does not contest the accuracy of these figures, but does disagree with the tax treatment accorded them by respondent.

Petitioner collected advance payments from parishioners for auditing and training services of $373,222.37 in 1970, $788,704.96 in 1971, and $1,198,763.86 in 1972. These were payments from people for whom no services were rendered during the year the payments were received. It was petitioner's policy to refund advanced payments upon request at any time before the services were taken. There is no evidence in the record that petitioner kept the advance payments segregated or placed restrictions on the use of these funds. Petitioner used the cash method of accounting for its receipts, except it treated advance payments as liabilities.

The Charter Mission expenses represented amounts transferred by petitioner to OTC during the tax years. Petitioner deducted these payments as expenses on its Forms 990. Respondent disallowed the deduction on the grounds that the payments were not a business expense but constituted an internal transfer of funds to the Flag Division. On brief, petitioner does not contest the adjustment.

Petitioner deducted payments of $28,930.34 in 1970, $67,892.40 in 1971, and $77,986.62 in 1972 to the Central Defense and Dissemination Fund. According to petitioner, these were payments to the United States Church of Scientology Trust (the trust).

Petitioner alleged that the trust originated in 1962. However, there was no trust document during the docketed years. The trust was first memorialized by Declaration of Trust on June 25, 1973. L. Ron Hubbard was the sole trustee of the trust during the docketed years.

During the docketed years, no investments were made with trust funds. They were deposited in several Swiss bank accounts: Rubric Trustee Account No. 272,893.6, Church of Scientology of California Trustee Account No. 285,222, Church of Scientology of California Trustee Account No. 285,222.1, L. Ronald Hubbard Trustee Account No. 272,893.2, and L. Ronald Hubbard Trustee Account No. 272,893.3, at the Swiss Bank Corp. in Zurich, Switzerland. Funds were also deposited in Account No. 015867.226 at the Swiss-Israeli Trade Bank, Geneva, Switzerland. L. Ron Hubbard, Mary Sue Hubbard, and Denzil Gogerly (a United Kingdom Church official who administered the trust) were all sole signatories on the trust accounts. L. Ron Hubbard kept the trust checkbooks. Member churches were required to remit 10 percent of their total income to the trust on a weekly basis.

In 1972, 4,222,015 Swiss francs ($1,119,678)[27] was withdrawn from the trust accounts in Switzerland. Petitioner's worksheets originally showed this withdrawal as an inter-account transfer to OTS. This is crossed out, and in different handwriting, the transaction is shown as cash held. According to petitioner, this money was brought aboard the *Apollo* where it

---

[27]For purposes of this case, we used a conversion ratio of 0.2652 dollars per Swiss franc which is the rate quoted for Dec. 29, 1972, in 46 Bank and Quotation Record (January 1973, N.Y.).

was kept in a locked file cabinet until 1975. Mary Sue Hubbard had the only keys to the cabinet.

Membership in the trust was restricted to churches of Scientology in the United States. However, the trust was administered in England by Denzil Gogerly, a United Kingdom Church official, and the United Kingdom Church tithed to the trust until some time in 1971. Financial statements for the trust covering the docketed years were belatedly prepared in 1973. They were prepared in South Africa. They were prepared for the benefit of 10 churches of Scientology in the United States although the Declaration of Trust recites only 5 member churches.

According to the financial statements finally prepared in 1973, the trust accounts had the following net proceeds and accumulated funds for the docketed years:

| Year ended | Net proceeds | Accumulated funds |
|---|---|---|
| Dec. 31, 1970 | $86,170.80 | $812,134.51 |
| Dec. 31, 1971 | 254,084.71 | 930,400.08 |
| Dec. 31, 1972 | 376,837.18 | 1,307,237.26 |
| July 18, 1973 | 691,106.02 | 1,998,343.08 |

The purported purpose of the trust was the defense of Scientology. During the docketed years there was only one disbursement for such purpose in the amount of $9,290.47. USGO expended substantially greater amounts for legal fees.

The United Kingdom Church was a branch of petitioner. According to petitioner's records, the United Kingdom Church earned the following profits:

| | 1970 | 1971 | 1972 |
|---|---|---|---|
| Total receipts | $892,783 | $2,017,850 | $1,815,509 |
| Less: Total expenses | (593,102) | (1,221,433) | (998,937) |
| Net income | 299,681 | 796,417 | 816,572 |

It was petitioner's policy to build large cash reserves and to deduct payments to these cash reserves as business expenses. These reserves were mainly held in OTC bank accounts. The yearend balances of the OTC bank accounts are shown in the following table:

OTC BANK ACCOUNTS
YEAREND (DEC. 31) BALANCE

| Bank | Bank account number | 1970 | 1971 | 1972 |
|------|------|------|------|------|
| (1) Swiss Bank Corp. | 295,728 | $1,721,748.46 | $1,653,475.50 | $1,825,724.25 |
| (2) Swiss Bank Corp. | 295,728.1 | 25,757.85 | 50,723.24 | 25.81 |
| (3) Swiss Bank Corp. | 295,728.2 | - - - | 98,743.80 | 163,820.00 |
| (4) Banque Marocaine | 081,920.4 | - - - | 110,852.06 | 380,629.76 |
| (5) du | 10,5616.2 | - - - | 1,330.93 | - - - |
| (6) Exterieur | 90,1924.0 | - - - | 36,289.48 | - - - |
| (7) " | 90,1928.0 | - - - | 8,425.93 | - - - |
| (8) " | 217.734.2 | - - - | 11,937.44 | 19,272.56 |
| (9) " | 02.03.C.05616.5 | - - - | - - - | 43,610.02 |
| (10) Banco de Vizcaya | 93,7470 | 20,577.44 | 1,433.57 | 1,477.60 |
| (11) Banco Unquijo | 15,855 | - - - | 7,697.29 | 19,535.64 |
| (12) Banco Espirito Santo E Comercial de Lisboa | 23,718 | - - - | 52,356.93 | 106,965.05 |
| (13) 1st National | 20,48.007 | - - - | 9,565.87 | 628.29 |
| (14) Banco de Vizcaya | Ellen Kayman | 742.59 | - - - | - - - |
| (15) Banco de Vizcaya | 917290 | 2,340.66 | - - - | - - - |
| (16) Banco Hispano Americano | 8631 | 1,814.72 | - - - | - - - |
| Total | | 1,772,981.72 | 2,042,831.54 | [28]2,561,688.98 |

During the tax years at issue, L. Ron Hubbard and Mary Sue Hubbard received salaries from petitioner in the following amounts:

| | 1970 | 1971 | 1972 |
|------|------|------|------|
| L. Ron Hubbard | $4,932 | $9,368 | $35,000 |
| Mary Sue Hubbard | 3,017 | 2,430 | 25,000 |
| Total | 7,949 | 11,798 | 60,000 |

Additionally, according to petitioner's own records, L. Ron Hubbard and Mary Sue Hubbard received 5,125.11.4 pounds in fees from the United Kingdom Church in 1970, 15,770.67 pounds in 1971, and 23,199.90 pounds in 1972.[29] Using the

[28] These balances are taken from petitioner's exhibit. We note that the yearend balance for 1971 is mathematically incorrect and should be $2,042,832.04. OTC's cash reserves may have even been larger than the amounts shown in these accounts. Petitioner contends that OTC had $1,986,409.50 in cash on board the *Apollo* on Dec. 31, 1972. There is some confusion in the record whether this amount is in addition to the listed bank accounts. Consequently, we were unable to ascertain the actual amount of cash reserves held by OTC.

[29] According to petitioner's own records, L. Ron Hubbard received or was expected to receive a salary from Worldwide of 10,000 pounds per year, while Mary Sue Hubbard was to receive from Worldwide an annual salary of 6,340 pounds. However, petitioner now asserts that L. Ron Hubbard and Mary Sue Hubbard were not actually paid these full amounts during the tax years in question. Without endorsing the accuracy of these amounts, we shall use them for purposes of our discussion.

conversion rate of 2.4 suggested by petitioner's witness, these amounts translate into $12,300.27 in 1970, $37,849.61 in 1971, and $55,679.76 in 1972. Thus, by petitioner's own admission, L. Ron Hubbard and Mary Sue Hubbard received salary payments from petitioner totaling $20,249.27 in 1970, $49,647.61 in 1971, and $115,679.76 in 1972.

In addition to the outright salary payments detailed above, during the years at issue, L. Ron Hubbard, Mary Sue Hubbard, and their four children resided for the most part aboard the *Apollo*. While aboard ship, petitioner paid the Hubbards' living expenses which included free lodging, food, laundry, and medical services. In 1970, Flag expended $31,720 for the benefit of the Hubbard family.

L. Ron Hubbard received royalty payments in connection with petitioner's sales of books and E-meters. These royalties were paid by ASHO and were computed on the basis of 10 percent of the retail price of the publications and E-meters distributed by ASHO PUBS. Parenthetically, we note that the retail price of these items was determined by a formula developed by L. Ron Hubbard. Beginning in August of 1971, all such royalties were paid on a weekly basis, while back royalties attributable to periods prior to that time were paid intermittently on later dates.

The amounts of royalties paid by ASHO to the account of L. Ron Hubbard during the years 1971 and 1972 were as follows:

| | |
|---|---|
| 1971 | $10,649.22 |
| 1972 | 104,618.27 |

Additionally, as of April 29, 1972, there were unpaid back royalties of $17,187.70 for the year 1971 which, along with all back royalties, were paid to L. Ron Hubbard by the end of 1974. The majority of ASHO PUB's sales of E-meters and books upon which royalties were paid to the account of L. Ron Hubbard were to other Scientology churches, including branches of petitioner.

It was a long-standing policy of petitioner that all works pertaining to Scientology and Dianetics had to be copyrighted to L. Ron Hubbard. As a result of this policy, a number of publications copyrighted by L. Ron Hubbard were actually written by others. For example, Ruth Mitchell wrote the book "Know Your People," and Peter Gillum wrote the book "How

To Be Successful"; however, both books were copyrighted by L. Ron Hubbard. Additionally, there are many policy letters contained in the OEC series that were actually written by paid employees of petitioner with L. Ron Hubbard's approval. Nevertheless, despite the fact that L. Ron Hubbard did not personally author the entire nine-volume set, he did receive royalty payments on the sale of this publication.

Petitioner expended funds to protect L. Ron Hubbard's patents and copyrights.

Sometime in the 1960's Scientology organizations around the world began paying L. Ron Hubbard 10 percent of their income in the guise of debt repayment. These payments were variously referred to as "LRH 10%s," "LRH RR," and "LRH Comm. Statistic (Stat.) Revised." The record is peppered with references to these alleged debt repayments in FBO correspondence and policy letters predating the docketed years. It is clear from these documents that there was no set amount of debt which had been negotiated between L. Ron Hubbard and petitioner or any other organization but rather a continuing obligation to make payments based on total receipts.

Petitioner continued to funnel debt repayments to L. Ron Hubbard during the docketed years. Between October 9, 1972, and December 28, 1972, USLO, also called FOLO, receipted $19,324.41 in debt repayment from Scientology organizations throughout the United States and Canada, including branches of petitioner. On petitioner's invoices (records of receipt), these payments were designated "LRH Repayments," "Founding Debt Payment," or "Per HCO Policy Letter 7 Sept. 72."

### Conspiracy

Petitioner, its agents, and others willfully and knowingly conspired to defraud the United States by impairing, obstructing, and defeating the lawful functions of the IRS in the determination, assessment, and collection of income taxes due from petitioner and from other Scientology organizations and officials. The conspiracy began in 1969 and continued until approximately July 7, 1977, when the FBI, pursuant to a warrant, searched petitioner's premises for evidence of the conspiracy and related crimes.

There is a written record documenting most of this conspiracy, some of it in official Church publications, some in confiden-

tial orders issued by petitioner's Guardian Office, and some in correspondence between Scientology officials. Prior to, and during the course of the conspiracy, L. Ron Hubbard issued policy letters and directives depicting the IRS as a danger to Scientology, and threatening to make the IRS "swim in circles." During 1969, personnel in petitioner's FBO network corresponded about plans to protect petitioner's tax-exempt status by forging records to conceal petitioner's relationship with OTC. Two confidential orders formulated by petitioner's Guardian Office in 1972 and 1974, respectively, outlined plans to thwart IRS investigations into the tax status of churches of Scientology by burglarizing Government offices and stealing Government documents. Reports sent to petitioner's Guardian Office describe compliance with the confidential Guardian Order issued in 1974.

In 1969, the IRS began an audit of petitioner's records to determine petitioner's tax liability for the years 1963 through 1967. In the same year, top officials on petitioner's staff in the FBO network grew concerned that petitioner's large payments to OTC, a foreign corporation not holding tax-exempt status, would jeopardize petitioner's tax-exempt status. To disguise these payments as debt repayment and to conceal the OTC sham, a cover story was developed.[30] The theme of the coverup story was that OTC was a corporation which provided training and consultation services to petitioner for a fee. Petitioner planned several measures to implement this cover and some of them were actually executed.

---

[30]This scheme draws on L. Ron Hubbard's advice for handling tax matters set forth in a policy letter dated June 25, 1967. L. Ron Hubbard stated—

"Now as to TAX, why this is mainly anybody's game of what is a PROFIT. The thing to do is to assign a significance to the figures before the government can. The whole thing is a mess only because arithmetic figures are symbols open to ANY significance. So I normally think of a better significance than the government can. I always put enough errors on a return to satisfy their bloodsucking appetite and STILL come out zero. The game of accounting is just a game of assigning significances to figures. The man with the most imagination wins. BUT there must be correct figures and there must not be gross misassignment of debts as profits or the whole thing won't hang together.

"Income tax is a suppressive effort to crush individuals and businesses and deprive the state of national gross product (since none can expand). The thing which baffles any suppressive is truth. It's the only thing that works. Significances one assigns figures are neither true nor false but always must be reasonable and *defendable*. And the figures themselves must always check out.

"*Income* does not mean profit. One can and should make all the INCOME one possibly can. Always. The only crime really is to be broke. But when one makes INCOME be sure it is accounted for as to its source *and* that one covers it with expenses and debts. Handling taxation is as simple as that."

On May 25, 1969, Vicki Polimeni, SBO and high-ranking official in the FBO network, by dispatch orchestrated a plan to disguise payments AOLA and other Advanced Organizations in Denmark and the United Kingdom made to OTC as debt repayment. She ordered the FBO at AOLA and various other Advanced Organizations to prepare and backdate weekly statements showing that each Advanced Organization was making expenditures *on behalf of OTC*.[31] The FBOs were directed to make these statements using Flag bill folders and Flag summaries. However, the Polimeni dispatch directed the FBOs not to mention Flag on the prepared statement. A mock statement itemizing Advanced Organization expenditures on behalf of OTC was included in the dispatch as an example.[32] The dispatch further explained that at the same time the FBOs were preparing the statements, the SBO and others at Flag would prepare billings from OTC to the Advanced Organizations using the statements to substantiate the billings. The purpose of these statements and billings was to manufacture evidence to show to the IRS which would disguise Advanced Organization payments to OTC as debt repayment for services OTC had allegedly rendered. In fact OTC, by petitioner's own admission, did not perform services for petitioner of the type described in the mock statement.

As part of the coverup plan, the FBO International wrote the FBO at AOLA on May 29, 1969, informing him that changes would have to be made to AOLA's disbursement vouchers and invoices to OTC dating back to August 1968 to make them support petitioner's tax story. (Petitioner's branch churches used disbursement vouchers to record payments, and invoices to record receipts.) On June 1, 1969, the FBO International also directed the FBO AOLA to prepare new signature cards and change the drawer's name on checks for account number 6919 used by AOLA but periodically maintained in the name of OTC at the Wilshire-Westlake Office of

---

[31]This cover story underwent modification so that by the time of the 1971–74 audit, petitioner was claiming that OTC, as petitioner's banking agent, was making expenditures *on behalf of petitioner*.

[32]The mock statement was addressed to OTC and had a blank space for indicating the name of the Advanced Organization which prepared the billing. The mock statement provided four examples of expenditures paid by the Advanced Organization on behalf of OTC: (1) A payment for marine fuel for the *Apollo*; (2) a payment to an OTC employee for expenses while on field assignment; (3) an airfare payment, and (4) a payment to the captain of the *Neptune* to cover ship's expenses.

the Crocker-Citizens National Bank in Los Angeles. This was done. Signature cards for this account show that between August 2, 1968 (when the account was established), and August 13, 1969, the account was periodically held in the name of OTS or OTC, in combination with petitioner's name or AOLA's name. However, beginning on August 14, 1969, account number 6919 was held in AOLA's name with no mention of OTC. Sometime in 1969, the drawer's name was also changed on checks for account number 6919 from OTS to Church of Scientology of California Advanced Organization of Los Angeles Reserve Account.

During the docketed years, petitioner advocated and practiced the use of obstructionist tactics to thwart IRS investigations of petitioner and affiliated churches. In 1970, petitioner's tax returns for the taxable years 1964 through 1967 were under audit. In June or July of that year, Martin Greenberg, the Church's accountant, told an assembled group of Scientologists[33] that he purposely made the audit difficult. He said he gave the examiner boxes of original records, disbursement vouchers, and invoices in no semblance of order, with the intent of so hopelessly overwhelming and confusing the examiner that he would be forced to give up the examination and accept petitioner's version of the facts. In April 1972, Mr. Greenberg instructed a member of the financial staff at an affiliated Church of Scientology to use similar tactics if IRS agents ever came to her church to examine records. She was told to give the IRS agent a bunch of records in a box in no semblance of order; to place the agent in a small, dark, out-of-the-way room, to refuse to give practical assistance like locating records, and to notify petitioner's Guardian Office immediately of the agent's presence. Henning Heldt, petitioner's vice president and the Deputy Guardian Finance in petitioner's Guardian Office, gave this staff member similar instructions.

For approximately 2 years from May 1971 through February 1973, IRS Agent Robert Cluberton tried unsuccessfully to audit petitioner's 1968 and 1969 tax returns.[34] Part of the

---

[33]Those present were: Kima Jason, Assistant to the Deputy Commodore; Jane Kember, Guardian Worldwide; and Scott Mayer, a low-level Scientology official and later a Government witness.

[34]Initially, the audit covered just the 1968 tax return. In March 1972, petitioner's 1969 tax

audit's lack of success was attributable to the IRS's failure to pursue vigorously the audit and part to petitioner's refusal to cooperate.[35] Petitioner never allowed agent Cluberton access to its financial records. On February 9, 1973, agent Cluberton served an administrative summons on Henning Heldt, vice president and director of petitioner. The summons specified records and documents to be produced and allowed a 10-day return. Heldt did not comply. On February 20, 1973, Heldt appeared at the Los Angeles IRS Office and handed Cluberton a letter stating he had resigned as an officer of the California Church and therefore did not have control of its records. Notwithstanding his resignation, Heldt continued to exercise control over petitioner's financial records. By letter dated June 12, 1973, he authorized the Crocker-Citizens National Bank to release certain bank statements to the bearer of the letter.

On or about October 26, 1971, petitioner filed an informational return, Form 990, for the taxable year 1970; on or about August 21, 1972, for 1971; and on or about October 12, 1973, for 1972. All three informational returns were prepared and signed by Martin Greenberg, certified public accountant. Reverend Mulligan as president co-signed the 1970 return; Craig Beeney, as secretary and vice president, respectively, co-signed the 1971 and 1972 returns. The returns were signed under penalty of perjury. They do not contain financial information for the United Kingdom Church or OTC.

During and after the docketed years, petitioner's Guardian Offices in the United States and the United Kingdom planned and executed a scheme to infiltrate the IRS, seize records pertaining to Scientology-related tax matters pending before the IRS, and conceal petitioner's connection to these covert, illegal activities. During this period, the highest ranking Guardian was Mary Sue Hubbard who held the position Commodore Staff Guardian. Jane Kember, the Guardian Worldwide, was just under her in rank. In the United States during the years 1970–72, the highest ranking official in the

return was added. Office policy required audits to cover all back tax years until the taxpayer was brought up to date.

[35]Petitioner maintained that the purpose of the IRS audit of its 1968 and 1969 tax returns was harassment, and justified its refusal to cooperate on this ground. Our findings on this issue are contained *supra* at 403—413.

Guardian Office was Robert Thomas, the Deputy Guardian United States (DG US). His senior staff and their positions from 1970–72 were as follows:

James Mulligan ...................................... Deputy Deputy Guardian[36]
Joel Kreiner ........................................ Deputy Guardian Legal
Craig Beeney ....................................... Deputy Guardian Technology
Henning Heldt ..................................... Deputy Guardian Finance
Arthur Maren ...................................... Deputy Guardian Public Relations
Terry Milner ....................................... Deputy Guardian Intelligence[37]

Martin J. Greenberg, whose title was CPA US, was an adjunct of the United States Guardian Office during these years. He was petitioner's accountant. Henning Heldt reviewed his work. By the end of 1972, the USGO had 40 staff members. James Mulligan, Craig Beeney, and Henning Heldt also served as officers and directors of petitioner during the docketed years. Their positions and dates of service were—

James Mulligan ...................................... Director and president
                                                     (Jan. 1, 1970—Sept. 3, 1973)
Henning Heldt ...................................... Director and vice president
                                                     (Feb. 23, 1971—Feb. 16, 1973)
Craig Beeney ....................................... Director and secretary
                                                     (Feb. 23, 1971—Apr. 13, 1973)

In April 1972, petitioner's Guardian Office formulated a three-prong plan designed to stop what it perceived to be an IRS attack on Scientology. The plan was developed in response to several unfavorable tax rulings revoking the tax-exempt status of churches of Scientology in the United States. The plan called for three separate intelligence operations: Operation Search and Destroy, Operation Random Harvest, and Operation Paris. The purpose of Operation Search and Destroy was to identify organizations and individuals furnishing information to the IRS and secure information about them covertly and overtly which could be used to discredit or "Dead Agent" them. This plan appears to have been a continuation of an earlier program since the Intelligence Bureau of the Guardian Office was already in possession of files taken from organiza-

---

[36]In 1973, James Mulligan's title was changed to "Commodore Staff Guardian Communicator, U.S."

[37]The Intelligence Division of the Guardian Office was also referred to as "B-4" or "Bureau 4."

tions providing information to the IRS.[38] Care was to be taken to prevent the Church of Scientology from being connected to the covert component of the operation.

The purpose of Operation Random Harvest was to document criminal activity on the part of the IRS. The purpose of the third intelligence program, Operation Paris, was to identify IRS personnel handling Scientology tax matters and to investigate their backgrounds and activities. A segment of the plan called for recruiting a "plant" to develop social and professional contacts with IRS personnel and develop a cover to hide his affiliation with the Church of Scientology. Significant information gleaned from Operation Paris was to be forwarded to the Intelligence Bureau of the Guardian Office. The Deputy Guardian Intelligence (DG Int US) was placed in charge of this project.

The Guardian Office later developed another plan to infiltrate the IRS and appropriate documents. The plan is memorialized in Guardian Order 1361 dated October 21, 1974. The plan was developed in response to the IRS's continuing investigation of Scientology tax matters which petitioner viewed as an attack. Part of this investigation covered petitioner's tax returns for 1964–69. The purpose of the plan was to root out damaging reports considered to be false in the IRS files, so that the IRS would forget about Scientology and direct its attention elsewhere. The plan called for infiltrating IRS offices in Los Angeles, Washington, D.C., and London; stealing files on Scientology and L. Ron Hubbard; and developing a suitable cover story to disguise how the information was obtained. The Deputy Guardian Information, U.S. (DG Info US) was in charge of implementing most of the plan.

Pursuant to Guardian Order 1361, the IRS offices in Washington, D.C., were burglarized, and documents relating to petitioner and other Scientology churches were taken and forwarded to petitioner's Guardian Office. At one point, Scientology operatives had difficulty gaining access to IRS intelligence files. They tried to solve this problem by having petitioner's attorney, Joel Kreiner, a witness in this case, make a freedom of information request for these documents believing the request would lead the IRS to place the files in a

---

[38]The Guardian Office trained personnel to filch documents critical of Scientology from other organizations.

central location for processing where they would be more accessible. Operatives gained inside information about the 1971–74 audit by monitoring the offices of Lewis Hubbard and his assistant and then successor, Stephen Friedberg. Their offices were monitored over a period of several months while the 1971–74 audit was in progress. At one point during this period, operatives reported they had gained access to all of the materials on Scientology kept in Lewis Hubbard's office including Chief Counsel's files. They also gained possession of Stephen Friedberg's handwritten daily notes which contained occasional references to the examiner's activities.

On December 11, 1979, several ranking officials in petitioner's hierarchy were convicted in the U.S. District Court for the District of Columbia of conspiracy to obstruct justice and to obstruct a criminal investigation in violation of 18 U.S.C. section 371. They were Mary Sue Hubbard, the founder's wife and second in the executive chain-of-command during the docketed years; Henning Heldt, petitioner's vice president and Deputy Guardian Finance during the docketed years; Duke Snider, petitioner's president from late 1975 through May 10, 1976, and USGO official; Gregory Willardson, a USGO intelligence official in the post-docketed years; and Richard Weigand, also a USGO intelligence official in the post-docketed years. On the same day, Mitchell Hermann, a.k.a. Mike Cooper, a Guardian official employed by the Church of Scientology in the District of Columbia, was convicted of conspiring to steal Government documents including ones pertaining to the 1971–74 audit.[39] A year later, on December 19, 1980, Jane Kember and Morris Budlong were convicted in the U.S. District Court for the District of Columbia of burglarizing the Exempt Organization Division of the National Office of the IRS on three occasions in 1976 while the 1971–74 audit was in progress. Jane Kember, the Guardian Worldwide, was the highest ranking official in the United Kingdom Church during the docketed years. Morris Budlong was an official in the Guardian Office Worldwide in the post-docketed years.

In the spring of 1975, Guardian Office personnel came aboard the *Apollo* and engaged in a project to falsify petition-

---

[39]Three other Scientology officials were convicted at the same time. One of these officials was not convicted of a crime related to the conspiracy of obstructing the IRS. We were unable to tell which churches employed the remaining two Scientologists.

er's financial records. The project was undertaken in anticipation of an IRS audit.

From June 1975 through July 1976, the IRS audited petitioner's records bearing on its 1971–74 tax returns. Following the audit, petitioner prepared a Church audit report and maneuvered to have it serve as the operative statement of facts to accompany a request for technical advice. Thereafter, petitioner and respondent entered into settlement negotiations which continued even after the notice of deficiency was issued.

The California Church did not keep books or journals to record its financial transactions. The examiners, therefore, worked from original records—checks, disbursement vouchers, and invoices. The California Church also gave the examiners tax workpapers for the years 1971 and 1972, in lieu of general ledgers or books of entry. During the course of the audit, the examiners received over 300 cartons of records containing, by conservative estimate, 2 million documents. The boxes were labeled by type of record and by year; for example, "1971 disbursement vouchers," but the labels did not always correspond with the materials inside. The records were generally not in chronological order. The checks were detached from their stubs. It took three or four examiners from 1 to 2 weeks just to organize 49 boxes of records from the San Francisco Organization. The Church's workpapers were not always prepared in accordance with generally accepted accounting principles and were insufficient to establish the information the California Church was required to report on its returns.

During the audit, the examiners tried to fathom the relationship between petitioner and OTC. Several times they asked for canceled checks from the bank accounts OTC maintained on behalf of the California Church. They were told these might take several weeks to produce since foreign banks did not return canceled checks as a matter of course. The California Church concealed from the examiners that it regularly received debit advices from the foreign banks in lieu of canceled checks, and it never produced the canceled checks. As a result, docketed-year disbursements totaling over $3 million from the Rubric General Account No. 295,728 on which L. Ron Hubbard was a signatory were never explained. The auditors made numerous requests for records to verify

that OTC expenditures claimed to be made on petitioner's behalf were actually expended on petitioner for an exempt purpose. The California Church did not comply with some of these requests. In one instance, the California Church failed to substantiate a schedule of approximately 300 claimed expenditures. The schedule was pared down to 20 items. The IRS never received adequate documentation, e.g., canceled checks or third-party bills, to substantiate even these 20 items.

During the audit and the ensuing negotiations, petitioner repeatedly represented that OTC was a separate corporation from petitioner. Petitioner represented that OTC was formed in 1968 to render financial services to the Flag Division aboard the *Apollo*. Petitioner represented that OTC was a trusted agent receiving and banking petitioner's funds and then expending them on petitioner's behalf to support Flag operations. Petitioner represented that OTC personnel performed these financial services. Petitioner further represented that at the start of the agency relationship, force of circumstances led petitioner to deposit its funds in existing OTC bank accounts, a practice which continued through the taxable years in issue. Petitioner also represented that in 1972, over $2 million in cash belonging to OTC was transferred to the *Apollo* and kept in OTC's custody until the end of 1974, when it was credited to petitioner as partial payment of a debt OTC owed petitioner.

All of these representations were false. OTC was in form, but not in fact, a separate entity from petitioner. Petitioner's personnel and not OTC personnel kept the OTC checkbooks, directed the flow of funds into and out of OTC accounts, receipted money for the support of Flag operations, and controlled and managed Flag expenditures. The OTC bank accounts were in reality opened and maintained by petitioner.[40] Only petitioner's personnel were signatories on the accounts.[41] Mary Sue Hubbard and L. Ron Hubbard were sole

---

[40] In n. 108 of the Church audit report, petitioner represented that OTC put its own moneys into OTC accounts used by petitioner. IRS Agent Eugene Endo initialed n. 108. His initials signified his agreement with the facts in the footnote but not their interpretation. The factual portion of n. 108 states that Church-prepared summaries of OTC accounts "show that in 1971 OTC deposited $2,295,164 into these accounts out of total deposits of $3,957,813 or 58%. In 1972, OTC deposited 38%, in 1973, 64%, and in 1974, 64%." The Church audit report contained many false representations and material omissions. Respondent did not ratify or adopt Agent Endo's admission.

[41] Joyce Popham was a signatory on major OTC accounts. She served on the OTC board of directors but was also a Flag employee and apparently never wrote a check on the OTC accounts.

signatories on the accounts. The $2 million in cash that was brought to the *Apollo* in 1972 in reality belonged to petitioner and not OTC. The cash was withdrawn from a Swiss bank account upon L. Ron Hubbard's authority, transferred to the *Apollo* by Flag employees, and kept in a file cabinet in a strongroom to which only Mary Sue Hubbard had keys.

Throughout most of the course of the conspiracy, the California Church knowingly concealed the status of the United Kingdom Church as an operating branch of petitioner. The Forms 990 filed by petitioner for the years 1970–72 did not consolidate or include the receipts, disbursements, assets, or liabilities of the united Kingdom Church. Church submissions to the IRS made during the. audit and intended to describe petitioner's corporate structure made no mention of the United Kingdom Church. Throughout the audit, petitioner's representatives referred to Scientology activities in the United Kingdom by such names as U.K. Church, U.K., United Kingdom Churches, Worldwide Church in England, and United Kingdom Scientology Organizations. They never used the term "U.K. Branch" or "Church of Scientology of California— U.K. Branch" or a term of like import although they did furnish some records which incidentally, e.g., in letterheads, disclosed the United Kingdom Church's corporate status. The Church audit report cast the United Kingdom Church as a separate corporate entity. An affidavit of petitioner's president dated November 9, 1980, in support of a motion to quash a subpoena to produce bank records from accounts maintained by the United Kingdom Church denied the accounts belonged to the California Church.

A stipulation in this case filed November 10, 1980, listed seven of petitioner's divisions but did not include the United Kingdom Church. Prior to trial, petitioner's representatives once acknowledged a formal connection between the United Kingdom Church and the California Church while denying any more than a formal connection. In March 1975, during the audit of the Hawaii Church, petitioner's representative stated that the United Kingdom Church was incorporated as the Church of Scientology of California as a legal convenience but operated separately and independently.

The United Kingdom Church had more than a nominal connection to petitioner. It lacked a bona fide board of

directors. Its franchise operations were controlled by Flag. Policy directives were issued jointly by the United Kingdom Church and the California Church for the board of directors of the California Church. United Kingdom Church officials and California Church officials could and did write checks on each other's accounts. Petitioner's "trust fund" was administered by the United Kingdom Church.

Church officials knew the United Kingdom Church was only operating in the United Kingdom as a branch of petitioner. At practically the same time that the California Church's representatives in the United States were portraying the United Kingdom Church as a separate and independent entity, petitioner's representatives in the United Kingdom were filing documents with the Registrar of Companies in Great Britain, referring to the United Kingdom Church as the "Church of Scientology of California—U.K. Branch," and stating that the United Kingdom Church "was not resident in the United Kingdom during the above year(s) [1967, 1968, 1970]" and was "not a 'Close' Company within the meaning of Schedule 18 Finance Act of 1965." Petitioner's United Kingdom accountant, Derek Field, who prepared and reviewed these documents, testified that the statement was intended to reflect the fact that the United Kingdom Church was not present in the United Kingdom as an entity. It was only present as a branch of the California Church.

## *Evidence*

On July 8, 1977 (and past midnight into July 9, 1977), FBI agents executed a search warrant at petitioner's premises, known as the Cedars-Sinai Complex, in Los Angeles. The search warrant was based on a 33-page sworn affidavit signed by FBI Special Agent Robert Tittle describing the Government's investigation of charges that Scientology officials from 1974 through 1976 conspired to steal documents belonging to the Federal Government and conspired to obstruct justice by covering up these crimes during a grand jury investigation of a burglary of the Office of an Assistant U.S. Attorney in the U.S. Courthouse in Washington, D.C. The search warrant specified 162 categories of items to be seized. Category 162 called for the seizure of:

Any and all fruits, instrumentalities, and evidence (at this time unknown) of the crimes of conspiracy, obstruction of justice and theft of government property in violation of 18 U.S. Code secs. 371, 1503 and 641 which facts recited in the accompanying affidavit make out.

During the search, FBI agents seized a document, identified as "Exhibit FX" in this case, from a file cabinet in petitioner's Guardian Office. The FBI agent who seized the document did not testify.

Exhibit FX consists of 19 pages. It is dated April 5, 1972. The document sets forth a plan to sabotage IRS investigations of the tax-exempt status of Scientology churches. The plan calls for employing secret operatives to gather information to discredit persons working for, or supplying information to, the IRS on Scientology matters. The plan is written in the format of a Guardian Order.

Exhibit FU, in the instant case, is a folder containing Guardian Order 1361, dated October 21, 1974, and a number of reports discussing compliance with the Guardian Order.[42] Guardian Order 1361 is a nine-page plan to derail governmental challenges to the tax-exempt status of Scientology churches, including petitioner. Petitioner stipulated that Guardian Order 1361 in Exhibit FU was prepared by petitioner's United States Guardian Office in 1974. Petitioner did not stipulate to the authenticity of the remaining documents in Exhibit FU. However, when the exhibit was moved into evidence some 6 months after it was first the subject of testimony, petitioner's only continuing objection was that the documents were the product of an illegal search and seizure.

Guardian Order 1361 calls for infiltrating the IRS and the Department of Justice, stealing documents from IRS offices in London, Los Angeles, and Washington, D.C., and the Tax Division of the Department of Justice, and passing information culled from these documents on to the Deputy Guardians for Information, Legal, and Public Relations at petitioner's Guardian Offices in the United States and Great Britain. The contents of most of the remaining documents in Exhibit FU bear on compliance with Guardian Order 1361. Some are progress reports. Some convey strategic information about

---

[42]The documents which comprise Exhibit FU are sometimes referred to as "the typewriter-case documents," since they were brought to the IRS in a typewriter case.

Government offices targeted for burglary. Some refer to Guardian Order 1361 on their face. Some show on their face that they were sent to a person in petitioner's United States Guardian Office. One document is a job-posting for a position as clerk-typist at the IRS.

Stephen C. McKellar, a criminal investigator in the Internal Security Division of the IRS, testified about the circumstances by which the IRS came into possession of the documents comprising Exhibit FU. His investigative report of these circumstances was also placed in evidence.

Agent McKellar first saw the typewriter-case documents on February 8, 1978. On that date Alvin Jones, an attorney, came to his office in Los Angeles carrying a black, metal typewriter case full of documents in file folders. The typewriter case had no markings on it except the letters "SMC" for Smith-Corona Corp. Agent McKellar testified that Jones explained that sometime in July 1977, one of his clients found the typewriter case by itself in a Sears store parking lot located on Santa Monica Boulevard and Wilton Place in Los Angeles. Agent McKeller's report amplifies this testimony somewhat and states that Jones explained to McKellar that his client saw an unidentified man leave the typewriter case in the parking lot unattended and that his client picked it up when the man failed to return after a short while. Agent McKellar testified that Jones told him he believed the documents would be of some value to the IRS since they described information about a burglary of IRS offices in Washington, D.C. The report further amplifies this point explaining that Jones told McKellar the documents related to break-ins of IRS offices for the purpose of reviewing records concerning the Church of Scientology.

Agent McKellar did not get a search warrant before opening the typewriter case and examining its contents. When he opened it he had some belief it contained evidence of a crime.

The audit of petitioner's 1971–74 taxable years began in June 1975 and lasted through July 1976. Respondent's examining agents had no authority to conduct settlement negotiations during the audit.

The documents in exhibits DU and HG constitute some of petitioner's correspondence with the IRS. The documents fall into one of three categories. The majority of the documents are petitioner's responses to formal requests for information from

the IRS during the audit.[43] These documents are identified by the fact that they have at least two of the following features: (1) They are addressed to an examiner and bear a date corresponding to the audit period; (2) they are captioned by, or contain an internal reference to, a specific IRS request for information; (3) their content clearly relates to a specific request for information. Exhibit DU also contains some of petitioner's correspondence with the IRS unrelated to information sought by the examiners.[44] These documents bear a date subsequent to July 31, 1976, and are addressed to Mr. William Connett, Mr. Alvin Lurie, or Mr. Joseph Tedesco of the IRS. There are also a few miscellaneous documents in Exhibit DU which cannot with certainty be categorized as petitioner's responses to requests for information from the IRS.[45]

## OPINION

This is a complicated case, both legally and factually—witness the long list of issues presented for resolution and the lengthy findings of fact we have had to make. We, therefore, think it is wise to announce our holdings at the outset, hoping this will help the reader's understanding. We hold that petitioner does not qualify for exemption from taxation under sections 501(a) and 501(c)(3) because it is operated for a substantial commercial purpose and because its net earnings benefit L. Ron Hubbard, his family, and OTC, a private noncharitable corporation controlled by key Scientology officials. Additionally, we hold that petitioner is not entitled to tax-exempt status because it has violated well-defined standards of public policy by conspiring to prevent the IRS from assessing and collecting taxes due from petitioner and affiliated Scientology churches. We further uphold the determinations respondent has made in his notice of deficiency, except his determination that petitioner received income from the United Kingdom Church. Finally, we find that petitioner's failure to file tax returns was without reasonable cause and

---

[43]All of the documents in Exhibit HG belong in this category. The following pages of Exhibit DU also contain documents in this category: pp. 1–121, 129–132, 132A–132B, 133–148, 150–201, 225–241.

[44]The following pages of Exhibit DU contain documents in this category: pp. 210–216, 221–223, 247–249.

[45]The following pages of Exhibit DU contain documents in this category: 122–128, 149, 202–209, 217–220, 224, 242–246.

that respondent therefore properly determined an addition to tax.

We have divided this opinion into eight sections, each of them announced by a Roman numeral. The first section deals with petitioner's challenges to the notice of deficiency (questions 1 and 2). The second section treats petitioner's objections to the constitutionality of the express conditions of section 501(c)(3). However, it does not treat petitioner's attack on the constitutionality of public policy requirements which have been read into section 501(c)(3). See *Bob Jones University v. United States*, 461 U.S. 574 (1983). In view of our holding that petitioner fails to qualify for exemption under the express conditions of section 501(c)(3), i.e., the provisions prohibiting commercialism and inurement, our holding that petitioner is not entitled to exemption because it has violated public policy is simply an additional ground of decision. We, therefore, reserve treatment of the public policy aspects of this case to a separate section. There is one minor exception. The second section does include treatment of petitioner's contention that the public policy requirement is unduly vague. In sum, the second section covers questions 3 through 10 on the list of issues presented. Midway through the trial, respondent raised a new issue. Respondent presented evidence that the United Kingdom Church is a branch of petitioner. The third section of this opinion considers the legal issues generated by respondent's claim that the United Kingdom Church is a branch church (question 13). The fourth and fifth sections deal with the Church's financial operations (questions 14 and 15). Section four elucidates our holding that the Church's activities evidence a substantial commercial purpose, and section five, our holding that the Church's earnings inure to the benefit of private individuals. Section six treats the public policy issues raised in this case (questions 11, 12, and 16). There are three of them: (1) Whether petitioner has, in fact, violated public policy; (2) whether requiring petitioner to comport with public policy intrudes on the Church's associational and free exercise rights protected by the First Amendment; and (3) whether petitioner is deprived of due process by the retroactive imposition of a public policy requirement. The seventh section treats a number of evidentiary issues raised in this case and the

eighth and last section deals with petitioner's tax liability as reflected in the notice of deficiency (questions 17 and 18).

## I.

Petitioner mounts two attacks on the notice of deficiency. First, petitioner alleges that it is invalid for a number of administrative reasons and, second, petitioner alleges that it is invalid because of constitutional considerations. The main thrust of petitioner's first argument is that respondent never issued a final letter of revocation or, if he did, he later nullified it and therefore the notice of deficiency is null and void, since an exempt organization cannot owe taxes. Petitioner relies on *A. Duda & Sons Cooperative Association v. United States*, 504 F.2d 970, 973 (5th Cir. 1974), stating that respondent could not assess taxes against a tax-exempt cooperative where it stipulated the revocation was void.

We think petitioner misinterprets the administrative record and misreads the *Duda* case. On July 18, 1967, respondent formally revoked petitioner's tax-exempt status and subsequently published an announcement of the revocation in the Internal Revenue Bulletin and removed petitioner's name from its cummulative list of charitable organizations. None of respondent's actions subsequent to the revocation show, as petitioner claims, that the revocation was either tentative or later nullified. Admittedly, respondent made no unflinching effort to collect taxes from petitioner prior to the taxable years at issue in this case and continued in subsequent audits to review petitioner's tax status, but we decline to agree with petitioner that these actions either nullify the revocation or detract from its finality.

Petitioner argues that respondent's disposition of its 1965–67 taxable years voided the letter of revocation issued on July 18, 1967. In 1974, respondent issued a notice of deficiency to petitioner for the taxable years 1965–67. The deficiencies were comparatively small, ranging from slightly over $2,500 to slightly under $14,000. Petitioner contested the 1965 but not the other deficiencies in the Tax Court. In late 1976, respondent settled the 1965 case by conceding petitioner's tax-exempt status for that year only and without prejudice to any other year and closed the other two years on the basis of "no change."

Petitioner's contention that respondent's disposition of its 1965–67 taxable years amounts to a nullification of the letter of revocation stretches the facts far beyond their reasonable interpretation. By late 1976, respondent had concluded the 1971–74 audit. This audit revealed potential income tax liability in the hundreds of thousands of dollars. Respondent may well have decided not to pursue the comparatively small deficiencies of the earlier years in order to marshall his resources to collect the potentially greater deficiencies of the later years. The settlement entered in the Tax Court on its face only applied to 1965, and the closing of the 1966 and 1967 taxable years on the basis of "no change" in context marks a concession of tax liability, only, and is without bearing on petitioner's tax status.[46] That respondent in post-revocation audits to determine petitioner's tax liability also reviewed petitioner's tax status is also not significant. More or less, the same records have to be examined in either type of audit. Since the double-issue review required virtually no extra work, respondent's reconsideration of petitioner's tax status shows nothing more than a desire to check for prior error. It is noteworthy that after performing these post-revocation audits, respondent never changed his ruling.[47]

This case is also readily distinguished from the *Duda* case. In that case the Government, in a pretrial conference, stipulated that it had revoked the taxpayer-cooperative's tax exemption for the wrong reasons and also stipulated that the revocation was not based on the taxpayer's failure to act as a cooperative. 504 F.2d at 973. The Government wanted to be relieved of these stipulations so it could collect taxes on the basis of the taxpayer's failure to act as a cooperative. 504 F.2d at 975. The court held that the Government could not be relieved of its disastrous concessions and allowed to show that the revocation was not a nullity. 504 F.2d at 975–976. In comparison, respondent, in the case at bar, has consistently maintained that petitioner was not operating for exempt purposes. This was communicated in the letter revoking

---

[46]The Court takes judicial notice of the fact that all indexed references to "no change" cases or reports in the Internal Revenue Manual refer to the closing of cases on the basis of no tax liability.

[47]Petitioner placed in evidence the "Foley memorandum" referring to the tentative revocation of petitioner's exempt status. The memorandum was not written by an IRS employee, and petitioner, itself, questioned the trustworthiness of the information in this memorandum.

petitioner's exempt status and in the notice of deficiency. As a general rule, the notice of deficiency is presumed to be correct (Rule 142;[48] *Welch v. Helvering*, 290 U.S. 111, 115 (1933)), and the Court will not look behind it. *Riland v. Commissioner*, 79 T.C. 185 (1982); *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324 (1974); *Suarez v. Commissioner*, 58 T.C. 792 (1972), overruled on other grounds *United States v. Janis*, 428 U.S. 433 (1976). This is true even where the record discloses procedural irregularities. *Cataldo v. Commissioner*, 499 F.2d 550 (2d Cir. 1974), affg. per curiam 60 T.C. 522 (1973); *Rosenberg v. Commissioner*, 450 F.2d 529 (10th Cir. 1971). Petitioner has not shown any serious procedural irregularity in the way respondent handled its case, much less action rising to the level of a nullification of the 1967 determination that it did not qualify for exemption from taxation.

Petitioner also challenges the notice of deficiency and the letter of revocation on constitutional grounds. The gravamen of petitioner's complaint is that respondent selectively enforced the tax laws against petitioner, revoking the Church's exemption from taxation and determining a deficiency because of hostility to Scientology in violation of the equal protection component of the Fifth Amendment and the First Amendment.[49] In support of its argument, petitioner makes a number of factual allegations. Most of them boil down to one of three points. First, respondent's files are suffused with correspondence and memoranda denouncing Scientology. Second, special intelligence groups within the IRS charged with investigating politically active organizations targeted petitioner and affiliated churches for surveillance. Third, respondent arbitrarily and capriciously handled numerous Scientology tax matters pending in the IRS.

Ordinarily, this Court will not look behind the notice of deficiency to examine respondent's motives, policies, or procedures in making his determinations. *Suarez v. Commissioner, supra* at 813; *Greenberg's Express, Inc. v. Commissioner, supra* at 327. However, this Court has recognized a limited exception to this rule which appertains here. When there is substantial

---

[48]All references to Rules shall refer to the Tax Court Rules of Practice and Procedure.

[49]Petitioner first raised this argument in a pretrial Motion to Render the Notice of Deficiency Nugatory and for Other Relief. The motion was denied after a hearing. However, the Court allowed petitioner to present evidence on this issue during trial and to reargue it on brief.

evidence of unconstitutional conduct on respondent's part, and the integrity of our judicial process would be impeded were we to let respondent benefit from it, this Court will examine respondent's conduct in reaching a determination. *Greenberg's Express, Inc. v. Commissioner, supra* at 328; *Suarez v. Commissioner, supra*. We believe that the evidence supporting petitioner's accusations raises sufficient doubts · about the constitutionality of respondent's conduct that judicial scrutiny of his actions is required to prevent our system from becoming an instrument of selective enforcement of the tax laws.

There are two components to petitioner's religious hostility argument, one involving equal protection, and the other, free exercise considerations. Petitioner makes the equal protection claim that it has been singled out for enforcement because of its unpopular religious views and practices. Petitioner also claims respondent violated its First Amendment rights because respondent's adverse determinations were motivated by its dislike for the Church's unorthodoxy.

We first consider petitioner's selective enforcement argument. It is by now well established that equal protection requires that laws fair on their face be impartially executed (*Yick Wo v. Hopkins*, 118 U.S. 356, 373–374 (1886)), and that discriminations based on hostility to a group's religion are constitutionally intolerable. *Niemotko v. Maryland*, 340 U.S. 268 (1951). However, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" (*Oyler v. Boles*, 368 U.S. 448, 456 (1962)), and is even necessary, particularly "In the tax field, with millions of returns, and many thousand that reveal some basis for further investigation." *United States v. Wilson*, 639 F.2d 500, 505 (9th Cir. 1981). In the criminal field, a case of selective prosecution is made out when the defendant shows: (1) The decision to prosecute was based on impermissible grounds such as race, religion, or the exercise of constitutional rights; and (2) that others similarly situated are generally not prosecuted. *Karme v. Commissioner*, 673 F.2d 1062, 1064 (9th Cir. 1982), affg. 73 T.C. 1163 (1980); *United States v. Ness*, 652 F.2d 890, 892 (9th Cir.), cert. denied 454 U.S. 1126 (1981); *United States v. Moon*, 718 F.2d 1210 (2d Cir. 1983), cert. denied 466 U.S. ____ (1984). Like the Ninth Circuit, which has appellate jurisdiction of this case, we express our concern that examining the IRS's actions

here under the standard applied in criminal cases may be too stringent a test. *Karme v. Commissioner, supra* at 1064. However, we need not decide this issue since petitioner's argument fails under both prongs of the criminal test.

Petitioner makes a number of factual allegations—some well founded, some exaggerated, and some completely unsupported. Petitioner did demonstrate that respondent's files contain memoranda and correspondence denigrating Scientology. During the period in which petitioner's tax exemption was under active consideration, a few of respondent's agents called Scientology a "medical quackery"; a "threat to the community, medically, morally and socially"; a "prey on the public pocketbook"; and similar epithets. These comments mostly sprang from persons in respondent's Refund Litigation Division, then assisting the Department of Justice in defending the *Founding Church* refund tax case. However, agents in respondent's Exempt Organizations Division charged with reviewing petitioner's tax status were privy to them. These comments were the remarks of individuals. There is no evidence respondent adopted them. However, some derogatory statements about Scientology are clearly attributable to respondent. In his Trial Memorandum, respondent stated that he intended to prove petitioner violated charitable law standards of public policy by the infliction of psychic harm, including the loss of moral judgment through brainwashing, accomplished by auditing and other practices and procedures. In correspondence sent to this Court, respondent called the Church a "cult," once again referred to the Church's "brainwashing" methods, and characterized the Church's policies and practices as a danger to the moral and physical health of citizens and responsible for trouble in families. None of these charges were proved, although this Court's rulings did not preclude respondent from showing Church policies and practices violated civil or criminal law.

Between 1969 and 1975, respondent formed and maintained three special intelligence units. These units collected information about taxpayers, selected by essentially political criteria, ostensibly to monitor their compliance with the tax laws. All three units collected information about petitioner. In October 1969, one of these intelligence units, the SSS, added the Founding Church to a list of 99 organizations selected for

investigation. Other groups selected at the same time included the Black United Front, the New Left Movement, and the Welfare Rights Organization. After the Founding Church was selected, the SSS received some information from respondent's District Offices about Scientology churches. Virtually all of it concerned matters pertinent to the tax status of these churches. The Case Development Unit, a local intelligence unit operating out of respondent's Los Angeles District Office, also collected information about the California Church and Scientology. Most of the information pertained to financial, religious, or charitable matters. A few reports linked petitioner or Scientology to criminal activity. A third intelligence group, the IGRU, established in 1973, had chapters in respondent's District Offices. Intelligence reports in respondent's Los Angeles District files connected petitioner with tax-protest activity. Perhaps based on these reports, the Los Angeles IGRU chapter classified petitioner as a tax resister. Files from the St. Louis IGRU unit were destroyed in 1975. One such file labeled "subversives" contained material only about Scientology.

Counterbalancing these facts evidencing respondent's political and religious hostility, to petitioner is the record of petitioner's actual treatment by the IRS. The decision to revoke petitioner's exemption was based upon legitimate Agency concerns. The decision was made after respondent examined petitioner's 1964 and 1965 information returns and following local and national protest conferences.[50] It was based on findings that the Church's activities were akin to a business, that it was serving the private interests of its members and not the public, and that its income inured to the benefit of Scientology practitioners. Thus both the procedures for and grounds of revocation were based upon the valid exercise of Agency authority.

Petitioner's contention that its revocation was rushed through Agency channels as part of a wholesale effort to take away the tax-exempt status of Scientology churches is not borne out. First, the revocation was not rushed. While we do not know exactly when the audit of petitioner's 1964 and 1965 informational returns took place, we surmise that the exami-

---

[50]Petitioner's allegation that it had no opportunity to contest the revocation is not borne out.

nation must have taken place in the first half of 1966, since by July 29, 1966, respondent had sent petitioner a letter stating proposed grounds for the revocation. The formal letter of revocation was issued on July 18, 1967. Thus, the deliberations leading to the revocation, far from being rushed, stretched out, at least, over the course of a year. Second, petitioner's loss of exemption was not part of a wholesale scheme. Admittedly, respondent examined several other Scientology churches during this period. These reviews were prompted by a request from the Department of Justice which was then defending a tax-refund case against the Founding Church. The Founding Church was denied exempt status on the grounds that it was organized and operated as a profit-making venture benefiting private interests and not serving religious or educational purposes. The Department of Justice in October of 1966 asked respondent to investigate affiliated churches holding tax-exempt status and report on ways they could be distinguished, or rescind their exemptions if they could not. Respondent acted on this request and investigated several Scientology churches. In some cases, denial or revocation of exemption was recommended. However, no other church besides petitioner appears to have lost its exemption during this period.

Between 1967 and 1974, respondent delayed action or changed positions on several matters involving Scientology churches. Respondent also issued Manual Supplement 42G–228. The manual established guidelines and procedures for identifying and examining Scientology churches and processing applications for exemption. The record disclosed no nefarious motive for respondent's indecisiveness, and we think respondent's hesitancy in rushing toward litigation was justified by the sensitivity and, in some cases, novelty of the issues involved. As for the Manual Supplement, a panel of the Ninth Circuit has already commented on this document saying that, in view of the Court of Claims decision upholding respondent's deficiency determination in the *Founding Church* case, the IRS might be remiss were it not to give special scrutiny to Scientology organizations. Compare *United States v. Church of Scientology of California,* 520 F.2d 818, 823 (9th Cir. 1975), with *Church of Scientology of Hawaii v. United States,* 485 F.2d 313, 317 (9th Cir. 1973).

The deficiency determination was based on facts learned during an extensive audit of petitioner's records. Good-faith negotiations preceded the issuance of the notice of deficiency. Petitioner's contention that respondent's conditions of settlement were arbitrary or unconstitutional is not well taken. Certainly, respondent was well within his authority to insist that petitioner's income could not inure to the benefit of OTC, a private, for-profit corporation. Sec. 501(c)(3); sec. 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs. Respondent could also require petitioner to file returns and keep records. Sec. 6001. Only exempt churches are relieved of these obligations (sec. 6033(a)(2)(A)(i)), and respondent was never willing to recognize unconditionally petitioner's exempt status. Rather, respondent's only offer of recognition was limited to petitioner's 1970–72 taxable years. Respondent was also well within his authority to demand that petitioner disavow participation in the crimes described in the Tittle affidavit. The First Amendment does not shield a church from the constraints of the criminal law (*Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1 (1890)), and the Government, through respondent, could insist its largesse not subsidize criminal activity. *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 547–551 (1983); *Bob Jones University v. United States*, 461 U.S. 574, 590–594, 598 (1983); *Oklahoma v. Civil Service Commission*, 330 U.S. 127 (1947).

Weighing all these facts, we find that petitioner's contention that respondent selectively enforced the tax laws against the California Church out of religious or political animosity falls short of the mark. On the one hand, petitioner was investigated by special intelligence groups formed to collect information about organizations selected for ideological reasons, rather than tax considerations. Also respondent, perhaps sometimes using a trial lawyer's hyperbole, denigrated the practice of auditing and made other mostly unproven charges about petitioner's harmful policies and practices. Weighed against these facts is the almost flawless record of respondent's actual treatment of petitioner's tax status and liability. The decision to revoke petitioner's exemption, the detailed and extensive audits of its records, the lengthy post-audit settlement negotiations carried on in good faith, and the final issuance of the

notice of deficiency were all valid exercises of administrative authority. We are also mindful that some of respondent's expressed hostility to petitioner's practices is attributable to petitioner's proven efforts to thwart respondent's duty to administer the tax laws.

Petitioner has also failed to meet the second prong of the criminal selective enforcement test. It has failed to demonstrate that respondent has not enforced the provisions of section 501(c)(3) against others similarly situated. *Karme v. Commissioner, supra* at 1064. Nor could petitioner meet this test. The cases in this Court alone are ample evidence of respondent's vigorous enforcement policy against churches which overreach the conditions of their exemption. See *Bethel Conservative Mennonite Church v. Commissioner,* 80 T.C. 352 (1983); *Ecclesiastical Order of ISM of AM, Inc. v. Commissioner,* 80 T.C. 833 (1983); *Church of the Transfiguring Spirit v. Commissioner,* 76 T.C. 1 (1981); *People of God Community v. Commissioner,* 75 T.C. 127 (1980); *Basic Bible Church v. Commissioner,* 74 T.C. 846 (1980); *Unitary Mission Church v. Commissioner,* 74 T.C. 507 (1980), affd. in an unpublished opinion 647 F.2d 163 (2d Cir. 1981); *Bubbling Well Church of Universal Love, Inc. v. Commissioner,* 74 T.C. 531 (1980), affd. 670 F.2d 104 (9th Cir. 1981). For cases in other courts, see *Founding Church of Scientology v. United States,* 188 Ct. Cl. 490, 412 F.2d 1197 (1969), cert. denied 397 U.S. 1009 (1970); *Universal Life Church v. United States,* 372 F. Supp. 770 (E.D. Cal. 1974).

Petitioner attempts to take itself out of the simple category of churches by claiming it is the only hierarchical church to have been selected, and the only church denied exemption, on public policy grounds. It is always possible to define the relevant class so narrowly that all others are eliminated. We believe the operative class to be churches or the even broader category, religious organizations. These are the classes employed by the Code. See sections 501(c)(3), 6033(a)(2)(A)(i), 6033(a)(2)(C)(i), and 7605(c). We see no reason under the circumstances to ignore the legislative classification. Furthermore, respondent is well within his rights to mount a test case challenging a church's tax-exempt status on public policy grounds. Such action does not constitute discriminatory en-

forcement. *Mackay Telegraph & Cable Co. v. City of Little Rock*, 250 U.S. 94, 100 (1919).

Petitioner repeats its same argument, that respondent revoked its tax-exempt status and issued a notice of deficiency out of hostility to its religion, under the First Amendment. The First Amendment, however, offers petitioner no more protection than the Fifth Amendment. Thus, petitioner is not entitled to redress even though conduct violative of the First Amendment is a substantial factor behind adverse government action where the Government shows by a preponderance of the evidence that it would have made the same determinations without resort to unconstitutional considerations. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416–417 (1979); *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287 (1977); *Lee v. Russell County Board of Education*, 684 F.2d 769 (11th Cir. 1982). We recognize that the cited cases are employment cases involving the firing of untenured teachers who have spoken out on political issues. However, we believe the rationale of these cases is fully applicable here. A person whose constitutional rights have been violated should not be placed in a better position than he would have been in had his rights not been violated. The proper remedy is to remove the taint. *Mt. Healthy City Board of Education v. Doyle, supra* at 286–287. Cf. *Duren v. Missouri*, 439 U.S. 357, 368 n. 26 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270–271 n. 21 (1977); *Knoetze v. United States*, 472 F. Supp. 201, 214–215 (S.D. Fla. 1979), affd. 634 F.2d 207 (5th Cir.), cert. denied 454 U.S. 823 (1981). Here, a healthy preponderance of the evidence shows that Service audits of the Church's records revealed petitioner had a substantial commercial purpose and had net earnings which inured to the benefit of a private corporation controlled by key Scientology officials. These are both valid statutory grounds for determining a deficiency. They overcome any taint that this case was prosecuted out of hostility to Scientology.

## II.

Petitioner raises a number of challenges to the constitutionality of section 501(c)(3). This section of the Code is one of

several sections which describe entities exempt from taxation under section 501(a). In pertinent part, section 501(c)(3) states:

Corporations * * * organized and operated exclusively for religious * * * purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual. * * *

The inurement restriction has received a narrow construction. While allowing reasonable expenses as deductions against gross earnings (*University of Massachusetts Medical School Group Practice v. Commissioner*, 74 T.C. 1299, 1306 (1980); *Saint Germain Foundation v. Commissioner*, 26 T.C. 648, 659 (1956)), courts have held that any money or benefits flowing to private persons which are not ordinary and necessary business expenses, no matter what the amount, constitute inurement. *Unitary Mission Church v. Commissioner*, 74 T.C. 507, 513 (1980), affd. without published opinion 647 F.2d 163 (2d Cir. 1981); *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 500, 412 F.2d 1197, 1202 (1969), cert. denied 397 U.S. 1009 (1970). The "exclusively religious purpose" restriction, on the other hand, has not been literally construed. A religious organization can have incidental nonreligious purposes and still maintain its exempt status. However, if from its activities it can be inferred that the organization has a substantial commercial purpose, it is ineligible for exemption. Sec. 1.501(c)(3)–1(c), Income Tax Regs. *Christian Manner International v. Commissioner*, 71 T.C. 661, 668 (1979); *Pulpit Resource v. Commissioner*, 70 T.C. 594, 602 (1978). In addition to meeting these express statutory conditions, this Court has ruled that section 501(c)(3) impliedly requires petitioner to comply with fundamental standards of public policy derived from charitable trust law. Petitioner has mounted a broadside attack on the constitutionality of these express and implied conditions. This section treats petitioner's constitutional objections to the express conditions of section 501(c)(3) reserving to another section petitioner's constitutional objections to the public policy requirement which has been read into the statute.

We first consider petitioner's challenges to the express statutory conditions of section 501(c)(3) based on the free exercise clause of the First Amendment. Petitioner raises three claims of unconstitutionality. Reaching the question left open in *Walz v. Tax Commission*, 397 U.S. 664 (1970), petition-

er first claims that the requirement of governmental neutrality toward religion mandated by the joint provisions of the free exercise and establishment clauses constitutionally compels an exemption from taxation for "religious income."[51] Petitioner next argues that, even if an exemption for "religious income" is not constitutionally compelled, nevertheless the lack of an exemption interferes with the free exercise of religion and is not justified by a compelling governmental interest. Thirdly, petitioner argues that section 501(c)(3) is overbroad because it penalizes commercial activity in aid of religion that is affirmatively protected by the free exercise clause.

At the outset, we note there is some tension in the case law concerning the standard of review applicable to questions involving tax exemptions for preferred activities. The tension springs from the fact that tax exemptions are generally classified as acts of legislative grace not subject to judicial review, unless arbitrary. *Commissioner v. Sullivan*, 356 U.S. 27 (1958); *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 857 (10th Cir. 1972), cert. denied 414 U.S. 864 (1973); *Parker v. Commissioner*, 365 F.2d 792, 795 (8th Cir. 1966), affg. this point *Foundation for Divine Meditation, Inc. v. Commissioner*, T.C. Memo. 1965-77, cert. denied 385 U.S. 1026 (1967). Augmenting this line of cases is another line holding that the Government has no obligation to subsidize preferred activities (*Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546 (1983); *Harris v. McRae*, 448 U.S. 297, 316-318 (1980); *Maher v. Roe*, 432 U.S. 464 (1977); *Buckley v. Valeo*, 424 U.S. 1, 93-108 (1976); *Cammarano v. United States*, 358 U.S. 498, 513 (1959)), and declining to scrutinize strictly claims of unequal distribution of Government largesse. *Regan v. Taxation With Representation of Washington*, 461 U.S. at 549; *Buckley v. Valeo, supra* at 93-108. On the other hand, another line of cases holds that the Government cannot put conditions on benefits which dampen the exercise of First Amendment rights (*McDaniel v. Paty*, 435 U.S. 618 (1978); *Elrod v. Burns*, 427 U.S. 347, 358 n. 11 (1976); *Pickering v. Board of Education*, 391 U.S. 563 (1968)), and the claim of chill

---

[51] Petitioner avoids defining "religious income" but concedes it is not income gained from nonreligious activities, income gained from religion and put to nonreligious uses, income taxed to defray Government services, or income earned by ministers and church employees.

has triggered strict judicial scrutiny (*Bob Jones University v. United States*, 461 U.S. 574, 604 (1983); *Sherbert v. Verner*, 374 U.S. 398 (1963)).[52]

Under the lesser standard of review, one which measures the statute by its reasonableness, section 501(c)(3) clearly does not interfere with the free exercise of religion guaranteed by the First Amendment. Under the express terms of the statute as construed, a religious organization does not have to pay taxes provided it is not operated for private benefit or profit. The justification for the grant of tax exemption to charitable organizations, as a group, is that such entities confer a public benefit. *Bob Jones University v. United States*, 461 U.S. at 591. They foster the mental, moral, and physical improvement of society. *Walz v. Tax Commission*, 397 U.S. 664, 672 (1970). There is an additional justification for granting religious organizations tax exemption. The grant of exemption guards against potential acts of hostility to religion in the form of oppressive taxing measures. *Walz v. Tax Commission, supra* at 673. However, when a religious organization loses track of its charitable mission and conducts its operations for profit or private gain, the reasons for the exemption are dispelled. The organization no longer serves the public benefit. Also, in such circumstances, it is reasonable for the legislature to conclude that the exemption helps line the pockets of a chosen few rather than guards against harm to religious freedom.

We believe that some, but not all, of petitioner's free exercise challenges to the constitutionality of the express conditions of section 501(c)(3) merit strict scrutiny. Strict scrutiny is not automatically triggered just because petitioner is a church. Petitioner must show that one of its fundamental rights protected by the free exercise clause is endangered by the statute. *Regan v. Taxation With Representation of Washington, supra*. Petitioner posits statutory interference with three rights: (1) The right to tax-free religious income, (2) the

---

[52]The tension between these lines of cases was present in *Federal Communications Commission v. League of Women Voters of California*, 468 U.S. ____ (1984). There, the Supreme Court examined sec. 399 of the Public Broadcasting Act of 1967 and found that the provision did more than merely prohibit Government funding of editorial broadcasts by noncommercial television stations; it even barred them from using private funds to finance editorial activity. 468 U.S. at ____-____. Applying a slightly more exacting standard of review than it ordinarily does in broadcasting cases (468 U.S. at ____-____), the Supreme Court held that the statute was an unconstitutional interference with First Amendment activities.

right to carry on church-sponsored commercial activity, and (3) the right to practice its belief in the doctrine of exchange. Only the last claim involves a fundamental right. Petitioner has no constitutional right under the religion clauses to tax-free religious income. The activities shielded by the First Amendment from Government interference—free speech, free press, free exercise—share a common preferred position in our constitutional scheme. Just as the press is not free from general economic regulation (*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 581 (1983)), and is apparently subject to an ordinary tax (*Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)), so, too, the free exercise clause does not immunize the income derived from religious activity from taxation. The free exercise clause takes the first step and protects religious beliefs and practices from governmental interference. It does not go a second step and require the Government to subsidize religion. *Follett v. McCormick*, 321 U.S. 573, 577–578 (1944); *People v. Life Science Church*, 450 N.Y.S.2d 664, 669 (N.Y. County Sup. Ct. 1982); *Watchtower Bible & Tract Society, Inc. v. County of Los Angeles*, 30 Cal. 2d 426, 182 P.2d 178, cert. denied 332 U.S. 811 (1947). See also *Regan v. Taxation With Representation of Washington*, 461 U.S. at 540. The establishment clause likewise does not compel a religious exemption from taxation or, at the very least, allows Congress to interpret the course of "benevolent neutrality" demanded by the religion clauses. *Walz v. Tax Commission, supra* at 669; cf. *Mueller v. Allen*, 463 U.S. 388 (1983); *United States v. Lee*, 455 U.S. 252, 260–261 (1982). A compulsory subsidy of religious activity appears to have the primary effect of advancing religion, a result prohibited by the establishment clause. *Sloan v. Lemon*, 413 U.S. 825 (1973); *Committee for Public Education v. Nyquist*, 413 U.S. 756 (1973). An exemption for "religious income" is also potentially entangling since, borrowing petitioner's definition of the term, it requires church and Government to determine item-by-item what is and is not income derived from and dedicated to religious activity. *New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977); *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[53] Given these dangers of entanglement and establish-

---

[53]We note that petitioner has made no attempt to provide a careful definition of the claim to exemption it asks us to carve out and protect. As a general rule, the more complicated the basis of

ment, at the very least, Congress ought to be the body to decide whether religious income is deserving of an exemption.

Petitioner claims that section 501(c)(3) as construed violates its right to carry on certain commercial activity which is affirmatively protected by the First Amendment. Specifically, petitioner claims that it cannot make a profit, accumulate earnings, sell religious literature, advertise, or remunerate its founder without losing its exemption by running afoul of the commercial purpose limitation that has been read into section 501(c)(3). Petitioner exaggerates the scope of First Amendment protection for church-sponsored commercial activity. We assume, arguendo, that the First Amendment protects some, if not all, of the listed commercial practices. See, e.g., *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647 (1981); *Jamison v. Texas*, 318 U.S. 413, 416–417 (1943). However, they are protected only when they are carried on as part of a religious mission. The First Amendment draws a vital distinction between purely commercial activity and commercial activity in furtherance of a religious purpose. *Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943). Section 501(c)(3) incorporates the requirements of First Amendment tolerance for commercial activity in aid of religion. A religious organization can maintain its exemption and engage in commercial activity, provided it is incidental to its religious purpose. The exemption is only lost when church-sponsored commercial activity takes on a life of its own and assumes an independent importance and purpose. Sec. 1.501(c)(3)–1(c), Income Tax Regs.; *Ecclesiastical Order of Ism of Am v. Commissioner*, 80 T.C. 833, 839 (1983), on appeal (6th Cir., July 6, 1983); *Parker v. Commissioner*, 365 F.2d 792, 798–799 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967). Petitioner, therefore, does not suffer any constitutional injury on account of section 501(c)(3)'s limitation on commercial activity.

Section 501(c)(3) does interfere with the California Church's practice of its belief in the doctrine of exchange.[54] This belief led the Church to exact a fee for its religious literature,

---

classification for exemption, the greater the danger of involving the Government in entangling inquiries. *Gillette v. United States*, 401 U.S. 437, 456–457 (1971); *Walz v. Tax Commission*, 397 U.S. 664, 698–699 (1970) (Justice Harlan, concurring).

[54]Respondent did not challenge the sincerity or the religiosity of this belief, and we, therefore, accept it as a sincerely held tenet of Scientology. *United States v. Lee*, 455 U.S. 252, 257 (1982).

artifacts, and services. Thus, by its own admission, five of its branch churches earned between 73 and 100 percent of their income from the sale of these items. While this fact alone does not explain our decision that petitioner is ineligible for exemption because it has a substantial commercial purpose, it does measurably contribute to our decision. See *infra* at 476. Since there is direct conflict between petitioner's religious practices and petitioner's eligibility for exemption, this claim warrants strict judicial scrutiny. *Bob Jones University v. United States*, 461 U.S. 574, 604 (1983). Under this standard, Government "may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *Bob Jones University v. United States*, 461 U.S. at 603, quoting *United States v. Lee*, 455 U.S. 252, 257–258 (1982). We believe petitioner's claim is directly controlled by the *Lee* case. There it was held that the soundness of the social security system, like the soundness of the revenue system, was an overriding governmental interest that could not be made to accommodate exemptions based on religious tenets without destroying the integrity of the revenue base. 455 U.S. at 260.

Having disposed of petitioner's claims that the express conditions of section 501(c)(3) violate the free exercise clause of the First Amendment, we turn to petitioner's claims that section 501(c)(3) violates the establishment clause. A statute must pass three separate tests in order to satisfy the requirements of the establishment clause.

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman*, 403 U.S. 602, 612–613 (1971), quoting *Walz v. Tax Commission*, 397 U.S. 664, 674 (1970) (citations omitted). Petitioner claims that section 501(c)(3) violates the second and third tests. The gist of petitioner's first argument is that the commercial purpose restriction hurts newer religions since they must rely on commercial techniques to attract members, propagate their faith, and raise income, whereas older religions already have public recognition, established coffers, and a body of followers. Although we believe there is

play in section 501(c)(3) which allows newer religions to proselytize aggressively, arguably its overall impact on newer religions is harsher. However, this fact alone, even if true, does not invalidate section 501(c)(3). In addition, petitioner "must * * * show the absence of a neutral, secular basis for the lines government has drawn." *Gillette v. United States*, 401 U.S. 437, 452 (1971). Petitioner has not done this. Moreover, we are convinced that the commercial purpose test does not rest on sectarian favoritism for established religions but instead has its basis in charitable trust law which requires charitable organizations to eschew commercialism in favor of serving goals designed to benefit the community at large. See sec. 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs.; see also Restatement, Trusts 2d, secs. 368, comment a, and 376 (1959).

Petitioner also maintains that section 501(c)(3) on its face and as applied results in excessive Government entanglement at the administrative level in violation of the third establishment clause test set forth in *Lemon v. Kurtzman, supra.* According to petitioner, the sheer magnitude of respondent's enforcement efforts is one tell-tale sign of entanglement. In slightly more than 10 years, respondent audited petitioner four times. One of these audits lasted a full year, employed three (perhaps four) agents, and covered millions of documents. Respondent also collected thousands of documents relating to petitioner. By the end of 1974, respondent's files contained approximately 2 thousand Church policy letters and some books and brochures describing Scientology beliefs and practices. According to petitioner, respondent also unconstitutionally entangled himself in petitioner's affairs by questioning the religiosity of certain Church practices and by using petitioner's policy letters to inquire into Church discipline, structure, and policy.

Usually, the entanglement test is invoked by a claimant seeking to invalidate a Government program authorizing benefits to religion. See, e.g., *Mueller v. Allen*, 463 U.S. 388 (1983); *New York v. Cathedral Academy*, 434 U.S. 125 (1977); *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736 (1976). Here, petitioner does not want to end the Government benefit but merely to avoid respondent's interference with its enjoyment. Petitioner's complaint, therefore, sounds more like a free exercise than an establishment clause complaint. See

*United States v. Holmes,* 614 F.2d 985, 989 & n. 7 (5th Cir. 1980). However, the entanglement test has been used on occasion to limit the reach of governmental power to regulate religious activity. See *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490 (1979).[55]

The establishment clause does not prevent the Government from making a threshold inquiry into whether or not a given practice is religious in nature and therefore entitled to First Amendment protection. See *Wisconsin v. Yoder,* 406 U.S. 205, 209–213 (1972); *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 433 (2d Cir. 1981); *Jones v. Bradley,* 590 F.2d 294, 295 (9th Cir. 1979). Petitioner's objections to respondent's inquiry into the religiosity of Dianetics and the E-meter therefore lack legal merit. The inquiry never crossed the threshold. Once petitioner's witnesses asserted that the E-meter and Dianetics had a religious purpose, respondent dropped the inquiry.

Petitioner also contends that respondent, aided by Church policy letters, made an impermissibly entangling inquiry into the Church's management, corporate structure, and its dissemination practices. We disagree. The establishment clause does not cloak a church in utter secrecy, nor does it immunize a church from all governmental authority. The thrust of the entanglement component of the establishment clause is to keep Government out of the business of umpiring matters involving religious belief and practice. *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709–710 (1976); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449 (1969). However, civil authorities are not barred from settling disputes implicating the secular side of church affairs as long as they rely on neutral principles of law. *Jones v. Wolf,* 443 U.S. 595, 602–603 (1979); *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367 (1970).

---

[55]In *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490 (1979), the Supreme Court construed the National Labor Relations Act, holding that it did not give the National Labor Relations Board (NLRB) jurisdiction over schools operated by a church. Noting the risk of entanglement and other interferences with religious freedom were the act to confer jurisdiction over church schools (440 U.S. at 501–504), the Court, in order to avoid serious questions about the act's constitutionality, declined to construe the act to confer such jurisdiction in the absence of an affirmative showing that Congress intended to bring church schools under the NLRB's jurisdiction. 440 U.S. at 501.

Respondent did rely on Church policy letters to establish basic facts about the Church. A nine-volume encyclopedia of Scientology policy called the OEC series was placed in evidence. Some of the policy letters in these volumes contain instructions on religious practices. The majority contain information about Church administration. An expert witness for the Church compared the OEC series to the constitution of the Presbyterian Church. Respondent relied on scattered policy letters in the OEC volumes to question witnesses about the Church's dissemination practices, its corporate structure, and its management functions. In making his inquiry, respondent skirted matters of religious doctrine, except at the threshold level of inquiry. We have also used Church policy letters to make findings on these topics and others including the Church's Franchise Programme and pricing policies. However, we have not had to resolve doctrinal matters to make our findings. The Church's documents speak for themselves. We, therefore, find that the use of Church policy letters in this case is consistent with the rule laid down in *Jones v. Wolf, supra*, which allows the State to examine Church documents, including the constitution of a church, provided the documents are scrutinized in purely secular terms and the facts determined are not attendant on the resolution of doctrinal issues. 443 U.S. at 604. See also *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc., supra* at 368.

Entanglement, per se, is not objectionable. What is objectionable is excessive entanglement. By this is meant a relationship between an arm of Government and a religious institution which threatens religious liberty by coercing, compromising, or influencing religious belief. Compare *Lemon v. Kurtzman*, 403 U.S. 602 (1971), with *Mueller v. Allen*, 463 U.S. 388 (1983). In its more benign form, an entangling statute is one which establishes some type of Government surveillance of a religious institution's affairs. See, e.g., *Lemon v. Kurtzman, supra*. In its severe form an entangling statute is one which imposes a program of Government regulation. See, e.g., *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979). Section 501(c)(3) does not fall into this second class. It is not a regulatory measure. The determination of a religious organization's tax liability does not entail Government control over

church finances. A church remains free to structure its finances as it sees fit. *United States v. Freedom Church*, 613 F.2d 316, 320 (1st Cir. 1979).

Section 501(c)(3) falls into the more benign category of entangling statutes since it exposes a religious organization to Government audits. However, the audits required under section 501(c)(3) do not share many of the features of the audits found objectionable in the entanglement cases. First, respondent does not have to monitor the activities of live human beings. Compare *NLRB v. Catholic Bishop of Chicago, supra* at 501; *Tilton v. Richardson*, 403 U.S. 672, 687–688 (1971). Second, respondent does not have to scrutinize closely the religious content of the organization's activities. Each receipt, expenditure, and activity of the organization does not have to be reviewed for its religiosity. Compare *New York v. Cathedral Academy*, 434 U.S. 125, 132–133 (1977). Of course, records have to be examined and some judgments made about the purpose of the organization's programs, receipts, and expenses. However, respondent does not have to sit as a religious expert. His task is to judge whether the records evince a primary commercial purpose. Equally as important, respondent does not have to make determinations about each and every item of receipt or expense since section 501(c)(3) permits some commercial activity. The loss of an exemption comes about only when the church's activities in the aggregate reflect a primary purpose to engage in private enterprise. Finally, the audits need not occur on an annual basis. Compare *Tilton v. Richardson, supra* at 688. Churches which meet the qualifications for exemption do not have to file annual returns. Sec. 6033(a)(2)(A)(i).

Respondent's involvement with petitioner was extensive. However, the blame for a goodly measure of this involvement must be laid at petitioner's doorstep. From 1969 onward, petitioner schemed to block the IRS from examining its records and determining its tax liability. It delayed and stalled revenue agents. It did not keep normal business records. It falsified records, failed to respond to requests for information, and misrepresented facts in many of those it did answer. The First Amendment's injunction against entanglement was not designed to shield a church against the Government's efforts to lay and collect taxes in the face of such flagrant and often illegal resistance.

Petitioner's remaining objection, that respondent evaluated the religiosity of some of its practices, is also without merit. Respondent did examine certain Church practices, characterized by petitioner as religious, for their commerciality. The inquiry, however, did not intrude upon Church dogma and belief except at the threshold level. See *Walz v. Tax Commission*, 397 U.S. 664, 697–698 n. 1 (1970) (Justice Harlan, concurring). As is so often said "the line of separation [between church and state], far from being a 'wall,' is a blurred, indistinct and variable barrier depending on all the circumstances of a particular relationship." *Lemon v. Kurtzman*, *supra* at 614. We find that the enforcement measures at issue here have created no more than an incidental burden on respondent's religious liberty.

Petitioner argues that the express and implied conditions for exempting religious organizations from taxation under section 501(c)(3) are unduly vague in violation of the First and Fifth Amendments. Petitioner's argument is confined to three aspects of the statute: (1) The requirement of an exclusively religious purpose; (2) the requirement forbidding inurement; and (3) the requirement of complying with public policy.[56] We do not reach the merits of petitioner's argument since we find petitioner lacks standing to raise it.

A claimant raising a vagueness defense must demonstrate that the statute is vague with respect to his conduct. He is not entitled to attack the statute because the language would not give similar fair warning to others. *Parker v. Levy*, 417 U.S. 733, 756 (1974). Each of the requirements which petitioner challenges has received narrowing constructions. The "exclusively religious" condition has been construed to mean that a substantial part of the organization's activities cannot serve a commercial purpose and that the following factors are to be considered in applying the test: amount of annual profits, amount of accumulated earnings, methods of operation, competition with like services in private enterprise, proportion of expenditures devoted to exempt purposes. See sec. 1.501(c)(3)–1(c), Income Tax Regs.; see also *Parker v. Commissioner*, 365 F.2d 792, 798 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967); *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. 202,

[56]We treat this one public policy issue here. As we noted earlier, the other public policy issues in this case are considered in section VI of this opinion.

212 (1978); *Fides Publishers Association v. United States*, 263 F. Supp. 924 (N.D. Ind. 1967). As construed, the inurement provision allows a religious organization to make ordinary and necessary business expenditures but disallows any other payments to private individuals no matter how small the amount. *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 497, 500, 412 F.2d 1197, 1200, 1202 (1969), cert. denied 397 U.S. 1009 (1970). This Court construed the public policy requirement to prohibit substantial activity in violation of well-defined public policy such as may be evidenced by a civil or criminal statute. Memorandum Sur Order filed April 1, 1980, at 56; Ruling Memorandum to the Parties, Re: Evidence with Respect to So-Called Public Policy Issues, dated October 30, 1980, at 5. For reasons only briefly stated here but amplified elsewhere in this opinion, petitioner's conduct clearly falls within the ambit of these narrowing constructions. It has made a business out of selling religion; it has diverted millions of dollars through a bogus trust fund and a sham corporation to key Scientology officials; and it has conspired for almost a decade to defraud the U.S. Government by impeding the IRS from determining and collecting taxes from it and affiliated churches. Petitioner, therefore, lacks standing to challenge section 501(c)(3) on vagueness grounds.

Petitioner's final constitutional argument concerns the burden of proof.[57] Ordinarily the taxpayer bears the burden of proof in the Tax Court to show that respondent's determination of deficiency is erroneous. Rule 142(a). Relying on *Speiser v. Randall*, 357 U.S. 513 (1958), petitioner claims this rule of procedure offends due process when applied to a church that has been determined deficient. According to petitioner, due

---

[57]Petitioner tacked on one other constitutional issue in its post-trial brief without discussion. Petitioner claims that sec. 501(c) enumerating exempt organizations is arbitrary and capricious because it prohibits some exempt organizations but not others from allowing their net earnings to inure to the benefit of private individuals. Congress has broad discretion in enacting tax legislation (*Madden v. Kentucky*, 309 U.S. 83, 87–88 (1940)), and the courts will not set aside a legislative classification in the tax field if it can be justified under any set of facts. *United States v. Maryland Savings-Share Insurance Corp.*, 400 U.S. 4, 6 (1970). The entities which are exempted from the inurement provision are either mutual self-help organizations or funds dedicated to the welfare of a specific group. These groups by definition have earnings which inure to the benefit of private individuals as the inurement provision has been construed to prohibit organizations from operating for the benefit of members. See secs. 1.501(a)–1(c), 1.501(c)(3)–1(c)(2), 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs.; *Spokane Motorcycle Club v. United States*, 222 F. Supp. 151, 153 (E.D. Wash. 1963). See also B. Hopkins, The Law of Tax Exempt Organizations 209–227 (4th ed. 1983). It would be self-defeating for Congress to help these groups by granting a tax break in one breath and in the very next breath take it away.

regard for religious liberty requires respondent to shoulder the burden of proof.

*Speiser v. Randall, supra,* struck down, under the due process clause of the 14th Amendment, a California taxing scheme which denied exemption to otherwise qualified taxpayers who unlawfully advocated the overthrow of the Government by force and violence. The California statute placed the burden of proof on the taxpayer to show he had not engaged in criminal speech. The Court assumed, without deciding, that a State had the power to deny tax exemptions to persons who engaged in criminal speech. 357 U.S. at 520. It then went on to hold—

when the constitutional right to speak is sought to be deterred by a State's general taxing program due process demands that the speech be unencumbered until the State comes forward with sufficient proof to justify its inhibition. [357 U.S. at 528–529.]

The similarities between *Speiser* and the instant case are only superficial. Both situations involve the interplay between a fundamental liberty and the Government's authority to lay and collect taxes. There the similarities end. The taxing provisions found offensive in *Speiser* were aimed at the suppression of speech. 357 U.S. at 525. Also, the procedural device employed to ferret out ineligible claimants had the practical effect of deterring speech. 357 U.S. at 526. Unlike the California provisions, section 501(c)(3) was not enacted to restrain religious liberty. The Senate debate on section 38 of the Act of August 5, 1909, 36 Stat. 112–113, a forerunner of section 501(c)(3), clearly shows that the congressional purpose behind the measure was to excuse charitable organizations from paying taxes so long as their profit was exclusively devoted to charitable purposes. See 44 Cong. Rec. 4150–4151, 4155–4156 (1909).[58] Moreover, as our earlier discussion of this point concluded, section 501(c)(3) does not operate as a restraint on religious liberty.

---

[58]The exemption for religious, charitable, and educational organizations originated in sec. 32 of the Act of August 27, 1894, 28 Stat. 509, 556, which was the first Federal statute to impose an income tax on corporations. The congressional debates preceding the enactment do not reveal the reasons for the exemptions. However, similar exemptions for mutual savings banks and life insurance companies were created because they were not operated as businesses for gain. 26 Cong. Rec. 6622–6623 (1894). Furthermore, the income tax provisions of the Act of August 27, 1894, were modeled, in measure, on the English system. 26 Cong. Rec. 6612–6613 (1894).

The function of procedural devices like the burden of proof or standard of proof is to distribute the risk of error in the factfinding process. *Santosky v. Kramer*, 455 U.S. 745, 754–755 (1982). Where a claimant is threatened with serious loss, due process requires that the claimant have greater protection against error. 455 U.S. at 758. In determining the seriousness of a claimant's loss, a court will consider both the nature of the interest at stake and the permanency of the loss. 455 U.S. at 758. Here, no liberty interest is at stake—merely the loss of money. Furthermore, the Church's loss is not permanent. It can regain its exempt status. The burden of proof has traditionally been placed on the taxpayer out of recognition that "taxes are the life-blood of government" and, therefore, the Government's burdens in collecting the revenue must be few and light. *Bull v. United States*, 295 U.S. 247, 259–260 (1935). Placing the burden of proof on the taxpayer is also justified on the basis that the facts and figures on which tax liability rests are peculiarly within the taxpayer's knowledge. *Campbell v. United States*, 365 U.S. 85, 96 (1961). Under the circumstances, we see no reason to upset the normal rule and place the burden of proof on respondent.[59]

## III.

Neither the notice of deficiency issued on December 28, 1977, nor the pleadings treated the United Kingdom Church as a branch of petitioner. Respondent first presented evidence relating to the United Kingdom Church on December 11, 1980, during the third week of trial immediately after petitioner rested its case-in-chief. Respondent contended that the United Kingdom Church was a branch of petitioner and that its operations were relevant to petitioner's tax status under three theories. First, the franchises managed by the United Kingdom Church were a commercial operation. Second, petitioner's attempt to conceal the corporate status of the United Kingdom Church was proof that it conspired to prevent the IRS from

---

[59]We note the possibility of constitutional infirmity in placing the burden of proof on the Church to disprove it violated 18 U.S.C. sec. 371. *Norwood v. Harrison*, 413 U.S. 455 (1973) ("no one can be required, consistent with due process, to prove the absence of violation of law." 413 U.S. at 471.) However, we need not decide this issue. Respondent raised this issue after filing his answer. The parties, therefore, agreed that the burden of proof was upon respondent to show that petitioner had an illegal purpose which disqualified it for exemption under sec. 501(c)(3). See Rule 142(a).

performing its duties. Third, L. Ron Hubbard possibly made personal use of the money deposited in the Worldwide Franchise accounts. After some shilly-shallying by respondent over the scope of respondent's intended reliance on evidence relating to the United Kingdom Church, this Court, over petitioner's objection, ruled on July 20, 1981, that respondent could present evidence relating to the United Kingdom Church's activities and corporate status under all three theories of relevance.

Rule 41(b)(2) encourages this Court to accept evidence that is not within the issues raised by the pleadings "freely when justice so requires" provided the objecting party is not prejudiced by its admission. Rule 41(b)(2) closely parallels rule 15(b), Federal Rules of Civil Procedure. However, rule 15(b), Fed. R. Civ. P., instructs the bench to grant a continuance to enable the objecting party to prepare rebuttal evidence.

We think that the interests of justice require us to admit respondent's evidence concerning the United Kingdom Church. First, petitioner had ample time through continuances to prepare rebuttal evidence. See *Robbins v. Jordan*, 181 F.2d 793, 795 (D.C. Cir. 1950). This case was tried intermittently over the course of a year. The matter of the United Kingdom Church was first raised on December 11, 1980. On December 29, 1980, this Court made a preliminary ruling admitting the evidence. The ruling became final on July 20, 1981, the first day of the seventh week of trial. This Court then ruled that respondent could present evidence relating to the United Kingdom Church's activities and corporate status under three theories of relevance: commercialism, inurement, and conspiracy. Petitioner began its rebuttal case on August 17, 1981. With continuances, petitioner completed rebuttal on November 12, 1981. During rebuttal, petitioner presented ample documentary and testimonial evidence directed toward refuting loss of tax-exempt status as a result of the United Kingdom Church's operations. Thus, we find that the continuances cured the prejudice, if any, to petitioner arising from respondent's presentation of the new material. Second, we are not very sympathetic to petitioner's cry of prejudice. The facts surrounding the United Kingdom Church's legal status were known to petitioner long before the trial (see *Hodgson v. Colonnades, Inc.*, 472 F.2d 42, 48 (5th Cir. 1973); *Scruggs v.*

*Chesapeake & Ohio Railway Co.*, 320 F. Supp. 1248, 1250 (W.D. Va. 1970)), and respondent's tardiness in raising the issue is clearly more attributable to petitioner's efforts at obfuscation than to respondent's bad faith or negligence. Finally, we believe that there would be a miscarriage of justice were the matter excluded. Petitioner's avowed purpose in bringing the various British churches under its corporate structure was to blanket them in its tax-exempt mantle, since the British authorities refused to grant them an exemption. Thus, if the United Kingdom Church is not subjected to our scrutiny, it will probably escape scrutiny altogether for the tax years at issue.

Petitioner claims that respondent raised the new matter in bad faith. Petitioner claims that respondent knew all along that the United Kingdom Church belonged to petitioner but deliberately waited to raise the issue until petitioner had completed its case-in-chief in order to sandbag petitioner. We do not interpret the facts as petitioner does. We agree that a few of respondent's agents had knowledge that the United Kingdom Church was formally incorporated as a branch of petitioner. Chief among them was Lewis Hubbard, an attorney in the Chief Counsel's Office, who provided guidance to the 1971–74 audit team while the audit was in progress. At the time of the audit, Lewis Hubbard had clearly read documents describing the California Church as a company registered to do business in the United Kingdom. He had also read the Foster Report, a document prepared for British Parliament, which explained that the main activities of Scientology in the United Kingdom were carried on by the California Church and that this was done for tax reasons. Nevertheless Lewis Hubbard credibly testified that at the time of the audit, he believed that the United Kingdom Church was only nominally connected to petitioner and that it had de facto independence. Certainly the Church did everything in its power to present this false picture or, what is worse, to hide the connection altogether. When, during the Hawaii audit which preceded the 1971–74 audit, Kreiner, the Church's attorney, told Lewis Hubbard that petitioner incorporated the United Kingdom Church but that it operated separately and independently, we must imagine that Kreiner said it in much the same way that another of

petitioner's attorneys, when objecting to a subpoena of the bank records of the United Kingdom Church, told this Court—

The accounts referred to there are not accounts of the Church of Scientology of California and they are not in its custody and control. It is true that the accounts bear the name Church of Scientology of California Worldwide but they are actually accounts of the United Kingdom Church of Scientology which until two years ago, as I understand it, was incorporated as the Church of Scientology of California but never, ever was a part of the Church of Scientology of California that's involved in this case.

Those accounts have had nothing to do with the Church of Scientology of California involved in this case.

Towards the end of the 1971–74 audit, Agent Endo changed some wording in his draft report of the audit on Lewis Hubbard's advice. The original version stated outright that petitioner had seven divisions and listed them. On the advice of Lewis Hubbard, Endo changed this to state that according to petitioner's submissions the Church had seven divisions. The listed divisions did not include the United Kingdom Church. Petitioner sees some form of sinister entrapment in this. We find nothing but the professional exercise of precaution.

Lewis Hubbard ceased advising respondent on Scientology matters in July of 1977. This was several months before Agent Endo drafted the notice of deficiency in November of 1977. There is no evidence that Lewis Hubbard advised Endo when the latter drafted the notice of deficiency which for all intents and purposes framed the issues in this case. Other than Lewis Hubbard, none of respondent's agents with direct responsibility for the prosecution of this case, or the 1971–74 audit underlying it, even knew that the United Kingdom Church was connected with petitioner. During the Hawaii audit and the 1971–74 audit, respondent's agents reviewed letters, checks, receipts, and disbursement vouchers bearing such names as the Church of Scientology of California UK or Church of Scientology WW on the letterhead or as the endorsement or payee. A few letters and receipts bore petitioner's name in bold print on the letterhead, and the words "a non-profit corporation in U.S.A. registered in England" in fine print across the bottom. There were few such documents in comparison to the more than 2 million documents which the agents reviewed. Under the circumstances, where Church officials were actively misleading the audit team about the

legal status of the United Kingdom Church, we do not think that the mere mention of the official name of the United Kingdom Church on a document, often in fine print, should have apprised respondent of the legal relationship.[60]

In conclusion, we find no evidence of bad faith in respondent's initial failure to incorporate the operations of the United Kingdom Church in its case against petitioner. Admittedly, Lewis Hubbard was on the road to discovery. However, Church officials did everything in their power to throw IRS officials off the scent of the United Kingdom Church's legal and operating connection to petitioner. They were almost successful. We cannot, however, countenance their effort at obfuscation by excluding the issue from our consideration. If any party is guilty of bad faith, it is petitioner.

Petitioner cites a number of cases in which this Court has disallowed the introduction of a new issue on grounds of prejudice. See, e.g., *Fox Chevrolet, Inc. v. Commissioner*, 76 T.C. 708, 733–736 (1981); *Estate of Goldsborough v. Commissioner*, 70 T.C. 1077, 1085–1086 (1978), affd. in an unpublished opinion 673 F.2d 1310 (4th Cir. 1982); *Estate of Mandels v. Commissioner*, 64 T.C. 61, 73 (1975); *Estate of Horvath v. Commissioner*, 59 T.C. 551, 556 (1973). These cases are distinguishable. Unlike the case at bar, no continuance was granted to allow the objecting party time to meet the evidence. Also, unlike the case at bar, the objecting party did not induce or contribute to respondent's failure to grasp and raise the issue sooner.

Respondent bears the burden of proving the United Kingdom Church is an operating branch of petitioner, since this matter was not pleaded, is inconsistent with the notice of deficiency, and required petitioner to produce new evidence to refute it. Rule 142(a); *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981); *Estate of Falese v. Commissioner*, 58 T.C. 895, 899 (1972). Petitioner concedes that the United Kingdom Church was incorporated as the Church of Scientology of California but argues that the United Kingdom Church operated inde-

---

[60]While the Church now claims that its stationery put respondent on notice of the status of the United Kingdom Church, the Church obviously did not think so in 1967. Writing on Church stationery to the IRS in 1967, the Church, in response to a request, listed its subordinate branches failing to mention the United Kingdom Church. The stationery, in fine print, referred to petitioner as "a non-profit corporation in U.S.A. registered in England." In a true display of "chutzpah" the Church placed the letter in evidence as an example of the type of document which should have given IRS officials notice that petitioner incorporated the United Kingdom Church.

pendently: De jure, it is part of petitioner; de facto, it is separate. Petitioner argues that substance should control over form. We reject petitioner's argument. Historically, the churches that comprise the United Kingdom Church were not part of petitioner. They operated independently. However, the British authorities would not grant them nonprofit status. As a result, the assets of these churches were transferred to petitioner so that they could carry on their operations in the United Kingdom under petitioner's tax-exempt mantle. As we said in *Legg v. Commissioner*, 57 T.C. 164 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974)—

The petitioner's first contention has little or no justification in light of the fact that the form of the transaction was contemplated and carried out by the petitioners; it was their decision to report the sale on the installment basis. A taxpayer cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form. [57 T.C. at 169.]

Petitioner elected to make the United Kingdom Church a branch church. It cannot escape the consequences of that decision now. "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice." *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted).

We also find that the United Kingdom Church was, in fact, subordinate to petitioner. Admittedly, it appears to have had some operating autonomy, and, by and large, to have kept separate financial accounts. However, the United Kingdom Church did not have a bona fide board of directors. Additionally, two of its major activities, its Guardian Office and its Franchise Office, were ultimately controlled by Flag executives. Also, key officials of both churches had authority to sign checks on the other church's accounts and sometimes exercised it. These indicia of the United Kingdom Church's dependence on petitioner are sufficient to carry respondent's burden of proof.

## IV.

In his notice of deficiency, respondent determined that petitioner was not operated exclusively for religious or other

tax-exempt purposes, as required by section 501(c)(3), during the years 1970, 1971, and 1972 and, therefore, was not exempt from tax under section 501(a). Specifically, respondent contends that petitioner was operated for a substantial commercial purpose and that the net earnings of petitioner inured to the benefit of private individuals. At the outset, we note that the burden of proof is on petitioner to overcome these grounds for denial of exempt status by respondent. *Schoger Foundation v. Commissioner*, 76 T.C. 380, 386 (1981); Rule 142(a). See discussion *supra* at 466–468.

In order for an organization to be entitled to exemption from Federal income taxes under section 501(a) and (c)(3), it must establish that it is organized and operated exclusively for exempt purposes. Thus, qualification for tax-exempt status under section 501(c)(3) is based on the satisfaction of two tests commonly known as the organizational and operational tests. In order to satisfy the organizational test, an organization's articles of incorporation must limit it to one or more exempt purposes and not authorize substantial activities which are not in furtherance of such purposes. Respondent concedes that petitioner satisfied the organizational test during the docketed years.

It is the second test, the operational test, which lies at the heart of the dispute in this case. Under this test, an organization must not engage, other than in insubstantial part, in activities which do not further an exempt purpose. Sec. 1.501(c)(3)–1(b) and (c), Income Tax Regs.; *Nat. Association of American Churches v. Commissioner*, 82 T.C. 18, 28–29 (1984). With respect to the operational test, it is "the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, that is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization." *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356–357 (1978). See *est of Hawaii v. Commissioner*, 71 T.C. 1067, 1078–1079 (1979), affd. in a unpublished opinion 647 F.2d 170 (9th Cir. 1981).

Whether an organization satisfies the operational test is a question of fact to be resolved on the basis of all the evidence presented by the record. See, e.g., *est of Hawaii v. Commissioner, supra* at 1079; *B.S.W. Group, Inc. v. Commissioner, supra* at 357. We are, of course, fully cognizant of the fact that although

an organization might be engaged in a single activity, that activity may further multiple purposes, both exempt and nonexempt. However, while the term "exclusively" contained in section 501(c)(3) has not been construed to mean "solely" or "absolutely without exception" (*Church in Boston v. Commissioner*, 71 T.C. 102, 107 (1978)), it is well established that "the word 'exclusively' places a definite limit on the 'purpose' at issue." *Copyright Clearance Center, Inc. v. Commissioner*, 79 T.C. 793, 804 (1982). Thus, the Supreme Court in *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945), explained the limit as follows:

in order to fall within the claimed exemption, an organization must be devoted to * * * [exempt] purposes exclusively. This plainly means that the presence of a single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes.

Accordingly, we must decide toward what end petitioner's activities are directed and whether such activities are "animated" by a substantial commercial purpose. *Better Business Bureau v. United States, supra* at 284. In doing so, we note that where a nonexempt purpose is not an expressed goal, the courts have generally focused on the manner in which the activities of the organization are conducted, implicitly reasoning that an end can be inferred from the chosen means. *Presbyterian & Reformed Publishing Co. v. Commissioner*, 743 F.2d 148, 155 (3d Cir. 1984), slip op. at 14, quoting from 79 T.C. 1070, 1082–1083 (1982). Among the factors relevant in making such an inquiry are the particular manner in which an organization conducts its activities, the commercial hue of those activities, and the existence and amount of annual or accumulated profits. *B.S.W. Group, Inc. v. Commissioner, supra* at 357. The existence of any of these factors supports a conclusion that an organization was not operated exclusively for an exempt purpose.

Practically everywhere we turn, we find evidence of petitioner's commercial purpose. Certainly, if language reflects reality, petitioner had a substantial commercial purpose, since it described its activities in highly commercial terms, calling parishioners, "customers"; missions, "franchises"; and church-

es, "organizations"—just to mention a few of the more glaring examples of petitioner's commercial vocabulary.

Petitioner was eager to make money. This was expressed in HCO PL March 9, 1972, MS OEC 381, 384. It sets out the governing policy of petitioner's financial offices by exhorting these offices to "MAKE MONEY. * * * MAKE MONEY. * * * MAKE MORE MONEY. * * * MAKE OTHER PEOPLE PRODUCE SO AS TO MAKE MONEY." (Capitalization in the original.) This is not an isolated policy letter coming back to haunt petitioner. The goal of making money permeated virtually all of petitioner's activities—its services, its pricing policies, its dissemination practices, and its management decisions.

Perhaps the most dramatic indicator of petitioner's commercial purpose is the fact that petitioner sold virtually all of its important religious services and products. Petitioner did some things for free: weddings, funerals, baptisms, family counseling, crisis auditing, and charity work. The record does not disclose how much of petitioner's resources were devoted to these free activities.[61] We do know, however, that the heart of petitioner's religious program, its auditing and training services, had to be purchased. The public paid a fee for these services, and while staff, on contract, were allowed free service, this was secured by a legal note which became due and payable if the contract was broken. Books and artifacts also had to be purchased. The dominant role played by petitioner's sales of religious services and products is brought home by the following table. It shows the percentages of total income each of petitioner's branch churches providing services to the public earned from the sale of petitioner's services and products:[62]

|      | UK | AOLA | ASHO | LAO | SFO |
|------|-----|------|------|-----|------|
| 1971 | 73 | 92 | 92 | 95 | 97 |
| 1972 | 73 | 99 | 99 | 98 | 100 |

---

[61]The Church audit report estimates that 38 percent of the Church's time was spent on those activities, but no substantiation of this estimate was ever produced.

[62]Two of petitioner's branches, FOLO and USGO, did not provide religious services to the public. Flag mainly provided religious services to Scientology staff. The United Kingdom Church received a substantial portion of its income from franchise tithes. When these payments are added in, the percentages increase to 88 percent for 1971 and 97 percent for 1972.

Of course, we are fully aware of the fact that these services and products are religious; however, the overall manner in which they were provided evidences a commercial purpose. In reaching this conclusion, we are particularly impressed by three factors: (1) The manner in which petitioner promoted Scientology services to the public; (2) petitioner's pricing policies with respect to such services and products; and (3) the contractual arrangements entered into by petitioner and its parishioners and staff with respect to Scientology services.

Petitioner made strenuous efforts to promote Scientology to the public. It gave free lectures and personality testing. It held congresses. It advertised. Staff members called "registrars," using a filing system, contacted the public and parishioners to encourage them to purchase Scientology services. Another group of people, FSMs, operating on a commission basis, also sold services to the public. These promotional efforts were guided by the results of surveys of community needs and desires.[63] Many of these practices are the stock and trade of the missionary. However, a few, like the payment of commissions to FSMs, closely replicate business methods. Furthermore, it is clear that the purpose of these promotional activities was not just to spread religion but to make money.[64]

Pricing policies are another factor we consider in determining whether petitioner has a commercial purpose. Where prices are fixed to return a profit, we consider it some evidence of a commercial purpose, although not determinative. *Christian Manner International v. Commissioner*, 71 T.C. 661, 670 (1979); *Peoples Translation Service v. Commissioner*, 72 T.C. 42,

---

[63]An excellent illustration of the businesslike philosophy petitioner employed in marketing its services is found in HCO PL, Nov. 21, 1969, 6 OEC 133. This letter provides in relevant part:

"The purpose of this policy letter is to provide a SET FORMAT that can be used over and over again by Orgs to find out in their country, area, city, community WHAT IS NEEDED AND WANTED. Once this is known to an organization it can angle its promotion on it and produce it. For example, an area wants more INTELLIGENT PEOPLE AND ACTIONS and LESS STUPIDITY. The Org of the area finds out and goes into a promotional programme of 'We can RAISE your IQ!!' or 'Tired of being STUPID? We can restore your NATURAL INTELLIGENCE!' Of course through training and processing an organization can produce this exact result.

"If an organization or group does this *over* and *over continually* to keep up with the trends and cover new areas its income will ROCKET. A 'Needed and Wanted Survey' as laid out below should be done by an org or group AT LEAST twice a year and again if the trend seems to be changing or a new area is disseminated to. As we expand we *repeat* the action."

[64]This purpose of making money lies barely beneath the surface in the promotional activities described in HCO PL May 23, 1969 (Issue III), 6 OEC 91–93, quoted in our findings of fact, *supra* at 423.

50 (1979). Petitioner's prices for its books and services were set to earn a profit. The minimum price for books was 5 times cost. Thus, even with the various discounts that were offered, petitioner stood to make a profit. The cost of auditing was also high, ranging from approximately $40 to $50 an hour and going as high as $76 an hour for specialized auditing. In terms of 1970 dollars these prices seem particularly steep. At Flag, prices were even higher. Considering that staff who performed these services were paid a weekly salary of approximately $10 plus room and board, petitioner was clearly realizing a handsome profit.

On brief, petitioner called its fees for religious services "fixed donations." However, it is clear they were not donations but payments for services rendered. Indeed petitioner, itself, repeatedly used such terms as "price," "buy," and "sell," in describing its activities, and its very own worksheets do not refer to these amounts as donations but have a separate account entitled "donations" for charitable contributions. Consequently, we cannot help but believe that the use of the term "fixed donation" was employed by petitioner in an effort to achieve favorable tax treatment.

Petitioner's pricing policies respecting discounts also show a concern for business. Thus, petitioner had a policy against offering services and products for free or reducing prices for parishioners who could not afford to pay full price. However, it did offer discounts where it stood to reap some advantage for itself, for example, on bulk sales or for advance payments.

Not only did parishioners have to pay for religious services, but they also had to sign a contract to get them. Under the terms of the contract, the applicant waived all rights of action against L. Ron Hubbard and petitioner, except the right to a refund. Likewise, staff members had to sign a legal note obligating them to pay for services rendered, in the event they broke their employment contracts. Petitioner's insistence on these legal formalities as a prerequisite to the rendition of Scientology services certainly colors its services with a commercial hue.

Petitioner derived substantial income from its franchising operations. By petitioner's own records the income from its franchising operations during the tax years in question was as follows:

1970 ......................................................... $288,672
1971 ......................................................... 307,809
1972 ......................................................... 435,960

In examining petitioner's activities with respect to its franchising operations, we find the manner in which these activities were conducted virtually indistinguishable from the manner in which most commercial franchises are operated. Petitioner allowed the franchise holders to market its name and copyrights in a designated area and sold them books at a discounted price; while, in turn, the franchise holders remitted 10 percent of their gross income to petitioner. These aspects of petitioner's franchising operations are closely analogous to the way in which all commercial franchising operations are conducted. Furthermore, the fact that petitioner paid its franchise holders commissions of 10 percent of the amounts their students spent at higher level organizations certainly punctuates the commercial nature of these operations. Additionally, the income generated from petitioner's franchising operations appears to be almost pure profit, since petitioner received its percentage off the top from the franchise holder's gross income.

During trial, Lorna Levett, a former franchise holder, testified that the Scientology franchise that she operated in Calgary, Alberta, Canada, from 1968 through April 1974 was run as a private business. We find her characterization appropriate not only for her individual franchise but also for petitioner's entire franchising operations. They were indeed run as commercial businesses.

A further example of the commercial manner of petitioner's operations was the income generated by the Flag Bureau through the provision of management services to Scientology organizations around the world, including branches of petitioner. Flag collected statistics from local churches, developed programs to improve church administration, and sent staff on assignment to local churches to help correct areas of administrative difficulty. Most of the statistics that were reported to Flag and then charted on graphs concerned income or production. Flag concentrated its attention on the organizations that made the greatest contributions to its support. All organizations that did not tithe to Worldwide paid Flag a management fee usually set at 10 percent of gross income.

These management services rendered by Flag closely resemble the types of management consulting services offered by numbers of commercial enterprises. They emphasized income production and retention and were clearly commercial in nature.

Petitioner's policy of selling religious services, its franchise program, its emphasis on income and production statistics, its management services, its pricing policies, its promotion programs, especially the payment of commissions on sales of services, show convincingly that petitioner operated in a commercial manner. From this we draw the inference that petitioner had a substantial commercial purpose. However, we do not rest our decision on the commercial hue of petitioner's activities, alone. Our conclusion that petitioner had a substantial commercial purpose is buttressed by two additional factors: the existence of sizable annual profits and substantial cash reserves.

Although the presence of substantial profits is not necessarily determinative of a commercial purpose, such profits constitute "evidence indicative of a commercial character." *Scripture Press Foundation v. United States*, 152 Ct. Cl. 463, 468, 285 F.2d 800, 803 (1961), cert. denied 368 U.S. 985 (1962). See also *Incorporated Trustees of the Gospel Worker Society v. United States*, 510 F. Supp. 374, 378 (D. D.C. 1981), affd. without opinion 672 F.2d 894 (D.C. Cir. 1981), cert. denied 456 U.S. 944 (1982); *Parker v. Commissioner*, 365 F.2d 792, 798 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967). In his notice of deficiency, respondent determined that petitioner's seven stipulated divisions (SFO, LAO, FOLO, ASHO, AOLA, USGO, and Flag) had the following consolidated net incomes during the docketed years:

| Income | 1970 | 1971 | 1972 |
|---|---|---|---|
| Gross receipts | $2,249,013.08 | $3,301,143.73 | $3,134,391.00 |
| Advance payments | 373,222.37 | 788,704.96 | 1,198,763.86 |
| Flag income | - - - | 263,557.47 | 240,932.55 |
| Payment Danish Kingdom Church | - - - | 77.92 | 53,609.76 |
| Payment United Kingdom Church | - - - | 76,497.24 | 161,018.38 |
| Total income | 2,622,235.45 | 4,429,981.32 | 4,788,715.55 |

| Expenses | 1970 | 1971 | 1972 |
|---|---|---|---|
| Per Form 990 | $2,438,646.65 | $4,242,124.02 | $4,178,876.05 |
| Trust | (28,930.34) | (67,892.40) | (77,986.62) |
| Charter Mission (disallowed) | (982,415.39) | (1,143,928.02) | (1,400,015.99) |
| Flag expenses | - - - | 1,238,466.30 | 1,036,108.56 |
| Total allowable expenses | 1,427,300.92 | 4,268,769.90 | 3,736,982.00 |
| Net income | 1,194,934.53 | 161,211.42 | 1,051,733.55 |

Petitioner does not actually contest the accuracy of these figures; however, it does disagree with the tax treatment accorded them by respondent. The most significant disagreement between the parties, at least in terms of amount, centers around the tax treatment of the amounts characterized as advance payments. In his notice of deficiency, respondent included such advance payments in income, stating:

As a cash basis taxpayer, you received payments for services to be rendered in the future. These amounts were not included in the gross receipts reflected on Forms 990 but are includible in your taxable income. Accordingly, your taxable income is increased in the amounts indicated.

Initially in its petition, the Church argued that not only were the advance payments not income in the years of receipt, but in addition, all amounts paid for religious services should be excluded from income since such amounts were received as charitable contributions from its parishioners. However, on brief, petitioner apparently abandons this contention and asserts, instead, that the advance payments of $373,222.37 in 1970, $788,704.96 in 1971, and $1,198,763.86 in 1972 were incorrectly included in its income. Petitioner claims that the advance payments should not be treated as income, since it had not earned them by rendering services, and since it had a duty to refund them on demand at any time before the services were taken.[65]

As a general rule, under the cash receipts and disbursement method, money which is received must be reported as gross income in the year in which it is received. Sec. 451(a); sec. 1.446–1(c)(1)(i), Income Tax Regs. Petitioner contends, howev-

---

[65]Petitioner failed to produce any evidence regarding the actual amounts, if any, of such refunds during the tax years at issue.

er, that the fact that it was under an obligation to refund the advance payments in full at any time prior to the rendering of services upon the request of the "donor" somehow changes this tax treatment. Petitioner is clearly wrong on the law. At least, since the seminal case of *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 424 (1932), the receipt of money under a claim of right is treated as taxable income even though the recipient may be under a contingent obligation to return it later.

We find the claim of right doctrine is applicable here. In order to avoid the application of the claim of right doctrine, "the recipient must at least recognize in the year of receipt 'an existing and *fixed* obligation to repay the amount received' and '*make provisions* for repayment.'" *Nordberg v. Commissioner*, 79 T.C. 655, 665 (1982), affd. in an unpublished opinion 720 F.2d 658 (1st Cir. 1983); *Hope v. Commissioner*, 55 T.C. 1020, 1030 (1971), affd. 471 F.2d 738 (3d Cir.), cert. denied 414 U.S. 824 (1973). The first condition is clearly not present in the instant case since petitioner was never under an existing and fixed obligation to repay the advance payments in question. Repayment was instead contingent on a refund request initiated by one of petitioner's "donors." Furthermore, there is no evidence in the record that petitioner's contingent liability to refund the advance payments imposed any restriction upon the use of the money in its hands. If petitioner eventually was required to refund any of the advance payments in a later year, it would then be entitled to a deduction for such amounts. However, such amounts are clearly income in the year of receipt.

In reaching this conclusion, we find petitioner's reliance on our holding in *Miele v. Commissioner*, 72 T.C. 284 (1979), misplaced. In *Miele*, we found that a law firm that used a cash method of accounting did not have taxable income in the year in which its clients transferred advances to a special bank account. We distinguished *North American Oil Consolidated v. Burnet, supra*, on two grounds. The clients' funds were kept in separate bank accounts, and the firm could only draw on the funds when an amount was undisputed. 72 T.C. at 289–290. Our holding in *Miele* is clearly distinguishable from the instant case, since there is absolutely no suggestion in the record that petitioner segregated the advance payments in any

of its numerous bank accounts. On the contrary, it appears that these payments were commingled with petitioner's other receipts and were thus received under claim of right.[66] Consequently, we find that respondent correctly included the amount of the advance payments in petitioner's taxable income for the taxable years in question.

Another major area of disagreement between the parties is the appropriate tax treatment of the Charter Mission expenses. These payments represented amounts transferred by petitioner to OTC during the tax years at issue. On its Forms 990, petitioner claimed them as business expenses. In his notice of deficiency, respondent disallowed petitioner's claimed Charter Mission expenses of $982,415.39 in 1970, $1,143,928.02 in 1971, and $1,400,015.99 in 1972, stating:

It is determined that the amounts reported as Charter Mission Expense are not deductible because said amounts do not constitute ordinary and necessary expenses paid or incurred during the taxable years 1970, 1971, and 1972, but rather represent an internal transfer of funds to the Flag Division, which is a division of the Church of Scientology of California.

However, concurrent with these adjustments, respondent did allow petitioner deductions for Flag Division expenses in the amounts of $1,238,466.30 in 1971 and $1,036,108.56 in 1972, which were not previously reflected on the Forms 990 filed by petitioner.

It is here that the fluidity of petitioner's position is particularly impressive. Surprisingly, petitioner does not actually object to the adjustments made by respondent for either 1971 or 1972, although it does assert that respondent erred in not allowing a similar deduction for Flag expenses of $419,856.76 in 1970, which it now asserts was the actual amount Flag paid out for expenses that year. Basically, despite the fact that petitioner initially claimed deductions for all payments made to OTC, albeit without explanation, and despite the fact that it has steadfastly maintained that OTC is a separate corporation

---

[66]Petitioner also relies on five other cases: *Rosenthal v. Commissioner*, 32 T.C. 225 (1959); *Draper v. Commissioner*, 6 T.C. 209 (1946); *Greenwood v. Commissioner*, 22 B.T.A. 1187 (1931); *Webb Press Co. v. Commissioner*, 9 B.T.A. 238 (1927); *Webb Press Co. v. Commissioner*, 3 B.T.A. 247 (1925); *Carey Van Fleet v. Commissioner*, 2 B.T.A. 825 (1925). The *Rosenthal* case involved the question of the applicability of the installment method and is clearly inapplicable to the present facts. The other four cases are irrelevant because they predate the seminal case of *North American Oil Consolidated v. Burnet, supra*.

from petitioner, it now argues that all payments to OTC from any branch of petitioner are essentially internal transfers to Flag for purposes of running religious activities aboard the *Apollo*. In order to explain its position, the petitioner now argues that OTC merely acted as a "bank" or "agent" for petitioner.

This relationship between petitioner and OTC was described by petitioner's accountant, Martin J. Greenberg, in his correspondence with respondent's agent. In a letter dated December 18, 1975, Greenberg stated—

(1) The basic relationship of the Church with OTC during the years 1971–74 was as follows: The Church chartered the ship Apollo from OTC for $2,000 per month. In addition, OTC acted as the Church's agent in the financial matters relating to Flag's operations. OTC received funds on behalf of the Church, and at the Church's instructions would pay all of the Church's expenses. OTC would issue a monthly statement of each individual disbursement made and an annual statement showing the receipts and disbursements for the year and the balance that the Church still had to its credit.

In a follow-up letter dated February 9, 1976, Greenberg further stated—

(2c) The first point that should be made is that *ALL* payments to OTS/OTC from any branch of the Church of Scientology of California are essentially internal transfers to Flag to run their religious activities aboard the ship. That is the exempt purpose and the ONLY purpose of every single penny sent to OTS — NO EXCEPTIONS! *OTS merely acted as a "bank" or "agent" for the Church* and the only funds actually paid to OTS for them to keep were the Charter fees and the finance charges.[67] * * *

\*       \*       \*       \*       \*       \*       \*

(2d and 2e) * * * The Churches have no "liability" to OTS for management fees, training or any other service (except as noted in 2b). *OTS, when acting as the Church's agent is in effect acting as a bank. There is no "liability" to deposit funds in the bank.* As long as you maintain a credit balance the "bank" will make whatever disbursements you authorize out of the "account." They have no say at all in telling you what you have to deposit. *That is basically the relationship of the Church to OTS.* * * * [Emphasis added.]

What appears to be happening is this. It appears that initially the Charter Mission expenses were deducted on the

---

[67]OTC allegedly received a 1-percent monthly finance handling charge, which was computed based on its total disbursements for the month.

Forms 990, probably on the basis of the story concocted in 1969 that OTC was providing supportive services to Flag. Petitioner has now changed its story. It now argues that OTC is merely a private "bank" for petitioner. It therefore concedes that the Charter Mission payments are not deductible, since deposits in banks are not expenses, but claims it should be allowed a deduction for the actual expenses incurred by Flag in 1970 in the amount of $419.856.76.

Before addressing this issue, we digress briefly to point out the flaws in petitioner's new story about OTC. First, it is nonsensical. According to petitioner's story, OTC was in constant debt to petitioner, since it continually transferred to OTC sums far in excess of what was currently needed by it to meet its alleged expenses. By petitioner's own admission, the balance OTC owed to petitioner increased during each of the docketed years. It is here that the logic of petitioner's story breaks down. After all, why would petitioner leave increasingly large sums in control of a commercial Panamanian corporation without any provision for interest and also pay it finance charges if it were truly independent? Second, OTC did not act as a banker for petitioner. The evidence is overwhelming that petitioner's employees handled the Church's finances. This is so because, as far as the record discloses, OTC had no offices, officers, or employees with which to perform financial services for petitioner.

We turn now to petitioner's claim that respondent erred in not allowing petitioner to deduct Flag's operating expenses of $419,856.76 for 1970. Petitioner bears the burden of proving the amount of allowable Flag expenses for that year. We cannot accept petitioner's records as trustworthy. In 1969, petitioner engaged in a plan to cover up OTC's relationship to petitioner. In pursuit of this plan, records were manufactured and falsified to show petitioner's branch churches in debt to OTC for support services. In April and May of 1975, shortly before the 1971–74 audit began, petitioner again engaged in a project to falsify Flag records to present to the IRS. During the 1971–74 audit, IRS auditors made repeated requests for substantiation that OTC expenditures were made on petitioner's behalf. Church officials did not comply. Instead, they offered a variety of excuses including a claim that Church activities aboard the *Apollo* were funded essentially through

cash expenditures. This evidence casts severe doubts on whether any of the Flag expenditures were actually incurred. Petitioner has, therefore, failed to satisfy its burden of proof. We are not at liberty to redetermine the amount of deductible Flag expenditures incurred during the tax years 1971 and 1972, since respondent has not seen fit to disturb his allowance of the amounts set forth. However, we do find that respondent correctly disallowed such expenditures for 1970 and that, in reality, the actual allowable expenditures for 1971 and 1972 should probably be substantially less than those allowed by respondent.

A third major area of disagreement between the parties is the proper tax treatment of the payments made by petitioner to the United States Churches of Scientology Trust. These payments were deducted by petitioner and were designated as payments to the Central Defense and Dissemination Fund and amounted to $28,930.34 in 1970, $67,892.40 in 1971, and $77,986.62 in 1972. In his notice of deficiency, respondent disallowed these deductions in full, stating:

It is determined that the payments to the Central Defense and Dissemination Fund (United States Churches of Scientology Trust) are not allowable as deductions under IRS section 162.

In its petition, petitioner contests this disallowance on the ground that such payments to the trust were reasonable and necessary expenses. However, on brief, petitioner apparently concedes that such payments are not deductible if it is judged not be be tax exempt, although petitioner does assert that the payments were in furtherance of its exempt purpose. We do not agree.

The facts surrounding the United States Churches of Scientology Trust, which are set out in detail in our findings of fact, can only be described as bizarre. Some of the more incredible are recited again here. To begin with, although the trust purportedly originated in 1962, there was no trust document until June 25, 1973. Also financial statements were not prepared for the trust during the docketed years. Furthermore, although the trust was purportedly a United States trust, it was administered in England and the financial statements which were belatedly prepared in 1973 were prepared in South Africa. The purported purpose of the trust

was the defense of the United States Churches of Scientology. However, there was only one disbursement for such purpose in the amount of $9,290.47, although the trust had accumulated funds of $812,134.51, $930,400.08, and $1,307,237.26 in 1970, 1971, and 1972, respectively, and although USGO spent substantially greater amounts for legal fees during the docketed years. The trust funds were not invested. They were kept in numbered Swiss bank accounts. L. Ron Hubbard was the sole trustee and generally kept the trust checkbooks. According to petitioner's worksheets, in 1972 over $1 million in trust funds was removed from some of these accounts and placed in a locked file cabinet on the *Apollo* where they were allegedly kept until 1975. Mary Sue Hubbard supposedly had the only key. The circumstances of this trust are just too bizarre to credit its validity. Petitioner has not carried its burden. We therefore find that respondent correctly disallowed petitioner's claimed expenses for the Central Defense and Dissemination Fund for the tax years in question.

The final area of disagreement between the parties centers on the proper tax treatment to be accorded the payments received by petitioner from the Danish Kingdom Church and United Kingdom Church. In his notice of deficiency, respondent included in petitioner's income payments from these churches as follows:

| Year | DK payment received | UK payment received |
|------|---------------------|---------------------|
| 1971 | $77.92 | $76,497.24 |
| 1972 | 53,609.76 | 161,018.38 |

However, petitioner contested the inclusion of these amounts in its income, stating that these funds were actually received by OTC and represented debt repayment.

For his part, respondent now contends on brief that since the United Kingdom Church, both in form and in substance, was a branch of petitioner, such payments were merely internal transfers, which, by definition, cannot be either debt repayment or income. Furthermore, respondent states that the same is also undoubtedly true of the Danish Kingdom Church.

With respect to the Danish Kingdom Church, we cannot find from the record in this case that it was in actuality a branch of petitioner. On the other hand, petitioner has not satisfied us

that a bona fide debt from the Danish Kingdom Church to OTC actually existed. Consequently, we find that respondent correctly included such amounts in petitioner's income in its notice of deficiency.

The same is not true for the payments from the United Kingdom Church. In light of our finding that the United Kingdom Church was in actuality merely a branch of petitioner, respondent is correct in his assertion on brief that the payments from the United Kingdom Church to OTC merely represent internal transfers and are, thus, not properly included in petitioner's income.

Having resolved the contested items in the notice of deficiency, we are now in a position to calculate petitioner's net income during the docketed years. By petitioner's own admission, the United Kingdom Church, during the docketed years, had net income of $299,681 in 1970, $796,417 in 1971, and $816,572 in 1972. Subtracting the United Kingdom Church payments and adding the United Kingdom Church's net taxable income to petitioner's other income, we find that petitioner's net income for the tax years in question was not less than $1,494,615.53 in 1970, $881,131.18 in 1971, and $1,707,287.17 in 1972. Additionally, there is considerable evidence in the record that the true income of petitioner was substantially in excess of those amounts. For example, during trial John McLean testified that in 1972, the average *weekly* income of United States Scientology organizations controlled by Flag was about $1 million and ranged as high as $1,400,000 during that year. Annualizing such weekly amounts would result in a figure in the $50- to $70-million range, an amount which obviously dwarfs the income reported by petitioner on its informational return for 1972. Furthermore, our finding that OTC is merely a front for petitioner, along with our recognition that the massive cash reserves held by OTC actually belong to petitioner, certainly raises the prospect that petitioner had millions of dollars of unreported income. However, even disregarding these indications of vast undisclosed profits, we find the amount of petitioner's determinable profits in the docketed years to be substantial. The existence of these substantial profits, when viewed in light of the commercial nature of petitioner's operations, lends additional support

to our finding that petitioner was operated in furtherance of a substantial commercial purpose.

The remaining factor supporting our finding is the existence of substantial reserves. Several cases have recognized this factor as indicative of a commercial purpose. See *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 357 (1978); *Incorporated Trustees of the Gospel Worker Society v. United States*, 510 F. Supp. 374, 378–379 (D. D.C. 1981), affd. without opinion 672 F.2d 894 (D.C. Cir. 1981), cert. denied 456 U.S. 944 (1982); *Parker v. Commissioner*, 365 F.2d 792, 798 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967).

In the instant case, the record is replete with evidence that petitioner was obsessed not only with making money but also with building up massive cash reserves. In HCO PL March 9, 1972, MS OEC 381, L. Ron Hubbard wrote the following:

> If a management unit such as a Bureaux, a Continental Liaison Office, an OT-Liaison Office or any agent thereof such as a Guardian or FBO or Flag Rep is any good, THE NEAREST SERVICE ORG WILL MAKE AMPLE MONEY TO PAY the managing unit and HAVE LOTS LEFT OVER TO SWELL SO Reserves. [Capitalization in original.]

In this same policy letter, L. Ron Hubbard defined "SO Reserves" as follows:

> SO RESERVES: Often miscalled "Flag Reserves" or "Management Reserves" which they are NOT. SO Reserves are: The amount of money collected for the corporation over and above expenses that is sent by various units (via FBOs and the Finance Network) to the corporation's Banks. It is used for purposes assigned by the BOARD OF DIRECTORS and for NO OTHER PURPOSE. These are normally employed for periods of stress or to handle situations. They are NOT profit. It is *not* support money for "Flag" or "Management." It is *not* operating money (Examples: Huge sums were required to cover WW when under attack and to catch the PUBS 1970 crash.) [Capitalization and emphasis in original.]

This policy letter illustrates petitioner's fervor for building cash reserves. More importantly for this case, petitioner's accumulations matched its fervor. In just two months in 1971, Sea Org Reserves swelled by $270,175. The bulk of petitioner's reserves were held in 16 active bank accounts maintained in the name of OTC. The yearend balances on these accounts were $1,772,981.72 in 1970, $2,042,832.04 in 1971, and $2,561,688.98 in 1972. Petitioner also accumulated reserves in

the sham United States Churches of Scientology Trust. By year's end in 1972, the trust had accumulated funds totaling $1,307,237.26. Approximately 6 months later, this balance had grown to $1,998,343.08. Petitioner also kept cash reserves aboard the *Apollo*. In 1968 and 1969, the ship's cash reserves fluctuated between $50,000 and $200,000. In 1972, slightly over $3 million in cash from the OTC and trust accounts was stored on board the ship. The total amount of petitioner's reserves for the docketed years is shrouded in mystery. Whatever the exact amount, it is clear that the accumulated reserves were substantial.[68]

In conclusion, petitioner's highly commercial method of operations, its high annual profits, and its substantial, undedicated cash reserves convince us that it had a substantial commercial purpose. *B.S.W. Group, Inc. v. Commissioner, supra; Parker v. Commissioner, supra.*

---

[68]We find that petitioner's large reserves are a factor indicating petitioner had a substantial commercial purpose even under the test announced in *Presbyterian & Reformed Publishing Co. v. Commissioner*, 743 F.2d 148 (3d Cir. 1984), revg. 79 T.C. 1070 (1982). In the *Presbyterian & Reformed Publishing Co.* case the Third Circuit, relying by analogy on the accumulated earnings tax, sec. 531 et seq., held that accumulations of cash may be considered evidence of a commercial purpose where they are unexplained by the legitimate needs of the organization, but that cash accumulations which are explained and dedicated to meet legitimate needs of the organization are not evidence of a nonexempt purpose. *Presbyterian & Reformed Publishing Co. v. Commissioner*, 743 F.2d 148, ____ – ____ (3d Cir. 1984), slip op. at 18–21. See also *Incorporated Trustees of the Gospel Worker Society v. United States*, 510 F. Supp. 374, 379 and n. 13 (D. D.C. 1981), affd. without opinion 672 F.2d 894 (D.C. Cir. 1981), cert. denied 456 U.S. 944 (1982).

Petitioner offered several justifications for its large reserves. Petitioner claimed that they were needed to purchase a land base for petitioner's operations; to protect the Church from its many foes; and to pay the Church's tax liability in the event it lost its battle for tax-exempt status. It is true that many years later the Church did secure land headquarters in Clearwater, FL. Also, no doubt, the Church needed money to protect itself from its detractors. Finally, since the IRS revoked the Church's tax-exempt status in 1967, there was a strong likelihood it would have to pay taxes.

However, the bulk of the evidence in the record undermines the legitimacy of these justifications, so that we have no difficulty in concluding that the reserves were accumulated to make money for the Church and its leaders. Thus, although the Church eventually secured land headquarters, this was done several years after the reserves were built up. Furthermore, the Church failed to introduce any evidence of the cost of the new headquarters in Clearwater, FL, or that reserves were used to pay for the premises. We also note that, although the purported purpose of the trust was the defense of Scientology, only one small disbursement was made for this purpose during the docketed years. The Church presented no evidence that the amount of its reserves bore any relationship to its anticipated needs. These facts alone cast doubt on the Church's stated reasons for accumulating reserves. However, what compels us further to conclude that the Church's justifications are mere pretense is the manner in which the reserves were maintained. They belonged to a bogus trust and a sham corporation and were mostly held in cash and numbered Swiss bank accounts. Under these facts, the Church has not carried its burden in demonstrating that the reserves were accumulated to further its tax-exempt purposes.

In light of our conclusion, we need not decide whether we concur in the Third Circuit's reversal in *Presbyterian & Reformed Publishing Co. v. Commissioner, supra.*

## V.

Respondent asserts, and we agree, that petitioner fails to qualify for tax-exempt status because a portion of its net earnings inured to the benefit of private individuals. In order to qualify for tax-exempt status under section 501(c)(3), not only must an organization establish that it is organized and operated exclusively for exempt purposes, but it must also prove that no part of its net earnings inures to the benefit of any private shareholder or individual. The term "private shareholder or individual" is defined in section 1.501(a)–1(c), Income Tax Regs., as a person having a personal and private interest in the activities of an organization. It does not refer to unrelated third parties. *People of God Community v. Commissioner*, 75 T.C. 127, 133 (1980). In other words, the inurement prohibition under section 501(c)(3) denies exempt status to an organization whose founders or controlling members have a personal stake in that organization's receipts.

Basically, the thrust of the concept of private inurement is to ensure that an exempt charitable organization is serving a public and not a private interest. See *Baltimore Health & Welfare Fund v. Commissioner*, 69 T.C. 554 (1978); *Callaway Family Association, Inc. v. Commissioner*, 71 T.C. 340 (1978). Thus, if part of the net earnings of an organization, no matter what its purpose, inures to the benefit of any private shareholder or individual, tax exemption under section 501(c)(3) will not be allowed. An organization bears the burden of proving that it is not operated for the benefit of private interests such as that of the founder or his family. *Basic Bible Church v. Commissioner*, 74 T.C. 846 (1980).

The term "net earnings" includes more than net profits, and they may inure to an individual in more ways than in the distribution of dividends. *Unitary Mission Church v. Commissioner*, 74 T.C. 507 (1980), affd. in an unpublished opinion 647 F.2d 163 (2d Cir. 1981). For example, we have found that the paying over of a portion of gross earnings to those vested with control of a charitable organization constitutes private inurement. *People of God Community v. Commissioner, supra.* Additionally, the amount or extent of such benefit is not determinative of a finding of private inurement. *Church of the Transfiguring Spirit, Inc. v. Commissioner*, 76 T.C. 1, 5 (1981).

Thus, the fact that the benefit conveyed may be relatively small does not change the basic fact of inurement. *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 497, 412 F.2d 1197, 1200 (1969), cert. denied 397 U.S. 1009 (1970).

In the instant case, there can be no question that L. Ron Hubbard and his family are clearly private shareholders or individuals within the meaning of section 501(c)(3).[69] During the tax years at issue, the obvious indicia of benefit to L. Ron Hubbard and his family include salaries, directors fees, management fees, complete support of the family, and royalties; while covert indicia of benefit include repayment of alleged debts in unspecified amounts and unfettered control over millions of dollars in funds purportedly belonging to OTC and the United States Churches of Scientology Trust.

During the tax years at issue, L. Ron Hubbard and Mary Sue Hubbard received salaries from petitioner totaling $20,249.27 in 1970, $49,647.61 in 1971, and $115,679.76 in 1972. We recognize that the payment of reasonable salaries by an allegedly tax-exempt organization does not result in the inurement of net earnings to the benefit of private individuals. However, excessive salaries do result in inurement of benefit. *Founding Church of Scientology v. United States, supra.* The burden falls upon petitioner to establish the reasonableness of the compensation paid to L. Ron and Mary Sue Hubbard. *Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 74 T.C. 531, 538 (1980), affd. 670 F.2d 104 (9th Cir. 1981). In the instant case, the salaries paid by petitioner to L. Ron and Mary Sue Hubbard are far from shocking. We are puzzled, however, by the increase in salaries in 1972 over 1971, since the record does not disclose what additional job responsibilities L. Ron and Mary Sue Hubbard undertook in 1972 to precipitate the increase. Furthermore, the salary payments are but the tip of the iceberg of the total benefits actually received by them. For example, L. Ron Hubbard, Mary Sue Hubbard, and their four children resided for the most part aboard the *Apollo*. While aboard ship, petitioner paid the family's living and medical expenses.

L. Ron Hubbard also received royalty payments in connection with petitioner's sales of books and E-meters. We, of

---

[69]Indeed, petitioner concedes as much on brief.

course, do not dispute an author's right to receive compensation in the form of royalties for his literary works. However, this does not mean that an individual can use a tax-exempt organization that he clearly controls, as is the case with L. Ron Hubbard and petitioner, to market his own works. Undoubtedly, it was this type of self-dealing that the prohibition against inurement under section 501(c)(3) was enacted to ban. For although it may indeed be common, as petitioner asserts, for an author to receive royalties of 10 percent on the sales of his copyrighted works, in a normal commercial setting, it is the publisher and not the author who establishes the price for which the books are ultimately sold. However, in the instant case, it was L. Ron Hubbard who personally controlled what amount he received on each book and E-meter sale through his setting of the price that petitioner charged for each item, and as we have previously found, such prices were well above cost. Additionally, it is uncontroverted that the majority of ASHO PUB's sales of E-meters and books upon which royalties were paid to the account of L. Ron Hubbard were to other Scientology churches, including branches of petitioner. The combination of L. Ron Hubbard's first contracting with petitioner to sell his books and E-meters in exchange for royalty payments, then his pushing the sales of such books and E-meters through his own policy letters, and finally his establishment of the prices of such items and the fact that the majority of sales were to petitioner's branches and other Scientology churches certainly constitutes a flagrant case of self-dealing, which clearly benefited L. Ron Hubbard, personally, and thus constitutes inurement.

Not only did L. Ron Hubbard receive royalty payments on his own works, but he also received royalties attributable to the literary efforts of some of petitioner's other employees. It was a long-standing policy of petitioner that all works involving Scientology had to be copyrighted to L. Ron Hubbard. This policy was articulated by L. Ron Hubbard in HCO PL of November 15, 1958, 1 OEC 13–14, as follows:

*Similarly, any book on Dianetics and Scientology must be copyrighted in the name of L. Ron Hubbard* and the copyright becomes the property of HCO. No copyright of anything must ever be permitted to escape. In the case of its having been done (a book on the subject copyrighted in the name of someone or something else) HCO Secretary in the area must request an

assignment of copyright to L. Ron Hubbard from its present owner and must be tireless and remorseless in getting the copyright, using any available means at whatever cost.

Similarly any trademark, registered mark, or patent for any sign, symbol, shield, device or design for Dianetics or Scientology or their organizations must be secured for HCO. All these are registered to L. Ron Hubbard and by blanket transfer are the property of HCO only. The name in which it is done is L. Ron Hubbard; the owner is then HCO.

*     *     *     *     *     *     *

Don't let one seal, one copyright, one design, one device, or even the names Dianetics and Scientology escape you on this. All the money you need to hire experts, lawyers, artists and pay fees is yours for the asking from the main office of HCO. Just ask.

[Emphasis added.]

Pursuant to this policy, a number of publications copyrighted by L. Ron Hubbard were actually written by others. For example, Ruth Mitchell wrote the book "Know Your People," and Peter Gillum wrote the book "How to Be Successful"; however, both books were copyrighted by L. Ron Hubbard. Additionally, numerous policy letters contained in the OEC were actually written by paid employees of petitioner with L. Ron Hubbard's approval. Nevertheless, despite the fact that L. Ron Hubbard did not personally author the entire nine-volume set, he did receive royalty payments on the sale of this publication.

Without addressing the legality of copyrighting materials and receiving royalty payments on the works of others, we find the policy of using paid employees of an organization to write materials that are then copyrighted to the organization's founder, and upon which he receives royalties, to be a clear use of an organization for a private, as opposed to a public, purpose—the crux of a finding of inurement.

The record reveals glimpses of other self-dealing transactions in addition to L. Ron Hubbard's receipt of royalties from literature published, sold, and sometimes, even written, by petitioner. For example, a portion of the debt allegedly owed by petitioner to L. Ron Hubbard during the tax years in question arose from his sale in 1966 of the St. Hill Manor to petitioner. Although we know from petitioner that the sales price in that transaction was 79,410.5.6 pounds, petitioner has failed to introduce any evidence as to the fair market value of

St. Hill at the time of the sale or the reason why petitioner needed L. Ron Hubbard's specific property. However, there is unrebutted evidence in the record that L. Ron Hubbard represented to the British Government on a statement of his assets to the Inland Revenue as of April 1966 that the value of this property was only 17,707.7.6 pounds—an amount less than one-fourth the eventual sales price. Admittedly, we do not really know what the actual fair market value of St. Hill was at the time of the sale. However, in light of the degree of control which L. Ron Hubbard maintained over petitioner and the fact that the debt arising from this transaction was apparently being serviced during the docketed years, absolute full disclosure of all facts relevant to such sale is in order.

In sum, the total value of the overt benefits received by the Hubbards during the tax years at issue in living expenses, and from salaries and royalties was several hundred thousand dollars. These payments are substantial. When viewed in light of the self-dealing that transpired, they prove conclusively that petitioner was operated for the private benefit of L. Ron Hubbard and his family. However, we need not rest our conclusion on this evidence, alone, since the record also abounds with indicia of covert inurement.

Probably the most covert form of compensation paid to L. Ron Hubbard was tithes (or a percentage of gross income) which petitioner and other Scientology organizations routed to him in the guise of "Founding Debt Payments." Although petitioner failed to produce a single witness who credibly testified about these payments, and we are thus left somewhat in the dark regarding the actual amounts and duration of such payments during the docketed years, there is considerable evidence in the record that these payments did indeed take place. A trail of documentary evidence shows that Scientology organizations began making these alleged debt repayments in the 1960s. In HCO PL December 21, 1965, 3 OEC 51, L. Ron Hubbard remonstrated all Scientology organizations for their failure to keep proper records of their debts to him for his past services in establishing Scientology. He directed the organizations to correct their records and to set up a system in the Office of LRH for keeping track of these debts and collecting payments. L. Ron Hubbard went on to state that the reason for these policies stemmed from the IRS's actions against the

Founding Church of Scientology. That controversy was eventually litigated in the Court of Claims. In finding that the net earnings of the Founding Church inured to the benefit of L. Ron Hubbard, the Court of Claims found that from 1957 on, L. Ron Hubbard was paid, in lieu of salary, 10 percent of the gross income of the Founding Church and of other Scientology congregations, franchises, and organizations, and that "Such an arrangement suggests a franchise network for private profit." *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 494, 498, 412 F.2d 1197, 1199, 1201 (1969), cert. denied 397 U.S. 1009 (1970). Thus, HCO PL of December 21, 1965, 3 OEC 51, was apparently issued in realization of the fact that the current scheme of compensating L. Ron Hubbard placed Scientology churches in a dangerous tax position. However, although the payments made to L. Ron Hubbard from that time on certainly differed in form, it appears that they differed little in substance.

HCO PL December 21, 1965, 3 OEC 51, marks the beginning of a documentary trail that leads through the tax years in issue. HCO PL June 25, 1967, 3 OEC 63, repeated L. Ron Hubbard's instructions to record debts owed to him. Flag Order 773 issued on May 25, 1968, ordered the removal of staff who incorrectly handled debt repayment to L. Ron Hubbard and, as a result, exposed him to greater income tax liability. FBO correspondence between Flag and AOLA in 1968 and 1969 discussed L. Ron Hubbard debt repayment (sometimes called "LRH RR" or LRH 10%s). A 1968 letter discussed the need to build up cash reserves aboard the *Apollo*, in part, to repay L. Ron Hubbard quickly. FBO correspondence in March 1969 concerned ways to send loan repayment tithes from AOLA to L. Ron Hubbard, then on board the *Apollo*, in a negotiable form other than dollars to avoid possible losses from a feared devaluation of the dollar. These references to the alleged debt repayment which pepper the record convince us that L. Ron Hubbard was personally receiving a certain percentage—in most cases 10 percent—of petitioner's and other Scientology organizations' gross income in the late 1960s.

These loan repayments continued in the docketed years. The official story with respect to these payments is detailed in HCO PL September 7, 1972, which states:

## "REPAYMENT OR DUE MONEY COLLECTED FOR LRH PERSONALLY."

### WHAT IS OWED

For years, public have thought or been told that the income of orgs goes to Ron, but this has never been true.

Quite the reverse, Ron's personal income and capital—even Veterans checks and Author's royalties—have been invoiced and used by orgs.

The entire Technology of Dianetics and Scientology have been used by orgs without reimbursement to Ron for research or development, nor even repayment for out of pocket expenses.

Where such payments have been made records will show that they were usually not received by LRH but that they too were invoiced and used by orgs and remain a debt of the Church in most cases.

The Saint Hill Organization, piloted and built and made prosperous by LRH personally, now belongs to the Church of Scientology of California, but has never been paid for.

The name "L. Ron Hubbard", an asset worth millions in goodwill and high credit rating, is used by all Scientology organizations but has not been paid for.

In the early years, the personal funds of LRH guaranteed org overdrafts and even loaned orgs money. Income from ACC's (Advanced Clinical Courses, taught by LRH) rightfully due to LRH were instead received and used by orgs.

Very little of the sums due have been repaid.

### ORG BALANCE SHEETS

Many orgs have invoiced LRH personal income as "their own income". This gives them a raised *income*. But it was not their money and is actually a *debt* owed to LRH. Balance sheets of the orgs, particularly in the tax matters, therefore show inflated income when a debt exists.

It is to the interest of all orgs that their balance sheets be correct. It is therefore incumbent upon them to furnish proper service in LRH collections.

### COLLECTION

The post of LRH ACCOUNTS OFFICER is being established in the personal Office of LRH at Flag, directly under LRH Pers Comm Flag.

LRH Accounts will provide LRH Comms with monthly statements showing monies owed and payments made, and will set weekly payment targets for LRH Comms to meet.

The routing of all payments and correspondence is direct to LRH accts, via the Cont'l FOLO as a mail relay point.

### LRH GOODWILL REPAYMENT ACCOUNT

Orgs having an LRH GOODWILL REPAYMENT ACCOUNT may use it to begin payments or to supplement current income in meeting their weekly payment target.

## OIC CABLE

As OIC cable format is subsequently updated the second stat of the LRH Comm will eventually be included. Meanwhile the OIC cable remains as currently but the collection stat of each LRH Comm will be graphed at Flag based on amounts actually received and date of receipt, and graphed locally by amount and date when sent.

## LRH COMM DUTIES

Any friction or opposition encountered by LRH Comms in obtaining repayment or collection of monies due must be reported with full factual details of WHO and WHAT to LRH Accts Flag.

Hat material on duties and functions relating to this collection statistic will be issued from time to time, as the post of LRH Accts is further established and developed.

However it will be found that a demand to meet the target, backed up by standard LRH Comm functions to get LRH Technology and Policy known and used correctly, will keep GI up trended and make it easy for the LRH Comm to keep his collection stat rising as well.

## EXCHANGE

The exchange factor in this is very simple and direct. To the degree that the LRH Comm gets LRH Technology and Policy known and used he will be able to make increasing repayment for it from the org to Ron, as the org will prosper and do well.

So START! And good luck to you with your new stat!

LRH Accounts Officer and
LRH Pers Comm
by order of
L. Ron Hubbard
FOUNDER

This policy letter clearly establishes that payments, other than salary and royalties, were being made by petitioner to L. Ron Hubbard under the guise of debt repayments. Additionally, it is obvious from this policy letter that the so-called debt repayments were not just for money advanced by L. Ron Hubbard to petitioner but were also compensation for L. Ron Hubbard's past work in developing Scientology and for the use of his name. Petitioner has not produced any evidence of bona fide indebtedness, and it is clear from the record that there was no recognized debt which had been negotiated between petitioner and L. Ron Hubbard but rather a continuing obligation to make payments based on petitioner's total receipts.[70]

---

[70] Indeed, in light of L. Ron Hubbard's degree of control over petitioner, there could be no independent negotiations between L. Ron Hubbard and petitioner.

Petitioner denies such payments existed and asserts that HCO PL September 7, 1972, was canceled two days later by another policy letter. However, not only is the document allegedly cancelling the quoted policy letter self-serving, but it is totally impeached by the testimony of John McLean and Eugene Endo who both testified that such debt repayments continued to be made long after the purported cancellation. Indeed, petitioner's own financial records for the period October 9, 1972, to December 28, 1972, indicate that payments designated either "LRH Repayments," "Founding Debt Payment," or "Per HCO Policy Letter 7 Sept. 72," totaling $19,324.41 were made during this period.[71] We thus find that the weight of the evidence clearly indicates that HCO PL September 7, 1972, was adhered to long after its alleged cancellation. It is, therefore, apparent that, although Scientology organizations rearranged their forms of payment to L. Ron Hubbard during the tax years in question, L. Ron Hubbard was still continuing to receive a percentage of their gross income.

Finally, although the apparent existence of an arrangement whereby all Scientology organizations funneled a percentage of their gross income to L. Ron Hubbard under the guise of debt repayment certainly constitutes evidence of inurement on a grand scale, probably the most blatant source of covert inurement to L. Ron Hubbard in the present case is the complete control that he exercised over the millions of dollars transferred to OTC and the United States Churches of Scientology Trust.

During the docketed years, L. Ron Hubbard had complete control of the United States Churches of Scientology Trust which in 1972 had accumulated earnings of $1,307,237.26. Our finding that the trust was not legitimate creates a presumption, left unrebutted, that L. Ron Hubbard privately benefited from the trust's funds.

With respect to OTC, we observe that, even were we to believe petitioner's story that OTC was a truly independent

---

[71]We are not at all convinced that these records represent the total amount of such alleged debt repayments in light of John McLean's testimony. McLean credibly testified that, during the fall of 1972, statistics were posted aboard the *Apollo* each week showing the amount of weekly payments to L. Ron Hubbard. According to McLean, the weekly payments to L. Ron Hubbard which were posted pursuant to the policy letter of Sept. 7, 1972, ranged between $7,000 and $22,000 per week. We credit McLean's testimony on this point.

corporation, we would nevertheless have to conclude that OTC's use of petitioner's funds constitutes inurement. OTC was a non-tax-exempt corporation. According to petitioner, it was constantly in debt to petitioner for huge sums of money. As petitioner's banker, this arrangement is best characterized as an interest-free loan.

In *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488 (1977), we found the existence of private inurement where a non-profit corporation, formed to take over the educational functions of a non-tax-exempt corporation, required parents of its students to make interest-free loans to the non-tax-exempt corporation. In that case we held that the interest-free feature of the loans was an unwarranted benefit to private individuals. We find the rationale of *Hancock Academy* equally applicable to the case at bar. If OTC had truly been independent, then certainly the huge sums transferred to it by petitioner constituted inurement to private individuals. See also *Founding Church of Scientology v. United States, supra.* ("Indeed, the very existence of a private source of loan credit from an organization's earnings may itself amount to inurement of benefit." 188 Ct. Cl. at 499, 412 F.2d at 1202.)

We do not, however, credit petitioner's story that OTC was independent. It was a sham corporation controlled by L. Ron Hubbard.

Petitioner's burden of proof with respect to inurement in this case is of necessity a heavy one. Where one individual is dominant in an organization, "there exists the opportunity for abuse which, in turn, evinces a need for open and candid disclosure of all the facts." *Basic Bible Church v. Commissioner*, 74 T.C. 846, 858 (1980). In the instant case, however, petitioner has been less than open and candid and has failed totally in carrying its burden of proof with respect to both OTC and the trust.

Several key Scientology officials were noticeably absent from the trial. L. Ron Hubbard did not testify, although he was the Church's leader, was a signatory on all Church and OTC accounts, and allegedly held sums of money in trust for petitioner.[72] Mary Sue Hubbard did not testify, although she

---

[72]Petitioner's counsel acknowledged his awareness of the negative inferences that could be drawn from the Church's failure to produce a witness. Nevertheless, he represented that petitioner

was the senior person on the Aides Council, commanded the International Guardian Network, and held the only set of keys to the *Apollo* strongroom where millions of dollars belonging to OTC and the trust were stored. Greenberg, the California Church's accountant, did not testify although he coordinated the 1971–74 audit on behalf of the Church, allegedly counted on February 23, 1975, the OTC money kept aboard the *Apollo*, and prepared petitioner's tax returns for the docketed years.[73] Mary Rezzonico did not testify although she served as Greenberg's assistant during the 1971–74 audit and was invested with the power of attorney to represent the California Church before the IRS on all matters and all years. H.A. Ross did not appear although he was the auditor of the trust accounts for the docketed years. Neither Fred Hare nor Vicki Polimeni testified although they were the Church officials who allegedly transported the trust funds from Switzerland to the *Apollo*. We stop here although there were others who were privy to facts and transactions of critical importance to the issues in this case, particularly concerning the trust and OTC, who did not testify.

Petitioner also failed to introduce important documentary evidence. The trust records were not produced although a file containing trust banking records and correspondence was allegedly maintained at the United Kingdom Church. The Church never produced records of OTC's expenditures, claiming OTC was a separate corporation over which it had no control and also claiming that the Swiss banks, where the OTC accounts were maintained, did not return canceled checks. These claims were false. OTC was a separate corporation in name only. Furthermore, petitioner regularly received debit advices from the OTC accounts, which provided the same information as would have been shown on a canceled check. The ready availability of these debit advices is underscored by the fact that at least one Church witness reviewed them in Los Angeles before giving testimony. Finally, petitioner did not produce instructions called "Flag Mission Orders" and reports

---

would not allow L. Ron Hubbard to appear as a witness thereby tacitly confirming the California Church's ability to produce him.

[73]Respondent's agents spent about 20 hours trying to serve Greenberg with a subpoena. They were not successful. However, several Church witnesses spoke with Greenberg during the course of the trial and found him in good health.

The failure of a party to produce relevant evidence within its possession or control gives rise to the presumption that, if produced, it would be unfavorable. *United States for the Use and Benefit of C.H. Benton, Inc. v. Roelof Construction Co.*, 418 F.2d 1328, 1332 (9th Cir. 1969); *Malat v. Commissioner*, 302 F.2d 700, 706 (9th Cir.), affg. 34 T.C. 365 (1960), cert. denied 371 U.S. 934 (1962). This is especially true where the party failing to produce the evidence has the burden of proof. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The need for full and candid disclosure is also particularly great where a church is dominated by its founder, since there is obvious opportunity for abuse of its tax-exempt status. *Basic Bible Church v. Commissioner*, 74 T.C. 846, 858 (1980); *Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 74 T.C. 531 (1980), affd. 670 F.2d 104 (9th Cir. 1981). In view of L. Ron Hubbard's unfettered control of the OTC and trust funds ranging in the millions of dollars, petitioner's failure to come forward with relevant evidence bearing on these holdings constitutes an overwhelming failure of proof. Consequently, we find petitioner was operated for the private benefit of L. Ron Hubbard and his family and that its net earnings inured to their benefit.

## VI.

In a pretrial ruling, we held that in order to qualify for exemption under section 501(c)(3) petitioner must meet the express conditions of that section and, in addition, must comply with fundamental notions of public policy. Our ruling anticipated the holding in *Bob Jones University v. United States*, 461 U.S. 574 (1983), which found that section 501(c)(3) was informed by charitable trust law and which read into the section a requirement that charitable organizations seeking to qualify for exemption from federally imposed taxes must serve a valid public purpose and confer a public benefit. 461 U.S. at 586–588 n. 12.

[T]o warrant exemption under section 501(c)(3), an institution must fall within a category specified in that section and must demonstrably serve and be in harmony with the public interest. The institution's purpose must not be so at odds with the common community conscience as to undermine any

public benefit that might otherwise be conferred. [461 U.S. at 592; fn. ref. omitted.]

Pursuant to our ruling, respondent offered proof that petitioner did not satisfy this public policy requirement because it conspired to impede the IRS in performing its duty to determine and collect taxes from petitioner and other Scientology churches, a felony offense under 18 U.S.C. sec. 371. Petitioner contends that our construction of 501(c)(3) impermissibly intrudes upon its associational rights and free exercise rights because there are less restrictive ways to purge petitioner's misconduct than to withhold its exemption.[74] Petitioner suggests that the Government's interests could just as well be vindicated by prosecuting Church officials who broke the law as by penalizing the entire California Church and denying its tax exemption. Petitioner reminds us that the First Amendment principle of requiring the least restrictive means has a sympathetic chord in charitable trust law. "If the purposes for which a charitable trust is created are legal, the mere fact it would be possible to accomplish the purposes by illegal means does not make the charitable trust invalid." Restatement, Trusts 2d, sec. 377, comment d (1959). This issue

---

[74]Petitioner raises two other objections to the public policy requirement we have read into sec. 501(c)(3). First, petitioner claims that the *Bob Jones* Court reserved ruling on the applicability of charitable law public policy standards to churches. We disagree. We believe the *Bob Jones* opinion unqualifiedly held that all organizations seeking exemption under 501(c)(3) must comply with fundamental standards of public policy. Ruling was limited only on the second issue presented in the case—whether the particular fundamental interest in eradicating racial discrimination could be applied to churches. In any event, we believe that the application of public policy requirements to churches does not in and of itself offend the Constitution. Churches are not above the law. Historically, there have been a number of compelling governmental interests justifying curtailment of religious liberty. See, e.g., *Reynolds v. United States*, 98 U.S. 145 (1878) (monogamy); *Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1 (1890) (monogamy); *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (control of smallpox); *Prince v. Massachusetts*, 321 U.S. 158 (1944) (protection of children from exploitative labor); *Gillette v. United States*, 401 U.S. 437 (1971) (conscription); *United States v. Lee*, 455 U.S. 252 (1982) (soundness of the social security system). If the Government has the power to prohibit religious practices outright which interfere with fundamental public interests, and even to deny corporate existence for engaging in such practices (*Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States, supra*), then, a fortiori, it has the power to deny tax benefits to churches which espouse and practice such beliefs.

Petitioner also claims that this Court's interpretation of the public policy requirement is an overbroad regulation of its free exercise rights. Prior to trial, this Court ruled that petitioner must comply with fundamental public policy such as may be evidenced in a civil or criminal statute. Respondent did not rely on this definition. Except for some brief cross-examination at the very beginning of the trial, respondent confined his case to showing petitioner conspired to defraud the Government in violation of 18 U.S.C. sec. 371. Since petitioner does not dispute that a charitable trust is invalid if it has an illegal purpose, petitioner's overbreadth claim is moot.

was also raised in a slightly different form in the *Bob Jones University* case. There the Court pondered what remedy should apply where an exempt organization confers some benefit, but also violates a law.

[W]e need not decide whether an organization providing a public benefit and otherwise meeting the requirements of section 501(c)(3) could nevertheless be denied tax-exempt status if certain of its activities violated a law or public policy. [*Bob Jones University v. United States*, 461 U.S. at 596 n. 21.]

It is axiomatic that a charitable trust is invalid if it is created for an illegal purpose. Restatement, Trusts 2d, sec. 377 (1959). Thus, a trust can be voided at the request of an interested party if trust property is used to perpetrate a crime defined by statute, or if the object of the trust is to defraud the Government, or if its purpose is to evade taxes. 4 A. Scott, Trusts 377 (3d ed. 1967); G. Bogert, Law of Trusts and Trustees, sec. 211, at 63–64, 114 (2d ed. 1979). See also *Carriage Square, Inc. v. Commissioner*, 69 T.C. 119 (1977); *Temple Square Mfg. Co. v. Commissioner*, 36 T.C. 88 (1961). Respondent has conceded that petitioner's stated purposes, i.e., the purposes described in petitioner's organizing documents, are religious. However, to qualify for a charitable exemption, not just the stated purposes, but the actual purposes manifested through the organization's activities must further a charitable purpose. Sec. 1.501(c)(3)–1(a), Income Tax Regs. This is a question of fact to be determined from all the circumstances. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 357 (1978); *Pulpit Resource v. Commissioner*, 70 T.C. 594, 602, 604 (1978); *Parker v. Commissioner*, 365 F.2d 792, 795 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967).

When we consider all the facts spread across the voluminous record in this case, we are left with the inescapable conclusion that one of petitioner's overriding purposes was to make money. We also conclude that criminal manipulation of the IRS to maintain its tax exemption (and the exemption of affiliated churches) was a crucial and purposeful element of petitioner's financial planning.[75] We need not repeat in detail

---

[75]Organizations qualifying for tax-exempt status under sec. 501(c)(3) are doubly rewarded. Not only do they not have to pay taxes, but they also stand in a better position to attract income since taxpayers who contribute to sec. 501(c)(3) organizations are permitted by sec. 170(c)(2) to deduct the amount of their contributions on their Federal tax returns.

petitioner's financial planning.[75] We need not repeat in detail our findings regarding petitioner's efforts to block the IRS from investigating, determining, and collecting taxes from petitioner and affiliated churches. The highlights of the conspiracy show its nature and scope.

The conspiracy spanned 8 years beginning in 1969 and continuing at least until July 7, 1977, when the FBI, pursuant to a warrant, searched petitioner's premises for evidence of the conspiracy and related crimes. The scheme involved manufacturing and falsifying records to present to the IRS, burglarizing IRS offices and stealing Government documents, and subverting Government processes for unlawful purposes. For example, Freedom of Information Act requests were planned for the purpose of having the IRS amass records in one central place where they would be easier to steal. At first, petitioner's FBO network masterminded the conspiracy, developing plans to conceal that OTC was a sham by falsifying and manufacturing records. Later, petitioner's Guardian Office, whose top officials served on petitioner's board of directors during the docketed years, directed the conspiracy. The Guardian Office developed plans to infiltrate the IRS and steal documents. Later it monitored the implementation of these plans.

In pursuit of the conspiracy, petitioner filed false tax returns, burglarized IRS offices, stole IRS documents, and harassed, delayed, and obstructed IRS agents who tried to audit the Church's records. Petitioner gave false information to, and concealed relevant information from, the IRS about its corporate structure and relationship to OTC. In the end, Jane Kember, the Guardian Worldwide, acting just under L. Ron and Mary Sue Hubbard in petitioner's hierarchy, was convicted of burglarizing the offices of respondent's Exempt Organizations Division on three occasions in 1976. The burglaries occurred while an extensive audit of petitioner's records was in progress. Furthermore, Mary Sue Hubbard, Duke Snider, and Henning Heldt were convicted of conspiring to obstruct justice. Their convictions in part rested on their efforts to conceal petitioner's connection to burglaries of IRS offices and

---

[75]Organizations qualifying for tax-exempt status under sec. 501(c)(3) are doubly rewarded. Not only do they not have to pay taxes, but they also stand in a better position to attract income since taxpayers who contribute to sec. 501(c)(3) organizations are permitted by sec. 170(c)(2) to deduct the amount of their contributions on their Federal tax returns.

Petitioner's course of conduct between 1969 and 1977 constitutes a violation of 18 U.S.C. sec. 371 and convincingly shows that petitioner had a substantial illegal purpose during the docketed years. We are, therefore, faced with the question of what remedy to apply. Are we required by either the First Amendment or charitable trust principles to find that the Government's only remedy is a criminal prosecution? For a number of reasons, we think not. First, 18 U.S.C. sec. 371, which provides that it is a felony offense for two or more persons to conspire to defraud the United States or its agencies, is a venerable and major Federal criminal statute. It was first enacted as section 30 of "An Act to amend existing laws relating to Internal Revenue and for other purposes" on March 2, 1867, 14 Stat. 471, 484, and has continued in effect almost in its present form ever since then. See *United States v. Gradwell*, 243 U.S. 476, 481 (1917). One has only to look at the numerous annotations which follow 18 U.S.C. sec. 371 in the United States Code Annotated to realize its importance in safeguarding our governmental functions. Second, petitioner's conspiratorial efforts were systemic and long lived. People in petitioner's FBO network, Guardian Office, and affiliated churches were involved. Church officials at the highest level of the hierarchy, not just ordinary Church members, participated in the conspiracy. Indeed, some high Church officials were finally convicted for their illegal activities. Three held top-ranking positions in petitioner's hierarchy during the docketed years and four others held important positions in petitioner's Guardian Offices in later years. At least four of petitioner's branch churches were affected by the conspiracy. There were plans to manufacture and falsify records at Flag and AOLA. Also officials at Flag and the Guardian Offices in the United Kingdom and United States spearheaded the conspiracy. The conspiratorial plan knew no geographic boundaries. Guardian Order 1361 called for infiltrating and stealing documents from IRS offices in London, Los Angeles, and Washington, D.C. Third, the Government's interest in ferreting out crime is not the only interest at stake here. The Government also has an interest in not subsidizing criminal activity. Were we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense. We think such paradoxes are

ing out crime is not the only interest at stake here. The Government also has an interest in not subsidizing criminal activity. Were we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense. We think such paradoxes are best left to Gilbert and Sullivan. Finally, under the statutory scheme, the denial of an exemption is not a permanent loss to petitioner. Only petitioner's 1970–72 tax years are before us. Petitioner is free to show that it qualifies for exemption in subsequent years since each tax year is a separate cause of action. *Commissioner v. Sunnen*, 333 U.S. 591, 598 (1948).

Petitioner states that in 1970, 1971, and 1972 it had no warning that public policy violations could lead to a denial of its tax-exempt status. Petitioner, therefore, claims respondent cannot, consistent with due process, invoke this requirement to deny its exemption. The public policy requirement is not strictly speaking a new provision. It is an implied condition of section 501(c)(3). However, it has only recently been read into that section, and it was not until the trial of this case was over that the requirement received Supreme Court sanction in *Bob Jones University v. United States*, 461 U.S. 574, decided May 24, 1983. The application of a public policy requirement to petitioner's operations during the taxable years at issue, therefore, has retroactive effect.

Holding petitioner subject to public policy standards embodied in charitable trust law does not violate petitioner's right to due process. The application of this requirement to petitioner's operations calls into play a form of limited retroaction first discussed in *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801). There it was held that if a law changes while a case involving public rights is pending, the new law must govern the case. 5 U.S. (1 Cranch) at 110. This approach has been followed not only in instances where a statutory change has intervened (*Carpenter v. Wabash Railway Co.*, 309 U.S. 23 (1940)), but also where judicial decision has clarified or overruled earlier case law. *Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538 (1941); *Oklahoma Packing Co. v. Oklahoma Gas & Electric Co.*, 309 U.S. 4, 7–8 (1939). See also *Linkletter v. Walker*, 381 U.S. 618, 625–627 (1965).

Petitioner's claim fails even when measured by general due process considerations in the area of retroactive law. The due

process clause does not make every retroactive law unconstitutional. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976); *Welch v. Henry*, 305 U.S. 134, 146 (1938). A retroactive tax law offends the due process clause only when the nature of the tax and the circumstances in which it is laid leave little doubt that it is harsh and oppressive. *Welch v. Henry, supra* at 147; *Hospital Data Center of S.C., Inc. v. United States*, 225 Ct. Cl. 158, 163, 634 F.2d 541, 544 (1980). See also *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d 703, 708 (9th Cir. 1976), vacated on other grounds 430 U.S. 952 (1977).

Under the circumstances, we find that the retroactive application of the public policy requirement is neither harsh nor oppressive. First, petitioner had ample notice that it was against the law to conspire to obstruct the IRS. 18 U.S.C. sec. 371 has been in effect for over 100 years. If the threat of criminal penalties was not sufficient to keep petitioner within the bounds of the law, it can hardly be supposed that petitioner would have acted differently had it known it would incur a tax liability for planning a campaign to thwart the IRS. Second, section 7805 places petitioner on notice that the Commissioner has broad authority to make tax rulings retroactive. Cf. *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 33 (1978) (Justice Brennan, concurring). Third, the public record belies petitioner's assertion that it did not have warning that it must comply with public policy standards to maintain its eligibility for exemption. In Rev. Rul. 67–325, 1967–2 C.B. 113, respondent stated his view that an organization which is not "charitable in the generally accepted legal sense" does not qualify for section 501(c)(3) status. Rev. Rul. 67–325, *supra* at 117. Regulations in effect during the docketed years defining the term "charitable" state the term is "used * * * in its generally accepted legal sense." See 26 C.F.R. sec. 1.501(c)(3)–1(d)(2) (1970), (1971), and (1972). The Commissioner of the IRS was on record in 1970 as saying that an organization seeking exemption within the meaning of section 501(c)(3) must meet the test of being "charitable" in the legal sense. Statement of Randolph W. Thrower, Commissioner of Internal Revenue, Before the Senate Select Committee on Equal Educational Opportunity, 91st Cong., 2d Sess. 1995 (1970). Rev. Rul. 71–447, 1971–2 C.B. 230, states:

All charitable trusts * * * are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy.

This same rule was also stated in *Green v. Connally*, 330 F. Supp. 1150, 1159 (D. D.C.) decided on June 30, 1971, and affd. per curiam sub nom. *Coit v. Green*, 404 U.S. 997 (1971).[76] Some, but not all, of these rulings were made in the context of determining whether racially discriminatory schools qualified for tax-exempt status, since they violated Federal public policy against racial discrimination. We find this of little significance, since the rule was stated broadly enough to throw into question petitioner's eligibility for exemption for violating 18 U.S.C. sec. 371. For all of the above reasons, we find that petitioner is not unduly injured by the retroactive application of public policy standards.

## VII.

Several of respondent's witnesses were former Scientologists. Petitioner challenges their credibility, claiming their disenchantment with the Church caused their testimony to be biased. This Court had ample opportunity to observe these witnesses. Most of them were questioned at length under cross-examination. With one exception, this Court found all of them to be credible. The exception is Lauren Gene Allard. There were significant inconsistencies in his testimony, and this Court has therefore only credited his testimony where it is corroborated by documentary evidence. The remaining ex-Scientologists were credible and markedly free of any tendency to be vindictive. Lorna Levett, a former Scientologist who had been in charge of a Scientology mission in Canada, admitted that she was disillusioned with Scientology. However, her disillusionment did not prevent her from giving candid and straightforward answers. Petitioner, on brief, did not point to any inconsistencies in her testimony, although she was cross-examined at length. Kathryn Hirsch was reluctant to testify and had to be subpoenaed. She worked in finance

---

[76]Subsequent to the decision in *Coit v. Green*, 404 U.S. 997 (1971), the Supreme Court has twice questioned its precedential value. See *Allen v. Wright*, 468 U.S. ___, ___ (1984); *Bob Jones University v. Simon*, 416 U.S. 725, 740 n. 11 (1974). We find this of little significance for notice purposes. What is important is that in 1971, the decision was "on the books" and informed petitioner that a charitable organization could not qualify for a tax exemption if it had an illegal purpose or violated public policy.

positions at the Celebrity Center Church of Scientology during the docketed years and testified about instructions from her superiors regarding techniques to resist passively IRS inquiries. Her testimony was unimpeached. Scott Mayer, another former Scientologist, served as an unpaid consultant to respondent's counsel. During the course of the trial, at the request of respondent's counsel, he became a paid consultant. Mayer was in the courtroom throughout the trial, and this Court, therefore, had ample opportunity to observe him both on and off the witness stand. Some of the details of his testimony regarding a 1975 project to falsify Church financial records were impeached, but the essentials of his story stood up under attack. On balance, this Court found Mayer to be both truthful and well informed.

The most sterling witness among the many former Scientologists who testified was John McLean. Petitioner tried very hard to impeach his testimony, since he had damaging things to say. He told about orders to falsify records, direct payments to L. Ron Hubbard, the removal of money from secret Swiss bank accounts, and the Church's heavy emphasis on making money. Petitioner tried hard to impeach three collateral aspects of McLean's testimony: (1) That McLean traveled to join Flag in 1971 with a man named Foster Tompkins; (2) that Flag kept statistics on "paid completions" in May 1971; and (3) that McLean's salary was suspended for a time as punishment.

The impeachment failed. McLean testified that on his journey from Los Angeles to join the Flag ship in Tangier, Morocco, he was met in New York by Foster Tompkins, who then accompanied him on his journey. Foster Tompkins testified as an impeachment witness. He said that he traveled from New York to Madrid and then on to Tangier, but not with McLean. However, a passport and travel vouchers show that both men were at the Barajas Airport in Madrid on February 19, 1971. Furthermore, both men testified that on arrival in Madrid, they went to a Flag outpost or relay point to meet with a man named David Rapp for a briefing. The similarities in the men's stories about their course of travel, combined with the documentary evidence placing both men at the Madrid airport on the same day, convince us of the truth of the gist of McLean's testimony. We find that the two men must have traveled from New York to the Flag outpost in Madrid

together, although it appears from other evidence that the men traveled separately on the very last leg of the journey from Madrid to the *Apollo* in Tangier. The Church also tried to impeach McLean's story that his pay was temporarily suspended as punishment because Church money in his custody was stolen from him while he was on a Church mission. However, this testimony was corroborated by a Flag Order dated June 22, 1971, and disbursement vouchers signed by him.[77] The Church also failed to impeach McLean's testimony about "paid completions." (A "paid completion" is a course or level that is completed and paid for.) McLean testified that in May 1971, the file room aboard the *Apollo* had files for the different churches including AOLA, and that the AOLA files had subdivisions for statistics on gross income and "paid completions." Petitioner tried to establish that statistics on paid completions were not kept until August 1971 when L. Ron Hubbard wrote a policy letter declaring that it was harmful for Scientology organizations to concentrate on increasing gross income at the expense of delivering quality services. The policy letter explains that L. Ron Hubbard therefore developed a new statistical goal called "paid completions accompanied by an acceptable success story." This new goal was meant to counteract the misguided tendencies of certain organizations to emphasize gross income statistics over quality services. However, it is clear from other policy letters that as early as March of 1969 Scientology organizations were instructed to report statistics on the number of grade levels that were paid for and completed. We, therefore, credit McLean's testimony and surmise that the new statistic introduced in 1971 had to do with *quality* paid completions and not just paid completions which were already being tabulated.

Lewis Hubbard and the examining agents for the 1971–74 audit testified at length in this trial and underwent extensive cross-examination by petitioner's counsel. They each displayed a high degree of professional dedication and an absence of any prejudice towards petitioner or Scientology.

---

[77] Petitioner introduced several disbursement vouchers for impeachment, all signed by John McLean, save one, which was signed simply with the name "Karen." The Court only credits the disbursement vouchers signed by John McLean. These show that following the incident which occurred on June 18, 1971, McLean was taken off the payroll until July 13, 1971. However, even if the voucher signed "Karen" were taken into account, John McLean at least went without pay for the week ending June 24, 1971.

This Court does not credit the testimony of two Church witnesses, Fran Harris and Joel Kreiner. Harris was very evasive on cross-examination about topics that were clearly within her area of competence. She did not know what discount prices were given to staff members; whether ASHO paid money to the so-called trust; how much money ASHO sent to Flag; what percentage of the ASHO budget was devoted to operating expenses; which organizations sent staff to train at Flag; whether staff training payments were routed through Los Angeles to Flag or went directly to Flag; how the Swiss banks notified her of their intention to charge negative interest on foreign deposits; whether one or two Swiss trust accounts were closed out in 1972; how she could be certain no one had access to the OTC and trust moneys; why the OTC cash aboard the *Apollo* was not deposited in the Banque du Benelux account in Luxembourg until 1975, even though the account was opened in 1973 and held other cash deposits from the *Apollo*; what the terms of her contract with the Sea Organization were; or why her close friend, Robin Roos, lost her position as CS–3 on the Aide's Counsel. Taking into account that Harris served as the chief financial officer at USLO, ASHO, AOLA, and then Flag, and considering that she and L. Ron Hubbard masterminded the transfer of the OTC and trust moneys from banks in Switzerland to the *Apollo*, we can only conclude that her evasiveness was intentional.

Joel Kreiner was the Church's chief legal officer (Deputy Guardian Legal, U.S.) from the fall of 1969 to June 1974. In June, he stepped down from his position as chief legal adviser but continued to hold a legal post in petitioner's Guardian Office. Kreiner was the Church's primary tax attorney and had custody and control of the Church's tax files. Kreiner's manner of giving testimony raised doubts about his credibility. He repeatedly revised his statements. Under respondent's examination, his memory was short and often had to be refreshed by documentary evidence. This Court was ultimately persuaded to disbelieve Kreiner by three factors. First, Kreiner prepared applications for exemption for several Scientology missions. Statements on the application form about the mission's relationship to the United Kingdom Church were misleading. The form failed to mention the mission's obligation to remit 10 percent of its corrected gross income to the

United Kingdom Church and described its practice of sending financial reports to the United Kingdom Church as purely voluntary, although, in fact, it was obligatory. Second, Kreiner wrote a letter transmitting the Church audit report to the IRS which characterized the report as "a fair and accurate version" of the Church's tax position. The report is filled with falsehoods about OTC, the trust, and the United Kingdom Church. Kreiner, as the Church's chief tax counsel during the docketed years, must have known this. Third, when Church operatives pursuant to Guardian Order 1361 were having difficulty stealing documents from IRS intelligence files, a Freedom of Information request prepared by Kreiner was made to the IRS for the purpose of amassing these documents in a central location where they would be easier of steal.

Petitioner raises four evidentiary objections to the introduction of the OEC series, a nine-volume compilation of Scientology policy letters.[78] Petitioner claims (1) that the compilation is hearsay; (2) that the policy letters predating the docketed years are irrelevant; (3) that the policy letters are not comprised of statements within the meaning of Fed. R. Evid. 801(a); and (4) that volumes cannot be admitted wholesale without examination of each policy letter for nonadmissible material. None of these objections is well founded.

Under the Federal Rules of Evidence, a party-admission is not hearsay. Fed. R. Evid. 801(d)(2)(B) provides:

A statement is not hearsay if— * * * The statement is offered against a party and is * * * a statement of which he has manifested his adoption or belief in its truth.

Petitioner notes the following disclaimer published in the front of each OEC volume and contends that the volumes, therefore, do not constitute a party-admission:

This is part of the religious literature and works of the Founder of Scientology, L. Ron Hubbard. It is presented to the reader as part of the record of his personal research into Life, and should be construed only as a written report of such research and not as a statement of claims made by the Church or the author.

---

[78]Petitioner also objects to the introduction of the OEC series on constitutional grounds claiming entanglement. We have treated this objection *supra* at 462–464.

A statement can be adopted by conduct as well as by words. *State v. Hamilton*, 236 N.W.2d 325, 330 (Iowa 1975); 4 J. Weinstein, Evidence, par. 801(d)(2)(B)[01], at 801–144 (1981). Here, despite its written disclaimer, petitioner has clearly manifested its adoption of the policy letters in the OEC series by its conduct. Petitioner distributed policy letters to staff throughout the Church. Staff were expected to know and follow the policy letters. The policy letters made up some of the material in staff folders containing job instructions and staff were quizzed from time to time on their content. Petitioner even offered a course, the OEC course, devoted to the study of policy letters—each volume requiring 2½ weeks of study. On balance, petitioner's actions speak louder than its words, and the OEC series must be considered the statements of a party-opponent within the meaning of Fed. R. Evid. 801(d)(2)(B).

Some of the policy letters in the OEC series predate the docketed years, and petitioner claims they are, therefore, irrelevant. Evidence is remote and irrelevant only when it bears no connection to provable issues in the case. *N.L.R.B. v. Ed Chandler Ford, Inc.*, 718 F.2d 892, 893 (9th Cir. 1983). Policy letters were effective until officially canceled. An editor's note in the OEC series marks when a policy letter has been canceled. Thus, all the policy letters in the OEC volumes predating the docketed years are relevant except the ones marked by an editor's note showing they were canceled. Petitioner claims that some policy letters fell into desuetude without being officially canceled. As a general proposition, this is probably true. However, according to petitioner, each Church allegedly kept a current index of updated orders and policy letters. Petitioner never produced this index.[79] Under the circumstances we think the early policy letters in the OEC series must be deemed to be in effect during the docketed years in the absence of specific evidence to the contrary.

Petitioner claims that the policy letters should not be admitted because they are so obscure that they cannot be said to be written assertions within the meaning of Fed. R. Evid. 801(a). Petitioner relies on *Zenith Radio Corp. v. Matsushita*

---

[79]On redirect examination, petitioner's witness Fran Harris said this index was not exhaustive. We do not believe this aspect of her testimony, since the statement contradicts her earlier testimony and was only elicited after repeated questioning by counsel.

*Electric Industrial Co.*, 505 F. Supp. 1190 (E.D. Pa. 1980), which held that certain diaries kept by Japanese businessmen were not admissible because they were unintelligible. The diaries were written purely for the diarist. They were not intended for an audience. They contained mostly coded notations which would have required the services of a cryptographer to decipher. 505 F. Supp. at 1211. The *Zenith* court did note, however, that a proper foundation for the diaries could have been laid had their meaning been explained. 505 F. Supp. at 1242. The policy letters at issue here are markedly different from the diaries. The policy letters were collected for publication and sold in petitioner's bookstore which was open to the general public. They were written in sentences rather than coded notations. Words or abbreviations which had idiosyncratic meaning were explained at the trial by witnesses.

Petitioner's final objection to the OEC series is the admission of the volumes as a whole without separate analysis of each policy letter for inadmissible material. Petitioner again relies on the *Zenith* case which held that "Rule 801(d)(2) requires that each statement [in a compilation] be separately admissible." 505 F. Supp. at 1240. The *Zenith* court was dealing with vicarious admissions under Fed. R. Evid. 801(d)(2)(C) and (D). The policy letters are, however, adoptive admissions within the meaning of Fed. R. Evid. 801(d)(2)(B) so that different considerations are at stake. The *Zenith* court was concerned that the diaries contained entries which did not qualify as admissions for one of three reasons. They were not assertions. They were not made in the scope of employment. They contained double hearsay. No such problems exist here. First, as we have already explained, the policy letters contain statements within the meaning of Fed. R. Evid. 801(a). Furthermore, since we are dealing with adoptive admissions and not vicarious admissions, we need not be concerned whether the statements were made in the course of employment. Finally, there is no double hearsay problem. California Church officials were expected to know the content of policy letters and to follow them lock, stock, and barrel. Under these circumstances all of the policy letters in the OEC series constitute adoptive admissions, including the ones containing double hearsay, 505 F. Supp. at 1243 n. 64; cf. *United States v. Article of Drug*, 362 F.2d 923 (3d Cir. 1966).

The admissions of a party-opponent have been freed under the Federal Rules of Evidence from many of the restraints placed on other forms of evidence to guaranty their trustworthiness, and the policy respecting them is one which calls for "generous treatment" of their admissibility. Advisory Committee's Note to Rule 801, reprinted in P. Rothstein, Rules of Evidence for the United States Courts and Magistrates 355–356 (2d ed. 1983). In keeping with this policy, we see no reason to scrutinize, individually, each policy letter in the OEC series prior to its admission.

The following Flag Orders were conditionally received in evidence provided respondent demonstrated they were applicable during the docketed years: Flag Orders RS391 (Exhibit AG), 565 (Exhibit AH), 773 (Exhibit AI), 2132 (Exhibit AJ), 3152 RR (Exhibit AK), 3302 (Exhibit AL), 3385–1 (Exhibit AN), 3385–7R (Exhibit AO), 3474–2 (Exhibit AP). Flag Order 3152 RR is dated March 30, 1972, and, therefore, shows on its face that it was in effect during the docketed years. Flag Orders RS391, 565, 773, and 2132 were all issued prior to the docketed years. Respondent demonstrated that Flag Orders did not automatically expire and thus made a prima facie showing that these orders continued in effect during 1970–72. McLean's testimony corroborated the continuing vitality of one Flag Order in this group. Flag Order RS391 states that L. Ron Hubbard must approve financial planning, and McLean testified this practice continued during the docketed years. Fran Harris was the only witness to rebut respondent's showing. Since this Court did not find her to be a credible witness, we find that Flag Orders RS391, 565, 773, and 2132 were in effect during the docketed years. Flag Orders 3302, 3385–1, 3385–7R, and 3474–2 post date the docketed years and were not in effect during 1970–72.

Petitioner objects to several bits of evidence which respondent used to prove petitioner violated public policy. Petitioner objects to any evidence of conspiratorial events occurring after the docketed years on relevancy grounds; to Exhibit FG, the stipulation of evidence filed on October 26, 1979, in *United States v. Hubbard*, Crim. No. 78 401 (D. D.C. 1979), affd. per curiam sub nom. *United States v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981), cert. denied 456 U.S. 926 (1982), on hearsay grounds; to Exhibit FU, the typewriter case documents, on

Fourth Amendment grounds; and to Exhibit FX, a Guardian Order, on Fourth Amendment grounds. We consider each of these objections in turn.

Many of the events making up the conspiracy to prevent the IRS from assessing and collecting taxes from Scientology churches occurred after the taxable years at issue in this case. To recapitulate, the most significant of these activities were the execution of petitioner's 1972 return, the burglaries of the IRS, the coverup of the burglaries, the falsification of petitioner's records on board the *Apollo*, and the misrepresentations made to the IRS auditors during the 1971–74 audit. Petitioner claims that evidence of these and similar conspiratorial events occurring after 1972 is irrelevant.

We recognize that each tax year is a separate cause of action. However, this rule does not force us to blind ourselves to events occurring outside the docketed years which have a direct bearing on the taxable years at hand. Fed. R. Evid. 404(b) authorizes the use of evidence of other crimes, wrongs, or acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Pursuant to this rule, a trial court has broad discretion to admit evidence of *subsequent* similar acts and crimes provided it is probative of one of these purposes and is not used merely to show criminal disposition. *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1149 (2d Cir.), cert. denied 439 U.S. 913 (1978); *United States v. Cavallaro*, 553 F.2d 300, 305 (2d Cir. 1977). See also *United States v. King*, 587 F.2d 956, 962 (9th Cir. 1978); *United States v. McDonald*, 576 F.2d 1350 (9th Cir. 1978). The burglaries, the thefts, the coverup, the falsification of records, all represent actions taken on petitioner's part to alter the facts and influence the issues presented in this very case. They are probative of petitioner's intent and plan to prevent the IRS from inquiring into the tax status of Scientology churches. Petitioner has insisted that it is innocent of any wrongdoing prior to and during the docketed years. For example, on brief, petitioner attempts to characterize a 1969 FBO network plan to disguise payments to OTC as an honest effort to record Flag expenses in a more organized fashion. Also, on brief, petitioner claims that Exhibit FX, a 1972 Guardian plan to counter IRS investigations of Scientology churches, does not contemplate illegal activity. The subsequent conspiratorial acts are, there-

fore, highly probative of petitioner's criminal intent. They also show the magnitude of petitioner's plan. In sum, December 31, 1972, is not a magic cutoff date for evidence that so clearly elucidates petitioner's role in a conspiracy that was rooted in the docketed years but continued to grow and flourish for a long time afterwards. Cf. *United States v. King, supra* at 962; *United States v. Testa,* 548 F.2d 847, 852 (9th Cir. 1977). This is especially so where a primary purpose of the subsequent acts was to influence the very matters before us.

Exhibit FG is a stipulation of evidence entered on October 26, 1979, in *United States v. Hubbard,* Crim. No. 78–401 (D. D.C. 1979). On the basis of this stipulation, several of petitioner's officials were convicted of conspiracy to obstruct justice in violation of 18 U.S.C. sec. 371. Petitioner claims that this Court cannot rely on Exhibit FG because it is hearsay. We agree that the stipulation is hearsay and that it cannot be used by itself for substantive purposes. However, petitioner misconceives what is being done here. The stipulation is not being used as substantive evidence. It has merged into the convictions of Mary Sue Hubbard, Henning Heldt, and others. Their judgments of conviction were received in evidence and we are here relying on the stipulation to determine the facts underlying the convictions.

Fed. R. Evid. 803 (22) allows evidence of a judgment of a felony conviction "to prove any fact essential to sustain the judgment." It is the duty of the trial judge in the subsequent case to determine just which facts were essential to the previous conviction. The Supreme Court in *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558 (1951), discussed the difficulties of the problem and the trial judge's task:

The difficult problem, of course, is to determine what matters were adjudicated in the antecedent suit. A general verdict of the jury or judgment of the court without special findings does not indicate which of the means charged in the indictment were found to have been used in effectuating the conspiracy. And since all of the acts charged need not be proved for conviction * * * such a verdict does not establish that defendants used all of the means charged or any particular one. Under these circumstances what was decided by the criminal judgment must be determined by the trial judge * * * upon an examination of the record, including the pleadings, the

evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts. [340 U.S. at 569.[80] Citations omitted.]

See also *United States v. Podell*, 572 F.2d 31, 36 (2d Cir. 1978).

Ordinarily, the evidentiary utility of a finding of guilt on a general count of conspiracy is limited to the essentials of the conspiracy, due to the difficulty in determining what substantive violations occurred. See *Emich Motors Corp. v. General Motors Corp.*, supra at 569–571; see also *United States v. Guzzone*, 273 F.2d 121, 122–123 (2d Cir. 1959); *United States v. Kates*, 419 F. Supp. 846, 852–853 (E.D. Pa. 1976). In the instant case, however, we do not have to operate in a vacuum. Petitioner's officials were convicted on the basis of a detailed uncontested stipulation of evidence. We can, therefore, determine with precision what the unlawful objects of the conspiracy were and what means were taken to effect its purposes.

Under the circumstances, we can safely conclude that the criminal court which handed down the convictions must have found facts in complete accordance with the stipulation of evidence. This follows from its duty to consider rationally the evidence. *Jackson v. Virginia*, 443 U.S. 307 (1979). The only evidence presented was an uncontested, written stipulation supported by documents. There were no witnesses. Thus, since credibility was not an issue, and since the stipulation was devoid of internal inconsistency and not contrary to the laws of nature, the criminal court had no principled basis for accepting only part of the stipulation and rejecting other parts. As a rational trier-of-fact, it had to adopt the stipulation in its entirety. We, therefore, are entitled to rely on the stipulation not as a discrete piece of substantive evidence but as a comprehensive statement of the facts clothing the convictions.

Exhibit FU consists of Guardian Order 1361 and a number of reports discussing compliance with the order. The documents were brought to the IRS in Los Angeles in an unmarked typewriter case by an attorney in private practice named "Jones." They were received by Agent McKellar. Petitioner claims that respondent should have obtained a warrant before

---

[80]Although the Supreme Court in *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558 (1951), was construing sec. 5 of the Clayton Act, 15 U.S.C. sec. 16(a), the language of the decision suggests that the Court felt it was applying general principles regarding the estoppel effect of a prior criminal conviction. See 4 J. Weinstein, Evidence, par. 803(22)[01], at 803–274 nn. 19 & 20 (1981).

opening the typewriter case, since attorney Jones told McKellar that he had read the documents and they appeared to relate to burglaries of IRS offices for the purpose of reviewing IRS records concerning the Church of Scientology. Petitioner lacks standing to pursue this Fourth Amendment claim. The typewriter case was found abandoned in a Sears parking lot sometime in July 1977 by a client of attorney Jones. The client saw an unidentified man leave the case containing the documents in the parking lot and, after a short while, when the person did not return to retrieve the case, the client took it and later gave it to attorney Jones. The typewriter case had no markings on it identifying it as belonging to the California Church and it appears from the record that it was not even locked. Under these facts, petitioner's objections to Exhibit FU lack merit. Abandoned property is not protected by the Fourth Amendment. *Abel v. United States*, 362 U.S. 217 (1960). Furthermore, a person who voluntarily abandons property lacks standing to complain of its search and seizure. *United States v. Kendall*, 655 F.2d 199 (9th Cir. 1981), cert. denied 455 U.S. 941 (1982); *United States v. Cella*, 568 F.2d 1266 (9th Cir. 1977); *United States v. Jackson*, 544 F.2d 407 (9th Cir. 1976).

Exhibit FX is a 19-page document dated April 5, 1972, written in the format of a Guardian Order. FBI agents seized the document from a file cabinet in petitioner's Guardian Office during a search of petitioner's offices on July 8, 1977. The FBI agents had a warrant for the search. We agree with petitioner that Exhibit FX falls outside the scope of the warrant. The search warrant enumerated 162 items to be seized. In most instances, each item described a specific document. However, item 162 was a catchall calling for the seizure of "Any and all * * * evidence * * * of the crimes of conspiracy * * * which facts recited in the accompanying affidavit make out." The reference to the "accompanying affidavit" is the affidavit of FBI Special Agent Robert Tittle. His affidavit describes, among other crimes, a conspiracy to steal documents from the IRS, but the conspiracy is limited to the years 1974 through 1976. Exhibit FX describes a plan to infiltrate the IRS and so is logically related to the conspiracy described in the Tittle affidavit. However, Exhibit FX is dated April 5, 1972, and thus predates the conspiracy described in the Tittle affidavit. We conclude that the FBI agents who

seized FX acted in excess of their authority under the warrant. *Marron v. United States*, 275 U.S. 192, 196 (1927); *United States v. Heldt*, 668 F.2d 1238, 1256–1257 (D.C. Cir. 1981) (per curiam), cert. denied sub nom. *Hubbard v. United States*, 456 U.S. 926 (1982).

This does not end the matter. In a few carefully defined circumstances, searches without a warrant do not offend the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (Justice Stewart, plurality opinion). A warrantless search is justified in exigent circumstances where evidence will most likely be destroyed in the time it takes to obtain a warrant. *Vale v. Louisiana*, 399 U.S. 30, 35 (1970). Another exception to the warrant requirement is the "plain view" exception. Under this exception, police, armed with a warrant to search a given area for specified objects, may seize an unlisted, incriminating object which inadvertently falls into plain view. *Coolidge v. New Hampshire, supra* at 465. These are the two most likely exceptions justifying the seizure of Exhibit FX. There are others, but we do not consider any of them, for however wellfounded one of these grounds may be, they are of no avail here because of respondent's failure of proof. The rule is well settled that, when evidence is presented showing that an item was seized that was not listed in the warrant, the burden is on the proponent of the evidence to prove that the seizure of the item was justified under one of the exceptions to the warrant requirement. *Vale v. Louisiana, supra* at 34; *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *McDonald v. United States*, 335 U.S. 451, 456 (1948). The seizing officer did not testify so we have no way of knowing if Exhibit FX was in plain view; nor was there convincing evidence put before us to support a finding under the requirements of *Vale v. Louisiana, supra*, that the document stood in imminent danger of destruction. We, therefore, conclude that Exhibit FX was seized in violation of the Fourth Amendment.

In *Suarez v. Commissioner*, 58 T.C. 792 (1972), we held "that as a matter of law, the protective rule of the fourth amendment which excludes evidence illegally obtained is applicable in a civil tax case." 58 T.C. at 806. In that case, we applied the rule to exclude records unlawfully seized by the Miami police in a raid on an abortion clinic. Our holding was partially overruled in *United States v. Janis*, 428 U.S. 433 (1976), which

held that the exclusionary rule did not prevent one sovereign from using in a civil proceeding evidence illegally seized by another sovereign's law enforcement officers. 428 U.S. at 459–460. What has become clear since our holding in *Suarez* is that the exclusionary rule is not a constitutional right but a judicially created remedy designed to deter unreasonable invasions of privacy by governmental officials. *United States v. Leon*, 468 U.S. ____ (1984); *United States v. Calandra*, 414 U.S. 338, 348 (1974). The rule is thus properly invoked only where its deterrent effect is likely to outweigh the societal cost of proscribing relevant evidence. *Immigration and Naturalization Service v. Lopez-Mendoza*, 468 U.S. ____ (1984); *United States v. Janis, supra* at 453–454. As a general proposition, the exclusionary rule is most efficacious where it is used to exclude evidence from a proceeding in the seizing officer's zone of primary interest. *United States v. Janis, supra* at 458. However, even in such a case, the application of the rule is not automatic. The societal cost of invoking the rule may be too great a price to pay (see *Immigration and Naturalization Service v. Lopez-Mendoza, supra*), or under the particular facts of the case, the application of the rule might be of little deterrent value. See *United States v. Leon, supra*.

The FBI was solely responsible for the seizure of Exhibit FX. The IRS had nothing to do with it. FBI agents seized the document during an authorized search of petitioner's premises on July 8, 1977. The search was made pursuant to a warrant for the purpose of gathering evidence about seven criminal conspiracies involving Scientology officials. Exhibit FX was one of some 23,000 documents seized. The rather complex history of these documents following their seizure is set out in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980). For our purposes, it suffices to say the documents were initially used in connection with criminal proceedings against 11 officials of the Church of Scientology and were kept under seal first by the California District Court and then by the District Court for the District of Columbia. Our record does not disclose when respondent first came into physical possession of Exhibit FX. However, it is clear that respondent's counsel first examined a copy of the document in Washington sometime in May 1980 during a period when the seal on the Church's records was improperly lifted by the District Court for the

District of Columbia, and the document was thus available to the general public for inspection.[81] Sometime thereafter, Exhibit FX was forwarded to respondent's counsel in Los Angeles.

Under these facts, the attenuation between the FBI's initial seizure of Exhibit FX and its subsequent use by the IRS in this proceeding is so great that we perceive no meaningful deterrent effect to be achieved by excluding the document from evidence. On the other hand, Exhibit FX is a highly relevant document. It shows that during the docketed years petitioner was developing plans to prevent the IRS from investigating Scientology churches. It is, therefore, a significant building block in respondent's public policy case against petitioner. We, therefore, hold that the exclusionary rule does not preclude the receipt of Exhibit FX into evidence.

## VIII.

For the reasons we have stated, in part IV of this opinion, we agree with respondent's determinations in the notice of deficiency, except his inclusion in petitioner's income of payments of $76,497.24 in 1970 and $161,018.38 in 1972 from the United Kingdom Church. In light of our finding that the United Kingdom Church is a branch of petitioner, these payments represent an internal transfer of funds. They, therefore, are not properly included in petitioner's income. Respondent concedes this point.

On brief respondent, for the first time, asks us to offset this downward adjustment to the deficiency notice with income from the United Kingdom Church. We decline to do so. In its preliminary ruling and its final ruling, this Court said it would entertain evidence concerning the United Kingdom Church's activities under one of three theories of relevance: to prove the Church operated commercially, to prove it benefited private interests, or to prove it violated public policy. During the trial, respondent repeatedly disavowed any intent to increase the notice of deficiency by reason of the United Kingdom Church's

---

[81] The seal on Exhibit FX was lifted by the District Court for the District of Columbia by orders dated Oct. 25, 1979, and Oct. 30, 1980. It was reimposed by order of the District Court dated Nov. 5, 1980, on remand from the U.S. Court of Appeals for the District of Columbia. *United States v. Hubbard*, 650 F.2d 293, 295 n. 1, 332–333 (D.C. Cir. 1980).

activities. He made this disavowal knowing that, if he proved his claim that the United Kingdom Church was a branch of petitioner, the notice of deficiency would be in error and a Rule 155 hearing would be required to recompute the deficiency. Nevertheless, during the course of the trial, respondent repeatedly disavowed any intent to increase the notice of deficiency by reason of the United Kingdom Church's income. Now, for the first time on brief, respondent seeks to shore up the faulty notice of deficiency with income from the United Kingdom Church's accounts.

We need not delve into the thorny question whether increasing and shoring up the notice of deficiency are legal equivalents. There may well be circumstances where the distinction is meritorious. However, here we must treat respondent's disavowal of intent to increase the notice of deficiency as inclusive of his intent not to shore up the notice of deficiency with income from the United Kingdom Church's accounts. We interpret respondent's disavowal expansively since he made it with full realization that his claim that the United Kingdom Church was a branch of petitioner would cause the notice of deficiency to be in error and would necessitate a Rule 155 hearing. Respondent now seeks to get out from under this requirement. Respondent's concession in open court not to seek an increase in the notice of deficiency was the equivalent of a stipulation. *Massachusetts Ave. Heights Citizens Assoc. v. Embassy Corp.*, 433 F.2d 513, 515 (D.C. Cir. 1970) (per curiam). Respondent is bound by his stipulations. *Kampel v. Commissioner*, 634 F.2d 708, 710 n. 3 (2d Cir. 1980); *United States v. 237,500 Acres of Land*, 236 F. Supp. 44, 46 (S.D. Cal. 1964), affd. sub nom. *United States v. American Pumice Co.*, 404 F.2d 336 (9th Cir. 1968).

Respondent also asks this Court to shore up the notice of deficiency with OTC's income. This is a new theory advanced for the first time on brief. Respondent is well aware of the lateness of this theory but nevertheless urges this Court to adopt it under the authority of *Wilkes-Barre Carriage Co. v. Commissioner*, 39 T.C. 839 (1963), affd. per curiam 332 F.2d 421 (2d Cir. 1964), which held that "a deficiency may be approved on the basis of reasons other than those relied upon by the Commissioner." 39 T.C. at 845.

It is too late in the day for respondent to raise this issue. Respondent knew well before trial that OTC was a sham corporation but did nothing to adjust the notice of deficiency to include this source of unreported income.[82] While OTC was clearly a sham and had substantial reserves in its bank accounts, petitioner has had no opportunity to prove that these reserves were not income. Petitioner cannot be expected to shoulder its burden if it does not know under which Code provision the Commissioner has proceeded and "if it does not know which transactions or group of transactions the Commissioner has determined to have resulted in distortions of true net income." *Commissioner v. Chelsea Products*, 197 F.2d 620, 624 (3d Cir. 1952).

The case of *Wilkes-Barre Carriage Co. v. Commissioner*, *supra*, on which respondent relies, is inapposite. In that case, unlike the case at bar, the taxpayer was aware at the outset which particular transactions were disputed by the Commissioner. The rule laid down simply allowed the Commissioner to put forward a new legal theory in support of deficiencies arising from well-defined transactions. In other words, the very same source of income was supported under a different theory. Here, however, respondent attempts to support his determination not only with a new legal theory but also from an entirely different source of income. Respondent is too late. See *Brook v. Commissioner*, 360 F.2d 1011, 1013 (2d Cir. 1966).[83]

Respondent determined an addition to tax under section 6651(a) for failure to file a corporate income tax return (Form 1120). Section 6651(a) provides a mandatory 5 percent per month addition on the amount of tax owed not to exceed 25 percent for failure to file a required return unless it is shown that the failure to file "is due to reasonable cause and not

---

[82]In his trial memorandum filed Oct. 3, 1980, respondent stated that petitioner's net earnings inured to the benefit of L. Ron Hubbard through "the diversion of large sums from petitioner to Hubbard utilizing sham entities known as O.T.C. and O.T.S. which were completely controlled and dominated by Hubbard." Respondent also said he would put on witnesses to show "petitioner * * * [and] entities known as 'O.T.C.' and 'O.T.S.' constitute, in substance, a single organization under Hubbard's absolute and total control." Respondent's trial memorandum filed Oct. 3, 1980, at 6, 47.

[83]In some cases, even the Commissioner's attempt to raise a new legal theory comes so late in the day that it cannot be heard because of its prejudicial impact on petitioner. *United States v. First Security Bank*, 334 F.2d 120, 122 (9th Cir. 1964); *Riss v. Commissioner*, 56 T.C. 388, 400–401 (1971), affd. sub nom. *Commissioner v. Transport Manufacturing & Equipment Co.*, 478 F.2d 731 (8th Cir. 1973). See also cases collected *supra* at 472.

* * * willful neglect." The burden of proof is on the taxpayer to show reasonable cause for failing to file a required return. *Funk v. Commissioner*, 687 F.2d 264 (8th Cir. 1982). Generally, the taxpayer must file his return on the proper form to satisfy this filing requirement. *Parker v. Commissioner*, 365 F.2d 792, 800 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967); *Olean Times Publishing Co. v. Commissioner*, 42 B.T.A. 1277, 1279 (1940).

On July 18, 1967, respondent revoked petitioner's tax exemption and instructed petitioner it was thereafter required to file a Federal income tax return, in petitioner's case, Form 1120. Petitioner ignored this instruction and continued to file its returns on Forms 990 "Return of Organization Exempt From Income Tax." Petitioner claims that it was justified in continuing to file its returns on Forms 990, since the revocation of exemption was null and void. We hold in part II of this opinion that the revocation was valid and effective. Petitioner's unilateral doubts about its effectiveness are not "reasonable cause" for its failure to file a proper return.

*Decision will be entered under Rule 155.*